**Andrew M. Calamari**
**Sanjay Wadhwa**
**Thomas P. Smith, Jr.**
**David Stoelting**
**Kristin M. Pauley**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**Phone: (212) 336-0174 (Stoelting)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**GREGORY T. DEAN and DONALD J. FOWLER,**<br><br>**Defendants.** | **17-CV-139 (GHW)**<br><br>**Jury Trial Demanded** |

## AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its amended complaint against defendants Gregory T. Dean ("Dean") and Donald J. Fowler ("Fowler," and, together with Dean, "Defendants"), alleges as follows:

## SUMMARY

1. While acting as registered representatives at J.D. Nicholas & Associates, Inc. ("J.D. Nicholas"), a now-defunct broker-dealer based in Syosset, NY, Dean and Fowler violated the antifraud provisions of the federal securities laws. As securities brokers, Dean and Fowler had a duty to make sure that they had a reasonable basis for any investment strategy they

recommended to customers. Dean and Fowler, however, recommended a trading strategy to 27 customers without any reasonable basis to believe that the strategy was suitable for anyone. Their investment strategy was not complex: purchase a security, sell it about 9 days later, and charge the customer commissions and other fees. However, they knew or recklessly disregarded that the strategy they knowingly recommended – a high-cost strategy of excessive in-and-out trading – was bound to lose money and was not suitable for their customers.

2. In addition, Dean and Fowler engaged in churning with regard to at least 3 of the 27 customer accounts. The trading in these accounts was excessive; Dean and Fowler exercised *de facto* control over the trading in the accounts; and they acted with intent to defraud or with willful and reckless disregard for the customers' interests.

3. Through these violations, Dean and Fowler received approximately $800,000, which they split between them. Their 27 customers, however, many of whom were investors of modest means, ended up with substantial losses in excess of $1.3 million.

## VIOLATIONS

4. By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Section 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (2) and (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5. Unless the Defendants, who continue to be employed as registered representatives associated with a broker-dealer, are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this amended complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (1) restraining and permanently enjoining each of the Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering each of the Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; and (c) imposing civil money penalties on each of the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The Defendants, either directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

8. Venue lies in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this amended complaint occurred within the Southern District of New York, including trades on exchanges based in the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities

exchange.

## DEFENDANTS

9. **Dean**, age 36, is a resident of Seaford, NY.

10. **Fowler**, age 31, is a resident of Massapequa, NY.

11. Dean and Fowler were employed by J.D. Nicholas from January 2007 through November 2014. Dean and Fowler hold Series 7, 24 and 63 licenses. Dean also holds a Series 6 license.

12. Both Dean and Fowler have disciplinary histories. Ten of Dean's customers filed Financial Industry Regulatory Authority (FINRA) arbitrations or complaints against him. Four arbitrations are pending and six claims were settled through payments to the customers.

13. Ten of Fowler's customers filed FINRA arbitrations or complaints against him. Except for two arbitrations, which are pending, the arbitrations and complaints were settled through payments to the customers.

## RELATED ENTITY

14. **J.D. Nicholas** – known until January 2011 as A&F Financial Securities Inc. – was incorporated under Florida law in 1997, and maintained its offices in Syosset, NY. It was registered with the Commission as a broker-dealer from December 1997 through July 2015.

15. In 2010, 2011 and 2015, J.D. Nicholas entered into three Letters of Acceptance, Waiver and Consent (AWC) with FINRA. In the 2010 AWC, FINRA found, among other things, that J.D. Nicholas failed to implement its supervisory procedures regarding excessive trading and churning. The 2011 AWC found that J.D. Nicholas "improperly and inaccurately" described a per-transaction $65 customer charge as a "handling fee" when this fee "was effectively the same as a commission to the firm." And the 2015 AWC made findings critical of

J.D. Nicholas's telemarketing activities. FINRA also imposed fines of $27,500 (2010), $125,500 (2011), and $35,000 (2015), and censures.

16. J.D. Nicholas entered into consent orders with state regulators in Connecticut (2011), Arkansas (2013) and New Hampshire (2013 and 2015). Similar to the FINRA AWCs, these consent orders made findings critical of J.D. Nicholas's imposition of a "per transaction fee" and its telemarketing practices, and imposed fines of $20,000 (CT), $17,500 (AK), $40,000 and $10,000 (NH).

**FACTS**

17. Dean and Fowler owed a duty to their customers to have a reasonable basis for any investment strategy they recommended. This meant that, at a minimum, they needed to understand whether the costs associated with the strategy – repeated short-term buying and selling of securities – would outstrip any potential gains. Dean and Fowler, however, did almost no due diligence on their strategy apart from superficial monitoring of business news. As a result, they had no basis to believe that the strategy was suitable for any customer, regardless of age, experience, investment objective or risk tolerance.

18. Dean and Fowler intentionally used the same basic strategy in the 27 customer accounts: the purchase of a stock followed by the sale of that stock within an average of 9 days, with the customer paying transaction-based commissions and fees. This pattern of buys followed by sales repeated itself over and over in the customers' accounts. Defendants knew or recklessly disregarded the fact that, given its extremely high costs, their strategy would not outperform the market, as they told investors. The inevitable result was that Dean and Fowler received exorbitant commissions at their customers' expense.

**Dean and Fowler Operated as Partners**

19. Although Dean and Fowler for the most part serviced different customers, they considered themselves partners in all respects. Their customers' accounts were assigned the same "rep codes," internal tracking numbers used at J.D. Nicholas to attribute customers to brokers.

20. Dean and Fowler split all commission revenue 50/50. As a result, Dean received half of the commissions that were paid by Fowler's customers, and Fowler received half of the commissions from Dean's customers. Dean and Fowler created a limited liability company, Outermost Intuition LLC, for the purpose of paying expenses incurred by their brokerage business, discussed and shared investment ideas, sat at adjoining desks, and answered each other's telephones.

21. Dean solicited, determined the strategy for, and recommended trades to 12 customers, identified in the Attachment as customers 8, 10-12, 14, 16-18, 20, 22-23, and 26.

22. Fowler solicited, determined the strategy for, and recommended trades to 11 customers, identified in the Attachments as customers 1, 4-7, 9, 19, 21, 24-25, 27.

23. Dean and/or Fowler solicited, determined the strategy for, and recommended trades to customers 2-3, 13, and 15.

**Finding Customers and Opening New Accounts**

24. Dean and Fowler obtained leads from telemarketing databases generated by marketing companies and cold-called potential customers across the country.

25. During their initial calls, Dean and Fowler told the customers that they used a short-term investment strategy; they were experienced and savvy stock pickers; and their strategy would outperform the market. Dean and Fowler made little or no mention of fees and costs, and

the customers believed that any risk arising from Dean's and Fowler's strategy would be more than offset by the possibility of a significant profit. In fact, Dean's and Fowler's strategy, with its substantial cost component, was virtually certain to end with customer losses.

26. The customers received new account forms pre-filled by J.D. Nicholas personnel to show that the customers' investment goal was "speculation" and time horizon was "short term – less than 1 yr." J.D. Nicholas highlighted the portions of the form where the customers needed to sign and any biographical information that had not yet been obtained. Dean and Fowler instructed the customers to simply sign and return the forms to J.D. Nicholas.

27. Dean and Fowler also made sure that the customers signed margin agreements, which allowed Dean and Fowler to make stock purchases with borrowed money. In addition to increasing the purchasing power, the use of margin increased the risk to the customers because of the increased leverage.

28. Dean and Fowler placed only a few trades in the first weeks or months that the accounts were open. After this initial period, Dean and Fowler began rapid buying and selling, which continued in each account until the customer closed the account, usually within two years.

29. As the 27 customer accounts were non-discretionary, Dean and Fowler were required to obtain authorization from the customer before any purchase or sale. A comparison of J.D. Nicholas's telephone and trading records, however, indicates that Dean and Fowler frequently placed trades without the customer's authorization, including, for example, in the accounts of customers 2, 5-8, 18, 22, and 27. Selected examples of unauthorized trades placed in these accounts include the following:

a. Dean or Fowler placed 105 trades in nearly two dozen different securities in customer 2's account from February 14 to March 7, 2013, a time during

which J.D. Nicholas's telephone records reflect one call with customer 2 on February 13, 2013, which lasted only 17 seconds.

b. Fowler placed six trades in three different securities in customer 5's account from July to September, 2012, a time during which J.D. Nicholas's telephone records reflect no calls with customer 5.

c. Fowler placed 25 trades in 15 different securities in customer 6's account from January to mid-February 2014, a time during which J.D. Nicholas's telephone records reflect no calls with customer 6.

d. Fowler placed 163 trades in more than two dozen different securities in customer 7's account from February 20 to April 8, 2014, a time during which J.D. Nicholas's telephone records reflect one call with customer 7 on February 20, 2014, which lasted three minutes, and one call with customer 7 on March 31, 2014, which lasted 17 minutes.

e. Dean placed 77 trades in dozens of different securities in customer 8's account from October 17, 2012 to April 16, 2013, a time during which J.D. Nicholas's telephone records reflect no calls with customer 8.

f. Dean placed 57 trades in more than one dozen different securities in customer 18's account from August 2012 to September 2013, a time during which J.D. Nicholas's telephone records reflect no calls with customer 18.

g. Dean placed 17 trades in seven different securities in customer 22's account from August to October 2012, a time during which J.D. Nicholas's telephone records reflect no calls with customer 22.

h. Fowler placed 160 trades in more than three dozen different securities in customer 27's account from July 2013 to November 2014, a time during which J.D. Nicholas's telephone records reflect only one telephone call with customer 27, which lasted four minutes.

**The Significant Cost Structure of the Strategy**

30. The primary customer expense was a per-trade fee of up to 3½% of the amount of the purchase or sale. Dean or Fowler decided the amount of the commissions. These fees, which were charged on both purchases and sales, are considered "commissions" when the firm acts as agent on the trade and "markups" or "markdowns" when the firm acts as a principal.

31. As Dean and Fowler knew, customers were also charged a mandatory "firm commission" of $65 per trade (before November 1, 2011) or $49.95 per trade (after November 1, 2011).

32. Another cost to the customer was margin interest which accrued for purchases made on margin.

33. Dean and Fowler knew or were reckless in not knowing that these costs that their customers were made to pay, including commissions, markups, markdowns, "firm commissions," and margin interest, would likely exceed any valuation gains attributable to the securities in customer accounts during the short period between the purchase and the sale.

**Dean and Fowler Had No Reasonable Basis for their Strategy**

34. Dean and Fowler pursued their high-cost, in-and-out trading strategy without having a reasonable basis for believing that this strategy was suitable for anyone. Since the customers incurred costs with every transaction, making a profit depended upon the price of the security increasing during the brief period the security was held in the customer accounts. The

increase in price had to exceed the combined purchase/sale costs for even a minimal profit to be realized.

35. The uniform trading strategy followed by Dean and Fowler in the 27 customer accounts, as summarized in the Attachment, shows that the impact of the costs that arose from the excessive trading doomed any possibility of even a minimal profit. Dean and Fowler knew, or were reckless in not knowing, that repeated short-term buying and selling of securities was not suitable for their customers because the transaction costs, which were determined by Dean and Fowler, would almost certainly outstrip any potential gains in the accounts.

36. Dean and Fowler purportedly relied on general interest news publications, investment periodicals, and the internet to generate trade recommendations. These resources, however, provided information on issuers and market conditions rather than the probability of generating returns from a high-cost, in-and-out trading strategy.

37. Dean and Fowler knew that generating even a minimal profit from their trading strategy depended on price increases of the stocks greater than the commissions and fees that they were charging the customers. Since the stocks were only held for an average of 9 days before being sold, any price increases were almost always negated by the accompanying costs. Frequently, moreover, the stocks declined in value during the brief holding period. These buy-high, sell-low trades of Dean and Fowler occurred repeatedly in all 27 customer accounts.

38. The real risk to the 27 customers arose not from poor stock picks or market conditions but from the strategy that was knowingly recommended and implemented by Dean and Fowler. Instead of performing due diligence on their high-cost, in-and-out trading strategy, Dean and Fowler did almost nothing to determine whether their own strategy, with its substantial cost component, could ever realize even a minimal profit.

**The Trading Was Excessive and the Costs Were Enormous**

39. Turnover and cost-to-equity ratios are used to evaluate activity in brokerage accounts. Turnover is the number of times per year a customer's securities are replaced by new securities. The cost-to-equity ratio, also referred to as the break-even ratio, measures the amount an account has to appreciate annually just to cover commissions and other expenses.

40. A turnover of 6, or a cost-to-equity ratio in excess of 20%, is considered to be indicative of excessive trading.

41. The Attachment lists the turnover, cost-to-equity ratios, and other data regarding the 27 customer accounts. The turnover numbers are extremely high, ranging from 20.73 to 451.92, with rates for 9 accounts exceeding 100. The average turnover for the 27 customer accounts was 105.00.

42. All but four of the accounts had cost-to-equity ratios in excess of 100%, with a couple over 200% and one at 463.65%. The average annualized cost-to-equity ratio for these accounts was 110.90%, meaning that the customers, on average, had to realize 110.90% in profits just to break even.

43. Dean and Fowler, on average, held each investment for only 9 days.

44. The customers paid high amounts in commissions and fees – an average of $37,039 in commissions and fees, which exceeded the average equity in the accounts of $26,289. Despite the low average equity, Dean and Fowler made an average of $3.5 million in purchases in each account. The total costs to all the accounts ($1,000,044) exceeded the total average equity for the 27 customer accounts ($709,815).

45. All 27 accounts ended up with substantial losses totaling $1,374,202.

46. Of the $1,000,044 in total costs incurred by the 27 customer accounts, Dean and

Fowler received approximately $800,000.

**Dean and Fowler Also Churned Three Customers' Accounts**

47. Dean churned the account of Customer 10, age 60, a resident of North Carolina, who retired from the Army in 1995 after 21 years of service. Fowler churned the accounts of two customers: Customer 5, age 74, a retiree in Pennsylvania, and Customer 24, age 70, who lives in Texas, and is retired from his career as an aerospace engineer when he became disabled nearly 30 years ago.

48. Dean and Fowler churned the accounts of Customers 5, 10, and 24 by engaging in excessive trading in disregard of their customers' trading objectives and risk tolerance for the purpose of generating commissions.

49. Dean made the decisions concerning the investments and the strategy and exercised *de facto* control over Customer 10's account. Customer 10 relied on Dean to make investment recommendations, never researching or rejecting any of Dean's recommendations. Customer 10 was an inexperienced investor. He had two accounts with other full-service brokerage firms at the time. Both accounts had small balances and minimal trading in equity and fixed income securities, as well as money market funds. Neither account used an in-and-out trading strategy. Dean also executed trades in Customer 10's account without prior approval.

50. Fowler made the decisions concerning the investments and strategy and exercised *de facto* control over the accounts of Customers 5 and 24. Customers 5 and 24 relied on Fowler to make investment recommendations, never making any of their own. Customers 5 and 24 did not ask Fowler to explain any of his recommendations or to furnish any of his research or analysis. The majority of Customer 5's savings was invested conservatively in mutual funds selected for him by a financial advisor. Customer 24 also relied on brokers to make investment

decisions for his other brokerage accounts.

51. The turnover in Customer 10's account was 52.89, and the cost-to-equity ratio was 150.48%. Although the average equity in Customer 10's account was only $11,361, Dean made a total of $701,323 in purchases, and each investment was held for an average of 10.8 days.

52. The turnover ratio in Customer 5's account was 20.73, and the cost-to-equity ratio was 67.51%. Although the average equity in Customer 5's account was only $34,452, Fowler made a total of $833,646 in purchases, and each investment was held for an average of 25.6 days.

53. The turnover ratio in Customer 24's account was 43.50, and the cost-to-equity ratio was 90.88%. The average equity in Customer 24's account was only $54,739, but Fowler made a total of $1,709,242 in purchases, and each investment was held for an average of 10.9 days.

54. Dean and Fowler knew, or were reckless in not knowing, that the repeated short-term buying and selling of securities was not in the best interests of Customers 5, 10, and 24 because the commissions and fees would exceed any potential gains in the accounts. Dean's and Fowler's scienter is further demonstrated by the fact that their churning earned them each substantial financial gain. Dean and Fowler received a total of approximately $67,000 in ill-gotten gains in connection with these three customer accounts, while Customers 5, 10, and 24 suffered aggregate losses of $105,400, largely depleting their accounts.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a)(1), (2) and (3) of the Securities Act**
**(Both Defendants)**

55. The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 54, as if fully set forth herein.

56. The Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

57. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

**SECOND CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Both Defendants)**

58. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54, as if fully set forth herein.

59. The Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon other persons.

60. By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently enjoining each of the Defendants from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this amended complaint.

**II.**

Ordering each of the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts, jointly and severally.

**III.**

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, New York
April 21, 2017

Respectfully submitted,

By: ______________________________

Andrew M. Calamari
Sanjay Wadhwa
Thomas P. Smith, Jr.
David Stoelting
Kristin M. Pauley
*Attorneys for Plaintiff*
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
Tel: (212) 336-0174 (Stoelting)

**Attachment to Amended Complaint filed April 21, 2017**
***SEC v. Gregory T. Dean and Donald J. Fowler*, 17-cv-139-GHW (S.D.N.Y.)**

| Customer | Annualized Cost-to-Equity Ratio | Annualized Turnover | Average Equity[1] | Total Purchases | Total Costs to Customer[2] | Total Loss | Weighted Days Held[3] | Account Period |
|---|---|---|---|---|---|---|---|---|
| 1 | 463.65% | 354.98 | $4,927 | $1,303,355 | $17,023 | ($32,994) | 2.0 | 6/1/14 - 2/28/15 |
| 2 | 98.55% | 156.41 | $256,407 | $39,995,011 | $252,003 | ($474,958) | 3.7 | 5/1/12 - 4/30/13 |
| 3 | 105.20% | 65.73 | $21,366 | $2,924,378 | $46,800 | ($28,840) | 12.3 | 8/1/12 - 8/31/14 |
| 4 | 158.85% | 79.54 | $5,866 | $578,743 | $11,565 | ($18,516) | 4.7 | 2/1/13 - 4/30/14 |
| 5 | 67.51% | 20.73 | $34,452 | $833,646 | $27,147 | ($38,745) | 25.6 | 9/1/11 - 10/31/12 |
| 6 | 137.60% | 92.35 | $14,817 | $1,925,589 | $28,710 | ($22,835) | 6.9 | 2/1/13 - 6/30/14 |
| 7 | 173.08% | 451.92 | $17,798 | $8,698,471 | $33,338 | ($60,573) | 1.0 | 1/1/14 - 1/31/15 |
| 8 | 125.30% | 80.85 | $24,040 | $2,751,243 | $42,665 | ($70,420) | 7.6 | 5/1/12 - 9/30/13 |
| 9 | 184.54% | 131.71 | $14,932 | $1,476,392 | $20,685 | ($15,222) | 5.2 | 3/1/13 - 11/30/13 |
| 10 | 150.48% | 52.89 | $11,361 | $701,323 | $19,954 | ($41,115) | 10.8 | 3/1/11 - 4/30/12 |
| 11 | 147.11% | 145.99 | $49,352 | $11,401,829 | $114,970 | ($40,498) | 5.0 | 5/1/13 - 11/30/14 |
| 12 | 125.05% | 46.66 | $14,882 | $462,297 | $12,389 | ($36,243) | 14.7 | 12/1/11 - 7/31/12 |
| 13 | 147.48% | 176.25 | $16,368 | $1,446,372 | $12,103 | ($22,709) | 4.6 | 7/1/13 - 12/31/13 |
| 14 | 252.15% | 192.20 | $20,240 | $4,206,924 | $55,229 | ($84,320) | 2.9 | 10/1/12 - 10/31/13 |
| 15 | 159.94% | 68.10 | $11,674 | $1,056,375 | $24,810 | ($69,708) | 7.5 | 1/1/12 - 4/30/13 |
| 16 | 163.91% | 83.93 | $8,667 | $1,452,902 | $28,373 | ($5,039) | 6.8 | 3/1/12 - 2/28/14 |
| 17 | 103.81% | 33.43 | $13,353 | $482,767 | $15,001 | ($5,777) | 17.6 | 1/1/13 - 1/31/14 |
| 18 | 71.01% | 38.35 | $25,722 | $1,397,053 | $25,871 | ($51,641) | 18.6 | 5/1/12 - 9/30/13 |

[1] "Average Equity" is an average of the net portfolio value amounts listed in the monthly account statements received by the customers.
[2] "Total Costs" includes commissions, markups, markdowns, margin interest, the firm commission, and other account fees.
[3] Weighted for investment size.

**Attachment to Amended Complaint filed April 21, 2017**
***SEC v. Gregory T. Dean and Donald J. Fowler*, 17-cv-139-GHW (S.D.N.Y.)**

| Customer | Annualized Cost-to-Equity Ratio | Annualized Turnover | Average Equity[1] | Total Purchases | Total Costs to Customer[2] | Total Loss | Weighted Days Held[3] | Account Period |
|---|---|---|---|---|---|---|---|---|
| 19 | 220.56% | 134.47 | $7,830 | $963,474 | $15,803 | ($18,881) | 2.7 | 10/1/12 - 8/31/13 |
| 20 | 155.14% | 82.80 | $15,628 | $754,836 | $16,142 | ($49,192) | 8.5 | 10/1/11 - 5/31/12 |
| 21 | 114.77% | 131.20 | $12,448 | $2,170,174 | $18,984 | ($19,396) | 3.4 | 12/1/12 - 3/31/14 |
| 22 | 100.97% | 24.27 | $6,115 | $272,627 | $11,351 | ($8,641) | 17.3 | 3/1/11 - 12/31/12 |
| 23 | 100.46% | 39.09 | $13,958 | $727,955 | $18,708 | ($8,148) | 17.6 | 10/1/12 - 1/31/14 |
| 24 | 90.88% | 43.50 | $54,739 | $1,709,242 | $37,479 | ($25,541) | 10.9 | 5/1/11 - 1/31/12 |
| 25 | 193.51% | 98.97 | $12,115 | $1,800,143 | $35,197 | ($49,608) | 7.5 | 3/1/12 - 8/31/13 |
| 26 | 176.83% | 58.13 | $3,664 | $408,131 | $12,425 | ($1,637) | 10.1 | 12/1/11 - 10/31/13 |
| 27 | 113.71% | 69.93 | $17,094 | $2,786,866 | $45,320 | ($73,005) | 7.5 | 9/1/12 - 12/31/14 |
| **Totals:** | | | **$709,815** | **$94,688,119** | **$1,000,044** | **($1,374,202)** | | |
| **Averages:** | **110.90%** | **105.00** | **$26,289** | **$3,506,967** | **$37,039** | **($50,896)** | **9.0** | |