**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____ )
Securities and Exchange Commission,   )
                                                          )
                        Plaintiff,            )
                                                          )          Case No. 17-cv-139-GHW
            v.                                  )          Hon. Gregory H. Woods
                                                          )
Gregory T. Dean and Donald J. Fowler,   )
                                                          )
                        Defendants.       )
_____)


## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Dated: February 9, 2018
        New York, NY

                                                Respectfully submitted,

                                                McCORMICK & O'BRIEN, LLP


                                                By: _____/s/_____

                                                        Liam O'Brien, Esq.

                                                9 East 40th Street, Fourth Floor
                                                New York, New York 10016
                                                Tel: (212) 286-4471
                                                Email: LOBrien@MCOBlaw.com

                                                *Attorneys for Defendants*
                                                *Gregory T. Dean and*
                                                *Donald J. Fowler*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF THE FACTS ............................................................................... 1

ARGUMENT ............................................................................................................ 1

I.   Standard for Summary Judgment ...................................................................... 1

II.  Defendants are entitled to summary judgment on Plaintiff's §10b and Rule 10b-5(b) claim,

     and Plaintiff's §17(a)(2) claim. ....................................................................... 2

     A.   Defendants made no material misrepresentations. ..................................... 3

     B.   Defendants lacked the requisite scienter. ................................................. 19

III. Defendants are entitled to Summary judgment on claim 1 : Violation of Section

     17(a)(2) of the Securities Act ……………………………………………………24

     CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

15 U.S.C. §77q(a)(2)......................................................................................................... 3

17 C.F.R. 240.10b-5(b) ("Rule 10b-5(b)"). ..................................................................... 2

1979 U.S. Dist. LEXIS 14635, at *10-11 (S.D.N.Y. Feb. 5, 1979)................................. 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). .......................................... 2

*Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) ..................................................... 4

*Blashka v. Greenway Capital Corp.*, 1995 U.S. Dist. LEXIS 15195 at *18,
    (S.D.N.Y. Oct. 16, 1995).......................................................................................... 6

*Bogart v. Shearson Lehman Bros.*, 1995 U.S. Dist. LEXIS 1291 (S.D.N.Y. Feb. 6, 1995).......... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). ................................................. 1, 2

*Chill v. GE,* 101 F.3d 263, 1996 U.S. App. LEXIS 30830, Fed. Sec. L. Rep. (CCH)
    P99,353, 36 Fed. R. Serv. 3d (Callaghan) 437.......................................................... 24

*Cohen v. Stevanovich*, 722 F. Supp. 416, 2010 U.S. Dist. LEXIS 66010, Fed. Sec. L. Rep.
    (CCH) P95,791 .................................................................................................... 22, 23

*de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) .............................. 7

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) .......................................... 20

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187,
    2009 U.S. App. LEXIS 972, Fed. Sec. L. Rep. (CCH) P95,263)..................................23

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 2008 U.S. Dist. LEXIS
    25917.................................................................................................................................22

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195, 2003 U.S. App.
    LEXIS 18274, Fed. Sec. L. Rep. (CCH) P92,497....................................................... 5

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).............................................. 20

*Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F. Supp. 521, 1990 U.S. Dist.
    LEXIS 609, Fed. Sec. L. Rep. (CCH) P94,902............................................................ 22

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000).........................................23

*Grey v. Gruntal & Co.*, 1987 U.S. Dist. LEXIS 4031, Fed. Sec. L. Rep. (CCH) P93,262
    (S.D.N.Y. May 21, 1987) ........................................................................................ 6

*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 2008 U.S. Dist. LEXIS 103354,
    Fed. Sec. L. Rep. (CCH) P95,026 .......................................................................... 22

*Hirsch v. DuPont*, 553 F.2d 750, 763 (2nd Cir. 1977))...............................................5

*Hunt, IRA v. Alliance North American Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir.
    1998).................................................................................................................................7

*In re Baesa Secs. Litig.*, 969 F. Supp. 238, 241 (S.D.N.Y. 1997) .............................. 20

*In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476-77 (M.D.N.C. 2004).....................23

*In re Indep. Engergy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 765............................ 23, 24

ii

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003)........................................................................................................................ 21

*In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005)........................................ 6

*In re UBS Ag Sec. Litig.*, 2012 U.S. Dist. LEXIS 141449, Fed. Sec. L. Rep. (CCH) P97,037, 2012 WL 4471265.............................................................................................................23

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013)................................................... 4

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1321, (2011)...............................................4

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). .................... 1

*Melder v. Morris*, 27 F.3d 1097, 1994 U.S. App. LEXIS 20448, Fed. Sec. L. Rep. (CCH) P98, 350, 30 Fed. R. Serv. 3d (Callaghan) 405 ........................................................................ 22

*Musab Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 2014 U.S. Dist. LEXIS 44481, Fed. Sec. L. Rep. (CCH) P97, 912, 2014 WL 1289251 (D. Conn. Mar. 31, 2014). .............. 4, 6

*Nick's Garage, Inc. v. Nationwide Mut. Ins. Co.*, 2015 U.S. Dist.101 F. Supp. 3d 185 .............. 2

*Pollack v. Laidlaw Holdings, Inc.*, 1995 U.S. Dist. LEXIS 5909, Fed. Sec. L. Rep. (CCH) P98, 741.......................................................................................................................... 5

*Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 2001 U.S. Dist. LEXIS 944, 56 Fed. R. Serv. 3d (Callaghan) 436, 43 U.C.C. Rep. Serv. 2d (Callaghan) 1282 (S.D.N.Y. Feb. 5, 2001)........................................................................................................................ 6

*Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 2008 U.S. App. LEXIS 14662, 44 Employee Benefits Cas. (BNA) 1470. .......................................................................................... 23

*Republic Tech. Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 545, 551 (2d Cir. 1973)....................... 3

*Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)................................................................. 20

*SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014). ................................................................. 25

*SEC v. Kelly*, 765 F. Supp. 2d 301, 2011 U.S. Dist. LEXIS 3290 (S.D.N.Y). ........................... 24

*SEC v. Lek Secs. Corp.*, 2017 U.S. Dist. LEXIS 137364, Fed. Sec. L. Rep. (CCH) P99, 856 (S.D.N.Y. Aug. 25, 2017). .....................................................................................24-25

*S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).............................................................24

*SEC v. Tee to Green Golf Parks, Inc.*, 2011 U.S. Dist. LEXIS 4388, at *10-11 (W.D.N.Y. Jan. 18, 2011)............................................................................................................................ 2

*Sec. Exch. Comm'n v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992).................... 3

*Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 129 (2d Cir. 2000)................................................. 3

*South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 2009 U.S. App. LEXIS 15467, Fed. Sec. L. Rep. (CCH) P96,000 (2d Cir. N.Y. July 14, 2009).............................................. 24

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, Inc., 531 F.3d 190, 2008 U.S. App. LEXIS 13449, Fed. Sec. L. Rep. (CCH) P94,763)...........................................22

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448, 2010 U.S. Dist. LEXIS 84881 (S.D.N.Y. Aug. 16, 2010) ................................................................. 5

*Thuman v. Dembski*, 2017 U.S. Dist. LEXIS 49685, at *15-16 (W.D.N.Y. March 29, 2017)....... 5

*U.S. S.E.C. v. Czarnik*, 2010 U.S. Dist. LEXIS 125463, at *3 (S.D.N.Y. Nov. 29, 2010)............ 3

*Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 2011 U.S. Dist. LEXIS 36129, Fed. Sec. L. Rep. (CCH) P96,294. ............................................................................... 24

*Walker v. Carter*, 210 F. Supp. 3d 487, 502 (S.D.N.Y. Sept. 26, 2016). ...................................... 2

*Wiener v. Oppenheimer*, 1979 U.S. Dist. LEXIS 14635 ............................................................ 5-6

*Wyatt v. Inner City Broad. Corp.*, 2011 U.S. Dist. LEXIS 110979 ................................................ 3

*Zerman v. Ball*, 735 F. 2d 15 (2d Cir. 1985) ...................................................................................... 6

## PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Gregory T. Dean and Donald J. Fowler, (collectively, "Defendants") respectfully submit this Memorandum of Law in support of its motion for summary judgment dismissing Plaintiff's claims alleging violations of (1) §17(a) of the Securities Act of 1933 ("Securities Act") and (2) §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b).

As there are no facts upon which a reasonable jury could conclude that Defendants made a material misrepresentation or omission in connection with the sale of any security, summary judgment should be entered dismissing Plaintiff's 10b-5(b) and §17b(2) claims against Defendants. Defendants also request any other relief as this Court deems just and proper.

## STATEMENT OF THE FACTS

In the interest of brevity, the Court is respectfully referred to Defendants' Statement of Undisputed Facts, and Affirmation of Liam O'Brien, Esq. and attached exhibits.

## ARGUMENT

### I.   Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) states that courts shall grant summary judgment when it appears that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. The moving party has the initial burden of informing the district court of the basis for its motion and identifying the matter it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party meets that burden, the non-moving party must then show that there is a genuine dispute as to one or more material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A "mere scintilla of evidence" in favor of the

nonmoving party will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The party opposing summary judgment cannot simply rely on the pleadings or on conclusory allegations or conjecture as to the facts, but must, rather, present "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Further, "it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading." *Nick's Garage, Inc. v. Nationwide Mut. Ins. Co.*, 2015 U.S. Dist.101 F. Supp. 3d 185 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). A genuine issue of fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, "the evidence and inferences must be viewed in the light most favorable to the party opposing the motion." *SEC v. Tee to Green Golf Parks, Inc.*, 2011 U.S. Dist. LEXIS 4388, at *10-11 (W.D.N.Y. Jan. 18, 2011). Further, "a district court generally should not weigh evidence or assess the credibility of witnesses." *Walker v. Carter*, 210 F. Supp. 3d 487, 502 (S.D.N.Y. Sept. 26, 2016).

Here, the undisputed facts show that Defendants are entitled to summary judgment.

## II.   Defendants are entitled to summary judgment on Plaintiff's §10b and Rule 10b-5(b) claim, and Plaintiff's §17(a)(2) claim.

The SEC's corresponding regulation to Section 10b of the Securities Exchange Act ("Section 10(b)" states, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange  . . .
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. 240.10b-5(b) ("Rule 10b-5(b)").

2

Section 17(a)(2) of the Securities Act ("Section 17(a)(2)" or "§17(a)(2)") states, in relevant part:

> (a)   Use of interstate commerce for purpose of fraud or deceit. It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . .
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . .

15 U.S.C. §77q(a)(2). The Second Circuit and this Court have both stated that the elements of §17 claims and §10b claims are similar, and the claims may be analyzed together. *Wyatt v. Inner City Broad. Corp.*, 2011 U.S. Dist. LEXIS 110979, at *16-17. *See e.g.*, *Republic Tech. Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 545, 551 (2d Cir. 1973); *U.S. S.E.C. v. Czarnik*, 2010 U.S. Dist. LEXIS 125463, at *3 (S.D.N.Y. Nov. 29, 2010) ("The same elements required to establish a section 10(b) and a Rule 10b-5 violation suffice to establish a violation under sections 17(a)(1) - (3), with the exception that scienter is not required for the Commission to enjoin violations under subsections (a)(2) or (a)(3).").

To establish a Rule 10b-5(b) violation, Plaintiff must prove: "(1) a misrepresentation or omission (where a duty to speak exists); (2) of a material fact; (3) made with scienter; and (4) made in connection with the purchase or sale of securities." *Sec. Exch. Comm'n v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). *See also Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 129 (2d Cir. 2000).

### A.  **Materiality**

The SEC made the following allegations in its Amended Complaint:

25. During their initial calls, Dean and Fowler told the customers that they used a short-term investment strategy; they were experienced and savvy stock pickers; and their

> strategy would outperform the market. Dean and Fowler made little or no mention of fees and costs, and the customers believed that any risk arising from Dean's and Fowler's strategy would be more than offset by the possibility of a significant profit. In fact, Dean's and Fowler's strategy, with its substantial cost component, was virtually certain to end with customer losses.

Am. Compl. at ¶ 25. The Complaint implies that Defendants failed to mention fees and costs to all twenty-seven of the customers referenced in the Complaint. However, the SEC has only deposed seven of the twenty-seven customers. The SEC has not elicited any testimony from twenty of the customers—almost two-thirds—to support its assertion that "Dean and Fowler made little or no mention of fees and costs . . .". *Id.*

Information is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted); *Musab Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 2014 U.S. Dist. LEXIS 44481, Fed. Sec. L. Rep. (CCH) P97, 912, 2014 WL 1289251 (D. Conn. Mar. 31, 2014). But "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and *all* material information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1321, (2011) (emphasis added); *Blyth, Inc.*, 9 F. Supp. 3d 175, 2014 U.S. Dist. LEXIS 44481 at *189.

Indeed, "[d]isclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks omitted). Rather, in accordance with the language of Rule 10b-5(b), "disclosure is required only when necessary to make statements made, in light of the circumstances under which they were made, not misleading." *Id.* (internal quotation marks omitted). Where a plaintiff is alleging an omission, the plaintiff must establish that the defendant

4

had a duty to disclose the information omitted. *Pollack v. Laidlaw Holdings, Inc.*, 1995 U.S. Dist. LEXIS 5909, Fed. Sec. L. Rep. (CCH) P98, 741.

Sophisticated investors must "investigate the information available to them with the care and prudence expected from people blessed with full access to information." *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448, 2010 U.S. Dist. LEXIS 84881 (S.D.N.Y. Aug. 16, 2010) (quoting *Hirsch v. DuPont*, 553 F.2d 750, 763 (2nd Cir. 1977)). When a sophisticated party could have easily protected itself from a misrepresentation by reviewing the documents available, the New York Appellate Division has explained:

> [W]here . . . a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195, 2003 U.S. App. LEXIS 18274, Fed. Sec. L. Rep. (CCH) P92,497.

Moreover, a sophisticated party is expected to appreciate the difference between salesmanship and a material misstatement or omission.  In *Bogart v. Shearson Lehman Bros.*, this Court differentiated between facts, material misrepresentations, and opinions. 1995 U.S. Dist. LEXIS 1291 (S.D.N.Y. Feb. 6, 1995). Certain type statements are "no more than the optimistic prediction of a salesman; it does not purport to be a representation of material fact as to what would occur in the future." *Id.* at *7. *See Thuman v. Dembski*, 2017 U.S. Dist. LEXIS 49685, at *15-16 (W.D.N.Y. March 29, 2017) (citing *Bogart* as persuasive on this point of law).

Similarly, in *Wiener v. Oppenheimer*, a customer alleged material misrepresentations when the defendants represented that a recommended stock was undervalued and, therefore, a

good one to purchase, even though the stock turned out not to be undervalued. 1979 U.S. Dist. LEXIS 14635, at *10-11 (S.D.N.Y. Feb. 5, 1979). This Court said, "The fact that defendants' representations were incorrect does not mean that defendants are liable for securities fraud. A trader must take his broker's advice with a grain of salt. He cannot recover from his broker when his broker's opinion turns out wrong." *Id.* at *11.

"There can be no omission where the allegedly omitted facts are disclosed." *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005); *Blyth, Inc.*, 9 F. Supp. 3d 175, 2014 U.S. Dist. LEXIS 44481 at 189.  A plaintiff cannot assert that defendants did not disclose risks associated with a brokerage account when those risks were either obvious or disclosed in the account documents. *Grey v. Gruntal & Co.*, 1987 U.S. Dist. LEXIS 4031, Fed. Sec. L. Rep. (CCH) P93,262 (S.D.N.Y. May 21, 1987) (citing *Zerman v. Ball*, 735 F.2d 15 (2d Cir. 1984) ("Bypassing the fact that the nature of a margin account was revealed in the margin agreement signed by [plaintiff], it is clear that the information [plaintiff] claims was withheld from her was so basic that any investor could be expected to know it."). Moreover, where a customer engages in margin trading in their account, received monthly accounts statements without "once indicat[ing] that anything in the account happened without his authority, or complained about the management of his account," even if the customer alleges the signature on the document is forgery, the Southern District has concluded that the customer agreed to the terms of the margin agreement. *Blashka v. Greenway Capital Corp.*, 1995 U.S. Dist. LEXIS 15195 at *18, (S.D.N.Y. Oct. 16, 1995).

Assuming arguendo, although Defendants deny the SEC's allegations, if there were material misrepresentations, under New York Law, reliance on statements that are contradicted by a writing is not justifiable. *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 2001

U.S. Dist. LEXIS 944, 56 Fed. R. Serv. 3d (Callaghan) 436, 43 U.C.C. Rep. Serv. 2d (Callaghan) 1282 (S.D.N.Y. Feb. 5, 2001) (citing *Hunt, IRA v. Alliance North American Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (reliance unreasonable where "prospectuses warned investors of exactly the risk [they] claimed were not disclosed") (internal citation and quotation marks omitted)).

When a customer opens a non-discretionary account (like the accounts opened by each of Defendants' customers) the customer has full responsibility for all trading decisions and the broker only has a duty to execute the transactions as directed by the customer. *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002). The SEC does not allege that the accounts were discretionary and, other than the assertions in the amended complaint regarding churning in three of the customer accounts, the SEC does not provide any facts from which a fact-finder could plausibly determine that Defendants exercised de facto control over the accounts. We note that, of the three customer accounts allegedly churned, the SEC has only deposed one of those customers.

As referenced above, the SEC's amended complaint implies that the Defendants failed to mention fees and costs to all of 27 of the customers referenced in the amended complaint. The SEC has not elicited any testimony from 20 of the customers identified in the amended complaint and, with regard to the 7 customers that have been deposed, it is irrefutable that information regarding fees and costs and the speculative trading strategy being employed in their accounts, was repeatedly disclosed to all of the customers on their new account forms, margin agreements, monthly accounts statements, trade confirmations and compliance letters. We address each of the 7 customers below.

1. **Customer 2**

Customer 2 signed and dated a JD Nicholas (hereinafter "JDN") Investment Account Application. *Customer 2 Dep.* SEC Ex. 186. The investment objective indicated on this document is "speculation" (*Id.*) which was also indicated on Customer 2's monthly account statements. *Id.* at SEC Ex. 194. Additionally, Customer 2 indicated on his Account Application that he had an annual income of between $100,001-$200,000, a net worth of $2.5 million, and 26 years of investment experience, including mutual funds, variable products, bonds, stocks, and options. *Id.* at SEC Ex. 186.  Customer 2 acknowledges that the handwritten portions of the new account form including address, phone number, "and so on" were indeed his handwriting. *Id.* at 39:3-5.

Customer 2 received monthly accounts statements detailing all of the activity in his account and also received confirmations indicating the commissions, markups and markdowns for every trade executed in his accounts. *Id.* at SEC Ex. 195. Customer 2 testified that he reviewed his monthly account statements. *Id.* at 155:17-19.

Customer 2 also signed a Margin Account Agreement, which contained disclosures regarding the costs and risks associated with trading on margin:

> **You can lose more funds than you deposit in the margin account.** A decline in value of securities that are purchased on margin may require you to provide additional funds to Legent to avoid the forced sale of those securities or other securities assets in your account(s).
>
> **Legent can force the sale of securities or other assets in your account(s).** If the equity in your account falls below the margin requirements or Legent's higher "house" requirements, Legent can sell the securities or other assets in any of your accounts held at Legent to cover the deficiency. You also will be responsible for any short fell in the account after such a sale.
>
> **Legent can sell your securities or other assets without contacting you.** Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case . . . .

*Id.* at SEC Ex. 191; 146:7-9.

Customer 2 signed an Option Account Agreement as well, which contained the following

acknowledgement:

> This document is to establish that you have read and received a copy of the
> **Characteristics and Risks of Standardized Options** booklet. Please sign in
> the indicated area to confirm that you have received the information on
> options.

*Id.* at SEC Ex. 193.

Customer 2, testified that he "would have understood it [the statement]," in 2012, and

that "[i]t means if I would have read the booklet it told me about [] how options work." *Id.* at

151:12-17. Furthermore, Customer Bernardo's signature is on the document and he conceded it

was fair for JDN to assume that having signed this agreement that he had read and understood

the agreement. *Id.* at 152:13-16.

Similarly, the SEC cannot credibly claim that Customer Bernardo was unaware of the

risks associated with his trading strategy, since he signed two "Day-Trading Risk Disclosures"

which contained the following warnings:

> **Day trading can be extremely risky**. Day trading is generally not appropriate
> for someone of limited resources and limited investment or trading experience
> and low risk tolerance. You should be prepared to lose all funds that you use
> for day trading. In particular, you should not fund day-trading activities with
> retirement savings, student loans, second mortgages, emergency funds, funds
> set aside for purposes such as education or home ownership, or funds required
> to meet your living expenses…
>
> **Be cautious of claims of large profits from day trading.** You should be wary
> of advertisements or other statements that emphasize the potential for large
> profits in day trading. Day trading can also lead to large and immediate
> financial losses …
>
> **Day trading will generate substantial commissions, even if the per trade
> cost is low.** Day-trading involves aggressive trading, and generally you will
> pay commissions on each trade.

*Id.* at 178:19-21; Def. Exs. 78-79.

Customer 2 even testified that he understood the phrase "be cautious of claims of large profits from day trading" to mean that he should "be cautious because if day trading goes in the other direction, you can lose a lot of money" (*Id.* at 172:11-19), and that he also understood that this type of strategy could incur very large commissions (*Id.* at 173:1-4).

Customer 2 understood the risks associated with a speculative investment strategy because he had over 20 years of investment experience, and had at least one account with another brokerage firm with the investment objective of speculation. *Id.* at Ex. Def. 80. Additionally, prior to opening his account with JDN, Customer 2 held at least four brokerage accounts, with Solomon Smith & Barney (*Id.* at Def. Ex. 83), Morgan Stanley Smith & Barney (*Id.* at Def. Ex. 84) and LIS Investments (*Id.* at Def. Ex. 86), and an account at an unnamed firm that cleared through First Southwest Company, which indicated the priority of investment objectives as (1) Speculation and (2) Growth/Capital Appreciation (*Id.* at Ex. Def. 85).

### 2.  Customer 6

Customer 6, too, was fully aware of the risks involved in pursuing his speculative investment strategy.  He signed and dated three JDN Investment Account Applications for three separate brokerage accounts and on each one he selected speculation as his investment objective. *Customer 6 Dep.* SEC Exs. 157, 160 and 161. Additionally, on the first page of every monthly account statement, the primary investment objective is stated as speculation. *Id.* at SEC Ex. 167, Def. Exs. 45, 47; 161:5-10. On the new accounts forms, Customer 6 indicated his annual income as between $125,000, his net worth as $500,000, and that he had over 10 years of investment experience including mutual funds, variable products, stocks, and options. Customer 6

acknowledged that the handwriting on the new account forms was his own. *Id.* at. 25:19-21; SEC Ex. 157.

Customer 6 testified that he received and reviewed his monthly accounts statements detailing all of the activity in his accounts (*Id.* at 131:10-22) as well as confirmations indicating the commissions, markups and markdowns for every trade executed in his accounts. *Id.* at SEC Ex. 166.

Customer 6 signed the Margin Account Agreement. *Id.* at SEC Ex. 162.  It contained the same disclosures regarding the costs and risks associated with trading on margin: as quoted above on page 8. Customer 6 also signed an Option Account Agreement (*Id.* at SEC Ex. 164) indicating that he had received and read the materials disclosing options risks.  See the option disclosure language quoted above.  Customer 6 even acknowledged that when he read the first paragraph of the Options Account Agreement, he understood this to mean options trading was highly speculative. *Id.* at 149:21-150:10.

Customer 6 also executed two Intent to Maintain Active Accounts forms, which included the following disclosures:

> You agree that you are fully and completely aware of the risks involved with the trading strategy that you have adopted and that it may result in significantly greater gains or losses than alternative methods of investing and/or trading strategies. Such strategies employed may involve an over concentration in one or more positions, a higher turnover of account equity, as well as a higher commission to equity ratio . . .
>
> Additionally that you fully, completely and freely participate in all investment decisions.

*Id.* at SEC Ex. 168.

Additionally, Customer 6 signed a "Day-Trading Risk Disclosures" quoted above (see page 9) warning him in stark terms of the risks associated with the investment strategy he had

11

selected (*Id.* at Ex. 168).   Customer 6 testified that he was fully aware of the risks and was satisfied with taking the risks as disclosed. *Id.* at 171:23-172:5.

Customer 6 was provided further notice of the risks associated with pursuing his investment strategies when provided on two separate occasions with letters from JDN Supervisors ("Supervisor Letters"). These letters contained the following provisions:

> During my periodic review of your account(s), I noticed that you have been actively trading on a short term basis. It is appropriate to point out that a regular practice of such trading can be costly in that every purchase and sale may include a commission or mark-up which must be recouped in order to realize a profit. These charges, if any, are indicated on every confirmation that you receive in the mail from our clearing agent. . . .

> To help us ensure that you are satisfied with our efforts in customizing the right investments to reach your financial goals, please feel free to call me if you would like to discuss the account, the charges identified on your confirmations or any of the services that we offer.

Despite these repeated disclosures, Customer 6 knowingly and willing continued trading in his JDN accounts. *Id.* at SEC Ex. 168. Customer 6 admitted under oath that he recalls making a comment to Mr. Fowler which relayed, "I trust what you're doing. My portfolio is growing. You seem to be doing a good job. You know, you probably don't need to call me for—for all of these stocks. As long as you continue doing well, I trust you." *Id.* at 78:23-79:3.

Customer 6 also possessed significant experience upon which he could rely when he opened his JDN accounts. Prior to opening his accounts with JDN, or concurrently, Customer 6 had at least two accounts with Blackbook Capital and Cornerstone Securities. *Id.* at SEC Ex. 159 and Def. Ex. 49. Customer 6 signed an Option Account Agreement, and an Option Approval form, which included a margin disclosure and signed Margin Agreement, for his Blackbook Capital Accounts in 2012. *Id.* at Def. Ex. 49.

### 3.  Customer 8

Customer 8 signed and dated a JDN Investment Account Application. *Customer 8 Dep.* SEC Ex. 241. The investment objective indicated on this document is "speculation" and this investment objective was also indicated on the monthly account statements. *Id.* at SEC Ex. 247. On the JDN Investment Account Application, Customer 8 indicating his annual income of $200,000, and a net worth of $8 million. *Id.* at SEC Ex. 241.

Customer 8 received monthly account statements detailing all of the activity in his account as well as confirmations indicating the commissions, markups and markdowns for every trade executed in his accounts. *Id*. at SEC Ex. 248.

Customer 8 signed a Margin Account Agreement containing the same disclosures regarding the costs and risks associated with trading on margin as quoted above (see page 8, *Id.* at SEC Ex. 244) and even conceded that, when he signed it, he would have had a fairly clear understanding of what each of the statements contained in the agreement meant (*Id.* at 118:11-16). Customer Estrada signed an Intent to Maintain Active Account form confirming his desire to assume the risks involved in an active trading strategy. See the language quoted above at pages 11 and *Id.* at SEC Ex. 249.

Customer 8 was not only provided disclosures of all material facts related to pursuing a speculative investment strategy, he has prior investment experience upon which he could rely when he opened his JDN account. He had a brokerage account with at least one other brokerage firm. Customer 8's brokerage account application with National Financial Services selects speculation as the highest priority investment objective. *Id.* at Def. Ex. 130. Moreover, Customer 8 has extensive experience in speculative business ventures. Customer 8's business engages in marketing, breeding horse and cattle, and/or horse racing. *Id.* at Def. Ex. 138. Customer 8

indicated in his deposition that horse racing is a "risky business" (*Id.* at 138:1-17) in which he has invested substantial funds and incurred substantial losses.  *Id.* at 133:11-25.

### 4.  Customer 11

Customer 11 held two accounts with JDN selecting speculation as his investment objective for both accounts. *Customer 11 Dep.* SEC Exs. 170, 171. This investment objective was clearly noted on Customer 11's monthly account statements. *Id.* at Def. Ex. 51 and SEC Ex. 178. Customer 11 even conceded that, had he read the definition for speculation under "investment objective", he would have understood that speculation involved a higher degree of risk. *Id.* at 112:7-16. Further, on the JDN Investment Account Applications, he indicated his annual income as $150,000, his net worth as $1.5 million (*Id.* at SEC Ex. 170) and that he had 15 years of investment experience. *Id.* at 27:25-28:6.

Customer 11 received monthly accounts statements detailing all of the activity in his accounts as well as confirmations indicating the commissions, markups and markdowns for every trade executed in his accounts. *Id*. at SEC Ex. 176, Def. Ex. 52. He testified that he reviewed the trade confirmations when he received them. *Id*. at 47:24-48:5. Furthermore, Customer 11 affirmatively acknowledged that the trades in his account were indeed authorized. *Id.* at 121:22-23.

Customer 11 signed a Margin Account Agreement (*Id.* at Def. Ex. 53) and, not one, but two, "Day-Trading Risk Disclosures" (*Id.* at SEC Ex. 181, 184) and an Intent to Maintain Active Accounts form (*Id.* at SEC Ex. 180). Customer 11 was provided further notice of the risks associated with pursuing his investment strategies when provided with two separate Supervisor Letters. *Id.* at SEC Exs. 182-183.

Customer 11 was not only provided disclosures of all material facts related to pursuing a speculative investment strategy, he had significant prior investment experience upon which he could reply when handling his accounts at JDN. Customer 11 held at least one account concurrently with another brokerage firm, Craig Scott Capital, for which the investment objective was speculation. *Id.* at SEC Ex. 172. Customer 11 acknowledges that he has both a commodities account and a margin account with Wells Fargo. *Id.* at 92:19-25, 94:17-19. Moreover, Customer 11 has extensive experience in speculative business ventures. He owns "Hub City Livestock Auction", a business that involves buying or selling livestock (*Id.* at 10:3-18) and a feedlot known as "Hillside Feeders." *Id.* at 86:16-23.  Customer 11's testimony also demonstrated that he is sophisticated and knowledgeable with regard to the risks associated with speculative investments and advanced trading strategies. *Id.* at 94:4-16.[1]

### 5. Customer 14

Customer 14 signed and dated two JDN Investment Account Applications. *Customer 14 Dep.* Def Ex. 107 and SEC Ex. 222. The investment objective indicated on the Investment Account Applications is "speculation" and this investment objective was also indicated on the monthly account statements. *Id.* at SEC Ex. 228. Customer 14 indicated that he had an annual income of $225,000, a net worth of $750,000, and 20 years of investment experience with mutual funds, and 5 years of investment experience with stocks. *Id*. at Def. Ex. 107. However, on the second Investment Account Application, Customer 14 indicated he has 20 years of experience in mutual funds, variable products, bonds, stocks, and options. *Id.* at SEC Ex. 222.

---

[1] "Well, it doesn't bother if—if the hedge isn't profitable, you—see, you can put a put under the market, and what you're doing is just—just basically is an insurance policy from having a train wreck in your cattle feeding operation. If your hedge makes money, that means your cattle are doing—doing bad. And most of the time you set up your hedge deal so that the loss on the hedge will be minimum. If you use your hedge, that means your cattle are losing bad. So we—it doesn't matter that the hedge is losing a little money. That means the cattle—you're—you're not needing it is what I'm trying to say. It's like insurance; you hope you never need to use it."

Customer 14 received monthly accounts statements detailing all of the activity in his accounts as well as confirmations indicating the commissions, markups and markdowns for every trade executed in his accounts. *Id.* at SEC Ex. 236.

Customer 14 signed not one, but two Margin Account Agreements, for two separate accounts. *Id.* at Def. Exs. 108, 110. Customer 14 even signed a Day-Trading Risk Disclosure. *Id.* at Def. Ex. 113. Customer 14 was provided further notice of the risks associated with pursuing his investment strategies when provided with a Supervisor Letter. *Id.* at Def. Ex. 114.

Customer 14 was not only provided disclosures of all material facts related to pursuing a speculative investment strategy, he had significant prior investment experience upon which he could rely when handling his accounts at JDN. Customer 14 held at least one additional account, at Craig Scott Capital, concurrently with his accounts at JDN. The Craig Scott Capital account had an investment objective of maximum growth (*Id.* at Def. Ex. 122). This demonstrates that Customer 14 understood and could discern different investment objectives. Furthermore, Customer 14 opened a margin account with Craig Scott Capital. *Id.* at Def. Ex. 123.

Most significantly, Customer 14 executed an affidavit in connection with an arbitration that he commenced against a broker dealer CraigScott Capital ("CSC"). *Id.* at Def. Ex 126. Customer 14 asserted claims of unauthorized trades and unsuitable investments akin to the claims that the SEC is asserting on behalf of Customer 14 in this case. *Id.* at Def. Ex. 125. In that affidavit, sworn under oath by Customer 14 he acknowledges that the claims he made against CSC were not true but that he made those claims in order to recoup some of the investment losses in his account. Curiously, Customer 14 testified in his deposition in this case that the statements that he made under oath in the affidavit were untrue and he knowingly signed the

16

false affidavit because he wanted the settlement funds. *Id.* at 174:11-16.[2]  Either way, whether the statements in the affidavit were true (or Customer 14was making false claims in the arbitration against CSC to extract a settlement) or the statements in the affidavit were the product of a deliberate perjury, the affidavit does nothing to bolster the credibility of the SEC's witness.

### 6.  Customer 18

Customer 18 signed and dated a JDN Investment Account Applications. *Customer 18 Dep.* SEC Exs. 201, 202. The investment objective indicated on the Account Applications is "speculation" and this investment objective was also indicated on the monthly account statements. *Id.*at Def Ex. 93 and SEC Ex. 205. Customer 18 received trade confirmations for every trade executed in his account. *Id.*at  SEC Ex. 207. Customer 18 was provided further notice of the risks associated with pursuing his investment strategies when he signed a margin account agreement (*Id.* at SEC Ex. 203), and an Options Account agreement (*Id.* at SEC Ex. 204), and an Intent to Maintain Active Account form (*Id.* at SEC Ex. 214) and again when he received the warnings set forth in a Supervisor Letter. *Id.* at Def. Ex. 94.

Customer 18 was not only provided disclosures of all material facts related to pursuing a speculative investment strategy, he had significant investment experience upon which he could rely when handling his accounts at JDN. Customer 18 held at least one account concurrently with his JDN account at National Securities with the investment objective of "market speculation" and an aggressive risk tolerance. *Id.* at Def. Exs. 99, 101. After Customer 18 closed one of his JDN account, Customer 18 opened an account with Legend Securities, again, with an investment objective of speculation. *Id.* at Def. Exs. 95-96.

---

[2] "Q. Why would you sign an affidavit that contained that statement if it was not true?
   A. Because I needed to reach a settlement.
   Q. So in order to get the funds, you were willing to sign a statement that was not accurate?
   A. Well, it was partially true."

7.  **Customer 24**

Customer Weathers, signed and dated the JDN Investment Account Application. *Customer 24 Dep.* SEC Ex. 122. Customer 24 selected an investment objective of "speculation" and "current income", (*Id.*) and speculation was also indicated on the monthly account statements. *Id*. at SEC Ex. 128. Customer 24 signed the Margin Account Agreement (*Id.* at SEC Ex. 125) and an Intent to Maintain Active Account form (*Id.* at SEC Ex. 129) and was provided further notice of the risks associated with pursuing his investment strategies when provided a Supervisor Letter. *Id.* at SEC Ex. 130.

Despite the SEC efforts to depict Customer 24 as disabled and unsophisticated, Customer 24 has held at least twelve additional brokerage accounts with HFP Capital Markets, Legend Securities, Rockwell Global, EKN Financial Services, Pension Financial Services, Aegis Capital Corporation, Friedman Schnaier (Prestige Financial Center), vFinance Investments, Maxim GRP, Eastbrook Capital, National Securities and Sterne Agee Leach. At least four of these accounts were speculative and at least three of these accounts had associated margin accounts. *Id.* at SEC Exs. 138, 133, 132, 134, 127, 136, 137, 140, 142, 143, 144, 146, 147, 149, 152, 153. Furthermore, with regard to his Maxim GRP  (*Id.* at 140:22-141:5), Eastbrook Capital (*Id.* at 142:3-5), National Securities, the Friedman Schnaier, and the Pension and Sterne Agee Leach accounts, Customer 24 alleges that *all* of the trades in these accounts were unauthorized (*Id.* at 145:11-17 and 146:16-19.). The testimony is simply not credible on its face.

In summary, the Complaint implies that Defendants are liable for material misrepresentations or omissions to all twenty-seven customers referenced in the Complaint because they claimed the customers would make money using the Defendants' investment strategies and did not tell the customers about investment costs and fees. However, the SEC has

not elicited any testimony from twenty of the customers in support its assertion. The depositions of the remaining seven customers demonstrate the irrefutable fact that information regarding fees and costs, and the speculative trading strategy being employed in their accounts, was repeatedly disclosed on new account forms, margin agreements, monthly accounts statements, option agreements, trade confirmations, and compliance letters.  Because each customer received several explicit notices regarding fees, costs, and risks, the foregoing establishes that there was no material misrepresentation or omission. Here, Defendants' assurances about their strategies outperforming the market fall under the category of salesmanship. The SEC cannot claim that Defendants materially misrepresented the chances of obtaining large profits simply because Defendants' strategies were not always successful. Customers are not entitled to a winning investment strategy and cannot blame their broker when a reasonable investment strategy does not outperform the market as hoped for.

**B. Defendants lacked the requisite scienter.**

The SEC's Complaint states:

> 33. Dean and Fowler knew or were reckless is not knowing that these costs that their customers were made to pay, including commissions, markups, markdowns, "firm commissions," and margin interest, would likely exceed any valuation gains attributable to the securities in customer accounts during the short period between the purchase and the sale.

(Am. Compl. ¶ 33).

The SEC further alleges "Dean and Fowler had a duty to their customers to have a reasonable basis for their investment strategy they recommended. That meant, at a minimum, they needed to understand whether the costs associated with the strategy—repeated short-term buying and selling of securities—would outstrip any potential gains. Dean and Fowler, however, did almost no due diligence on their strategy apart from superficial monitoring of business

news." (Am. Compl. ¶ 17). The SEC goes on to state, "Dean and Fowler pursued their high-cost, in-and-out strategy without having a reasonable basis for believing this strategy was suitable for anyone. Since the customers incurred costs with every transaction, making a profit depended upon the price of the security increasing during the brief period the security was held in the customer accounts." (Am. Compl. ¶ 34). Additionally the SEC alleges, "[Defendants] churned the accounts of Customer 5, 10, and 24 by engaging in excessive trading in disregard of their customers' trading objectives and risk tolerance for the purpose of generating commissions." (Am. Compl. ¶ 48). As discussed below, these allegations are neither supported by the evidence nor are they sufficient to establish the requisite scienter as a matter of law.

The U.S. Supreme Court has interpreted scienter as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Scienter can be established by either proving knowing or intentional misconduct, or recklessness.

Recklessness under Rule 10b-5 must include a mental state approximating an intent to deceive, manipulate or defraud. *See Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (recklessness "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company"); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) ("[recklessness] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company"); *In re Baesa Secs. Litig.*, 969 F. Supp. 238, 241 (S.D.N.Y. 1997) (though recklessness includes "awareness like concepts of intent, still on its face, it leaves no doubt that some form of conscious disregard is required."

Defendants here did not have intent to deceive, manipulate, or defraud. In this case, when interviewing new customers, the Defendants would

> . . . start[] off with [new customers'] other investment experience, what other
> accounts they had, what other positions they had, how much experience

20

> they've had, their largest gains and losses in the account in the past, their
> financial situation at that point in time when they opened up the account, the --
> their risk exposure, their appetite for risk, [and] what they were actually able to
> risk out of the principal that they sent.

*Fowler Dep.* 56:1-9. In addition, Defendants "discussed risk in the account . . . [and asked

questions such as,] 'Do you have any annuities out there? Any fixed income?' [They would] go

through those [questions] and make a determination from there." *Id.* at 65:9-16, 66: 3-6. The

customers would then receive a "new account" form containing the information that the

customer had provided. The customer would be asked to make sure all information, including

information regarding investment strategies and risk assessments, was correct, and change any

incorrect information before returning the form to JDN. *Fowler Dep.* 68:11-12. Defendants then

either spoke with their customers on a daily basis or, at least obtained explicit authorization

before performing any trades. *See, e.g.*, *Dean Dep.* July 13, 2017, 101:22-102:1, 106:17-19;

Fowler Dep. 170:20-22, 187:23-25, 209:8-9, 224:3-11).  Furthermore, and contrary to the SEC's

assertions, Defendants utilized several services to conduct research and perform due diligence.

*Dean Dep.* July 13, 2017, 115:10-19, *Fowler Dep*. 74:4-75:14.

Moreover, as indicated in the discussions above regarding the individual customers, the

defendants and their brokerage firm provided the customers with an extensive amount of

information disclosing the risks and costs associated with the investment strategies that they had

decided to pursue.

The SEC allegations with regards to scienter are also deficient because the SEC has not

alleged in the Amended Complaint that Fowler or Dean had motive or opportunity to commit

fraud, aside from "generating commission".  The case law indicates that is insufficient basis to

establish scienter. A motive to earn commissions or fees is not sufficient to plead scienter. *In re*

*Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003). In

fact, plaintiffs that claim that defendants engaged in short selling for profits is exactly the kind of generalized profit-seeking motives that courts have repeated rejected. *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 2010 U.S. Dist. LEXIS 66010, Fed. Sec. L. Rep. (CCH) P95,791 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, Inc., 531 F.3d 190, 2008 U.S. App. LEXIS 13449, Fed. Sec. L. Rep. (CCH) P94,763)). If generating fees and commission was motive and therefore satisfies the element of scienter, this would contradict the purpose of requiring the plaintiff to prove scienter. As the Southern District stated:

> [Plaintiffs] have alleged no gain other than the fact that the [accounting] firm was compensated for its professional services. It would defy common sense to hold that the motive element of the [ ] scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter.

*Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F. Supp. 521, 1990 U.S. Dist. LEXIS 609, Fed. Sec. L. Rep. (CCH) P94,902. *See also, Melder v. Morris*, 27 F.3d 1097, 1994 U.S. App. LEXIS 20448, Fed. Sec. L. Rep. (CCH) P98, 350, 30 Fed. R. Serv. 3d (Callaghan) 405 ("Simply put, accepting the plaintiffs' allegation of motive as sufficient would make a mockery of Rule 9(b) by effectively eliminating the scienter requirement as to securities underwriters since all underwriters are, of course, fee seekers.")

Where the desire to earn fees is inherent to the position and is generally possessed by all those who share this position, this is not sufficient to allege a "concrete and personal benefit." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (quoting *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 2008 U.S. Dist. LEXIS 25917), "the desire to earn management fees is a motive generally possessed by hedge fund managers, and as such, does not suffice allege a 'concrete and personal benefit' resulting  from fraud."). *See also*, *Heller v. Goldin Restructuring*

*Fund, L.P.*, 590 F. Supp. 2d 603, 2008 U.S. Dist. LEXIS 103354, Fed. Sec. L. Rep. (CCH) P95,026 ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.").   Further, the defendants did not receive "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," because there was no material misstatement or omission. *Id.* (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)).

"Allegations of heavy trading or large profits, without further information, do not satisfy the scienter requirement." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (citing *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476-77 (M.D.N.C. 2004)). Although large commissions generated by in-and-out trades may be inappropriate for unsophisticated investors who desire a low-risk strategy, this kind of trading may be appropriate for sophisticated investors who desire a speculative strategy. *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 2008 U.S. App. LEXIS 14662, 44 Employee Benefits Cas. (BNA) 1470. Further, "[i]t seems implausible [here] to have both an intent to earn excessive fees for the corporation and also an intent to defraud Plaintiffs by losing vast sums of money." *In re UBS Ag Sec. Litig.*, 2012 U.S. Dist. LEXIS 141449, Fed. Sec. L. Rep. (CCH) P97,037, 2012 WL 4471265 (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 2009 U.S. App. LEXIS 972, Fed. Sec. L. Rep. (CCH) P95,263)).

Moreover, the SEC's allegations that the Defendants had no basis to believe their strategy was suitable are similar to the allegations that "if Defendants had properly done their jobs, they would have uncovered the truth" which "have always been insufficient to establish scienter.*" In re Indep. Engergy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 765. "While an 'egregious

refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of…recklessness,' merely calling a misrepresentation obvious does not make it so." *Id.* The SEC must show something more than simply the bare incantation that a misrepresentation was obvious or that the defendant ignored information available to it. *Id.* (citing *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998)). The duty to monitor, or the assertion that defendants ignored obvious signs of fraud must rise to the level such that the defendant "should have known that they were misrepresenting material facts." *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 2009 U.S. App. LEXIS 15467, Fed. Sec. L. Rep. (CCH) P96,000 (2d Cir. N.Y. July 14, 2009). Even "allegations that 'strongly suggest that the defendants should have been more alert and more skeptical" are not sufficient to indicate fraud. *Chill v. GE,* 101 F.3d 263, 1996 U.S. App. LEXIS 30830, Fed. Sec. L. Rep. (CCH) P99,353, 36 Fed. R. Serv. 3d (Callaghan) 437. "By contrast, insider trading is a classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *Wachovia Equity Sec. Litig. v. Wachovia Corp.*, 753 F. Supp. 2d 326, 2011 U.S. Dist. LEXIS 36129, Fed. Sec. L. Rep. (CCH) P96,294.

The SEC fails to plead motive or conscious misbehavior or recklessness, and as testimony supports, they have failed to demonstrate Defendants acted with scienter.

## III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CLAIM 1: VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT

The SEC's amended complaint dated April 21, 2017, sets forth a cause of action under the Securities Act Section 17(a).  In general, claims under 17(a)(1) are "essentially the same as the elements of a claim under Section 10(b) and Rule 10b-5." *SEC v. Kelly*, 765 F. Supp. 2d 301, 2011 U.S. Dist. LEXIS 3290 (S.D.N.Y.).

To establish a violation of Section 17(a), the SEC must allege the defendant engaged in manipulative acts in connection with the offer or sale of securities. *SEC v. Lek Secs. Corp.*, 2017

U.S. Dist. LEXIS 137364, Fed. Sec. L. Rep. (CCH) P99, 856 (S.D.N.Y. Aug. 25, 2017). "Scienter is not required to prove a defendant violated [Section 17(a)(2)] provision." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014). "A showing of negligence is sufficient." *Id.*

However, as set forth above, the evidence establishes that SEC cannot credibly allege there was a misstatement or omission in regards to the commissions and fees disclosed on the confirmations, the risks associated with margin agreements, day-trading, and options trading, as provided by the related disclosures. Accordingly, the defendants should be granted summary judgment with regard to the SEC's cause of action pursuant to Section 17(a)(2).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion for summary judgment should be granted in its entirety.

25