**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **17-CV-139 (GHW)** |
| | : | **ECF Case** |
| **GREGORY T. DEAN and** | : | |
| **DONALD J. FOWLER,** | : | |
| | : | |
| **Defendants.** | : | |

_____ :

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**SECURITIES AND EXCHANGE COMMISSION**
**David Stoelting**
**Jorge G. Tenreiro**
**Kristin M. Pauley**

**200 Vesey Street, Suite 400**
**New York, New York  10281**

**February 9, 2018**
**ORAL ARGUMENT REQUESTED**

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................3

ARGUMENT ........................................................................................................3

I.      SUMMARY JUDGMENT IS APPROPRIATE .......................................3

II.     DEAN AND FOWLER VIOLATED THE ANTIFRAUD PROVISIONS BY MAKING UNSUITABLE RECOMMENDATIONS WITHOUT ANY REASONABLE BASIS ................................................................................5

      A.  The Antifraud Provisions of the Federal Securities Laws ....................5

      B.  Dean and Fowler's Trading High-Cost, Excessive Trading ..................6

      C.  Dean and Fowler Failed to Meet their Duty to Conduct Due Diligence to Ensure That Their Recommendations Were Suitable For at Least Some Customers ........8

      D.  Dean and Fowler Made Other Material Misrepresentations and Omissions.........11

      E.  Dean and Fowler Acted With Scienter ...............................................13

      F.  Dean and Fowler Acted Negligently ..................................................13

III.    DEAN AND FOWLER VIOLATED THE ANTIFRAUD PROVISIONS BY MAKING UNSUITABLE CUSTOMER-SPECIFIC RECOMMENDATIIONS WITHOUT ANY REASONABLE BASIS ..............................................................14

IV.    DEAN AND FOLWER ENGAGED IN UNAUTHORIZED TRADING ON CERTAIN CUSTOMERS' ACCOUNTS ..............................................15

V.     THE RELIEF SOUGHT IN THE AMENDED COMPLAINT IS WARRANTED ...17

      A.  Injunctive Relief is Appropriate.........................................................17

      B.  Dean and Fowler Should Disgorge Their Ill-Gotten Gains .................18

      C.  Dean and Fowler Should be Ordered to Pay Prejudgment Interest.....................19

D.  Civil Penalties Are Appropriate ....................................................................19

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ....................................................................5, 13

*Allah v. Wilson*, No. 13 Civ. 4269 (ALT), 2017 WL 4350611 (S.D.N.Y. July 31, 2017).............4

*Al Rizek*, Exch. Act Rel. No. 41725, 1999 WL 600427 (Comm'n Op. Aug. 11, 1999)................ 7

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................... 3

*Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 767 F.2d 1498 (11th Cir.1985) .......13

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983)....................................................13

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)........................................................... 5

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ............................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 3

*Cody v. SEC*, 693 F.3d 251, 259 (1st Cir. 2012) ...................................................9, 14

*Costello v. Oppenheimer & Co., Inc.,* 711 F.2d 1361 (7th Cir. 1983) ..................................10-11

*Daniel R. Howard*, Exch. Act Rel. No. 46269, 2002 WL 1729157 (July 26, 2002)
  (Comm'n Op.), *aff'd, Howard v. SEC*, 2003 WL 22162370 (1st Cir. Sept. 19, 2003)........... 6-7

*Donald A. Roche*, Exch. Act Rel. No. 38742, 1997 SEC LEXIS 1283 (June 17, 1997)
  (Comm'n Op.) ....................................................................................16

*F.J. Kaufman and Co., et al.*, Exch. Act Rel. No. 34-27535, 1989 WL 259961,
  (Dec. 13, 1989) (Comm'n Op.) ................................................................... 8

*Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126
  (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) ...................................4

*Hanly v. SEC,* 415 F.2d 589 (2d Cir. 1969) ........................................................... 8

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) .......................... 5

*In re New Times Sec. Servs.*, 371 F.3d 68 (2d Cir. 2004) ..............................................8

*Lester Kuznetz*, Exch. Act Rel. No. 23525, 1986 WL 625417 (Aug. 12, 1986) (Comm'n Op.).... 8

*Moran v. Kidder Peabody & Co.*, 609 F. Supp. 661 (S.D.N.Y. 1985) *aff'd mem.*, 788 F.2d 3 (2d Cir. 1986) ............................................................................................. 6

*Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107 (2d Cir. 2017) ................... 3

*Peter C. Bucchieri*, Exch. Act Rel. No. 37218, 1996 WL 254677 (May 14, 1996) (Comm'n Op.) ................................................................................................ 7

*Pross v. Baird Patrick & Co.*, 585 F. Supp. 1456 (S.D.N.Y. 1984) ........................................... 16

*Ralph Calabro,* Rel. No. 9798, 2015 WL 3439152 (May 29, 2015) (Comm'n Op.) ................... 18

*Rizek v. SEC*, 215 F.3d 157 (1st Cir. 2000) ............................................................................ 10

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978) ..................................... 6

*Rush v. Oppenheimer & Co., Inc.*, 592 F. Supp. 1108 (S.D.N.Y. 1984) .................................... 6

*Sandra K. Simpson*, Exch. Act Rel. No. 45923, 2002 WL 987555 (May 14, 2002) (Comm'n Op.) ............................................................................................. 15-16

*SEC v. Benson*, 657 F. Supp. 1122 (S.D.N.Y. 1987) ............................................................... 18

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978) ......................................................................... 18

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) ................................................................... 18, 19

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ..................................................................... 17

*SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) ............................................................ 20

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978) ...................................... 17

*SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602 (S.D.N.Y. Oct. 22, 2002) ...................................................................................... 20

*SEC v. First City Financial Corp., LTD.*, 890 F.2d 1215 (D.C. Cir. 1989) ............................... 18

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................................................. 19

*SEC v. Friendly Power*, 49 F. Supp. 2d 1363 (S.D. Fla. 1999) ................................................. 19

*SEC v. Hasho*, 784 F. Supp. 1059 (S.D.N.Y. 1992) ..................................................8, 11, 16, 18

*SEC v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997) .................................................... 18

*SEC v. Kane*, No. 97 Civ. 2931, 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003) ...........................20

*SEC v. Kenton Capital, Ltd.*, 69 F.Supp. 2d 1 (D.D.C. 1998) ....................................................19

*SEC v. Landberg*, 836 F. Supp. 2d 148 (S.D.N.Y. 2011) .........................................................11

*SEC v. Manor Nursing Centers, Inc.* 458 F.2d 1082 (2d Cir. 1972)..........................................17

*SEC v. Markusen*, Civ. No. 14-3395, 2016 WL 1629267 (D. Minn. Apr. 25, 2016)..................13

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ........................................................................... 6

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)......................................................17

*SEC v. Milan Capital Group, Inc.*, No. 00 Civ. 108 (DLC), 2000 WL 1682761
   (S.D.N.Y. Nov. 9, 2000)........................................................................................................ 6

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ................................................... 5

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012) .......................................11

*SEC v. Platinum Inv. Corp.*, 02-cv-6093 (JSR), 2006 WL 2707319
   (S.D.N.Y Sept. 20, 2006)...................................................................................................9, 10

*SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974) ......................................18

*SEC v. Shainberg*, 316 Fed.Appx. 1 (2d Cir. 2008) ..............................................................9-10

*SEC v. Softpoint,* 958 F. Supp. 846 (S.D.N.Y. 1997) ..........................................................5, 13

*Steven E. Muth*, Exch. Act Rel. No. 52551, 2005 SEC LEXIS 2488 (Oct. 3, 2005)
   (Comm'n Op.) ......................................................................................................................16

*William C. Piontek*, Exch. Act Rel. No. 48903, 2003 SEC LEXIS 2940 (Dec. 11, 2003)
   (Comm'n Op.) ......................................................................................................................16

**Statutes**

Internal Revenue Code

26 U.S.C. § 6621(a)(2).................................................................................................................19

Securities Act of 1934

Section 17(a), 15 U.S.C. § 77q(a)...................................................................5, 13-14, 15, 17

Section 20(b), 15 U.S.C. § 77t(b) ...............................................................................................17

Section 20(d)(2)(C), 15 U.S.C. § 77t(d)(2)(C) ...............................................................19

Securities Exchange Act of 1934

Section 21(d)(3)(B)(iii), 15 U.S.C. § 78u(d)(3)(B)(iii) ...........................................19

Section 10(b), 15 U.S.C. § 78j(b) .............................................................5, 13, 15, 17

Section 21(d), 15 U.S.C. § 78u(d) ...........................................................................17

**Rules**

17 C.F.R. § 201.600(b) .............................................................................................19

17 C.F.R. §§ 201.1001 and 201.1002 .......................................................................19

Fed. R. Civ. P. 56(a) ..................................................................................................3

FINRA Rule 2111(a) ...................................................................................................9

Rule 10b-5, Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5........................5, 13, 15, 17

Plaintiff Securities and Exchange Commission respectfully submits this memorandum of law in support of its motion for summary judgment against defendants Gregory T. Dean ("Dean") and Donald J. Fowler ("Fowler") ("Defendants").

## PRELIMINARY STATEMENT

From 2011 through 2014, Dean and Fowler, as licensed securities professionals, disregarded one of the most fundamental obligations of a broker: the duty to have a reasonable basis for customer recommendations. Their brazen breach of this duty – which is a fundamental investor protection – was highly reckless and caused more than two dozen customers to lose more than $1 million. Their scheme was not complex. They spent every day making hundreds of cold calls to potential customers who lived far from their New York offices. Once a customer opened an account and a relationship of trust was established, Dean and Fowler launched a pattern of high-cost, excessive, in-and-out trading in the customer account, pursuant to which each security was sold, on average, 5.3 days after it was purchased. Ex. 1 at 8. What Dean and Fowler knew – but their customers did not – was that the costs of their strategy doomed any chance of even a modest profit. Eventually, the customer, unable to tolerate the relentless costs and losses, closed the account. Dean and Fowler then moved on to the next customer to pursue the identical strategy.

The customer losses did not result from market forces or from investment risk. Instead, they were the result of the high cost, high turnover structure that Dean and Fowler imposed, and kept hidden from their customers, in all twenty-six accounts. The strategy was beneficial only to Dean and Fowler, who were enriched from these costs while the customers' account equity cratered.

The duty to have a reasonable basis for customer recommendations is something Dean and Fowler knew well. They chose, however, to ignore this duty because they elevated greed over their professional obligations. In twenty-six customer accounts, Dean and Fowler imposed nearly identical trading patterns in which securities are bought and then sold, often at a lower price, hours or days after purchase. Ex. 1 at 81-60. Such irrational, senseless trading had only one purpose: to generate commissions for Dean and Fowler. And Dean and Fowler had no basis whatsoever, let alone a reasonable basis, to recommend this absurd pattern of trading.

The Defendants' trading strategy, and the destructive impact of costs, is summarized by the SEC's expert witness report. Ex. 1. The dollars lost in each account, and the manner in which the costs utterly defeated any chance of a profit, are undeniable. These accounts needed to achieve an annual investment return of, on average, 168.2% just to break even. Ex. 1 at 8. Clearly, Dean and Fowler did not act in their customer's best interests. Ex. 1 at 8.

Making a recommendation without a reasonable basis violates the antifraud provisions of the federal securities laws. This summary judgment motion turns on whether there is any evidence in the record from which a trier of fact could conclude that Defendants had a reasonable basis in recommending their strategy. But, after nine months of discovery, no evidence of any reasonable basis determination by Dean and Fowler has surfaced, and Defendants admit in their discovery responses that they have no evidence at all of any reasonable basis determination for any of the 26 accounts. Such an extreme departure from a broker's duty of care constitutes recklessness. Summary judgment, therefore, is appropriate. Injunctions, disgorgement of all commissions received along with prejudgment interest, and a civil penalty should be imposed.

## STATEMENT OF UNDISPUTED FACTS

The SEC relies on its Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SMF"), filed herewith, as its statement of undisputed material facts that supports summary judgment against Dean and Fowler. Factual citations in this memorandum of law are to the paragraph numbers in the SMF ("SMF ¶ ___") or to the Exhibits to Plaintiff's Statement of Material Facts ("Ex. __").

## ARGUMENT

### I. SUMMARY JUDGMENT IS APPROPRIATE

The Second Circuit recently summarized the applicable standard:

> For the court to grant summary judgment, the movant must 'show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-114 (2d Cir. 2017).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

This case is suitable for resolution by summary judgment. The primary evidence consists of summaries of the trading in the 26 accounts and of measurements of the impact of the cost structure of that trading on the potential for profits. This objective data, which measures buys, sells, and costs, is summarized in detail in Exhibits A through H of the SEC's expert report. These purely statistical summaries, which are derived directly from customer account statements and the trading blotter, cannot legitimately be disputed. Although Defendants have submitted

their own expert report, it is confined to the Amended Complaint's claim based on alleged churning of three customer accounts, but otherwise *agrees* with the objective data used in the SEC's expert's report.  SMF ¶¶ 265-279;  Ex. 1.

Nor can Defendants point to any evidence in the record to contradict the fundamental basis of the motion.  The thousands of records the SEC has collected from J.D. Nicholas, the broker-dealer at which the Defendants worked, and turned over to Defendants shows the absence of a single record even suggesting that Defendants conducted a suitability analysis for these customers or otherwise had a reasonable basis to recommend the strategy.  SMF ¶¶ 136-140.

All that Defendants have offered in response are the unsupported assertions that they did have a reasonable basis for their recommendations.  But self-serving allegations without any record support cannot create a triable issue.  *E.g.*, *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126,  at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010); *see also Allah v. Wilson*, No. 13 Civ. 4269 (ALT), 2017 WL 4350611,  at *3 (S.D.N.Y. July 31, 2017) (granting summary judgment; "[a]bsent any supporting evidence . . . self-serving testimony is . . . insufficient to defeat" a summary judgment motion).

The SEC's summary judgment motion does not call for credibility determinations or choices between conflicting versions of events.  The Defendants' duty to have a reasonable basis for their recommendations  – and the absence of any evidence showing that they did anything to meet this duty – is established.  Summary judgment is warranted.

## II.   DEAN AND FOWLER VIOLATED THE ANTIFRAUD PROVISIONS BY MAKING UNSUITABLE RECOMMENDATIONS WITHOUT ANY REASONABLE BASIS

### A.  The Antifraud Provisions of the Federal Securities Laws

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  To establish a violation of Section 10(b) and Rule 10b-5 thereunder, the SEC must show:  (1) a materially false or misleading statement or omission, or use of a fraudulent device, (2) in connection with the purchase or sale of securities, and (3) scienter.  *See*, *e.g.*, *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *Basic Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988).

Section 17(a) of the Securities Act of 1933 ("Securities Act") prohibits fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce.  Section 17(a)(1), but not Sections 17(a)(2) or (3), requires proof of scienter.  *Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861-62 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998); *see also* 15 U.S.C. § 77q(a).

Rules 10b-5(a) and 10b-5(c), which also implement Section 10(b) of the Exchange Act, prohibit the use of any "device, scheme, or artifice to defraud" or any other "act, practice or course of business which operates . . . as a fraud or deceit" in connection with the purchase or sale of securities, with scienter.  17 C.F.R. § 240.10b; *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) ("[A] cause of action exists under [Rule 10b-5] subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.").

"Scienter 'may be established through a showing of reckless disregard for the truth.' 'Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *SEC v. Milan Capital Group, Inc.*, 2000 WL 1682761, at *5 (S.D.N.Y. Nov. 9, 2000) (citing *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)).

## B.  Dean and Fowler's Trading High-Cost, Excessive Trading

Dean and Fowler recommended and implemented, in the accounts of twenty-six customers, a short-term, speculative and excessive trading strategy, combined with high costs. A critical component was the use of margin to increase buying power. The contours, costs, and consequences of Dean and Fowler's strategy—as seen clearly through the eventual, devastating effects on each account's equity—are summarized below.

The excessiveness of trading is traditionally measured by the turnover ratio and the cost-to-equity ratio. Turnover ratio measures the number of times a customer's securities are replaced by new securities, and is calculated by determining the aggregate amount of purchases in an account over a given period, and dividing by the account's average net equity during that period, and then annualizing that ratio. Ex. 1 at 4. No specific turnover rate *per se* establishes excessive trading. However, courts have found that a turnover rate of six or greater is indicative of excessive trading. *See Moran v. Kidder Peabody & Co.*, 609 F. Supp. 661, 666 (S.D.N.Y. 1985) *aff'd mem.*, 788 F.2d 3 (2d Cir. 1986) (*citing Rush v. Oppenheimer & Co., Inc.*, 592 F. Supp. 1108, 1112 (S.D.N.Y. 1984)) ("Excessive trading is generally held to exist when there is an annual turnover rate in an account in excess of six."); *see also In re Howard*, Exch. Act Release

6

No. 34-46269, 2002 WL 1729157, at *3 (July 26, 2002) (Comm'n Op.), *aff'd Howard v. SEC*, 77 F. App'x 2 (1st Cir. Sept. 19, 2003) (review of NASD disciplinary proceeding based on excessive trading and quantitative suitability violations).

In addition, a cost-to-equity ratio, or break-even analysis, determines the rate of return that an account has to earn on an annual basis just to cover transaction costs for the account. Ex. 1 at 5. A cost-to-equity ratio greater than 20% is indicative of excessive trading. *See id*. at *3; *see also Al Rizek*, Exch. Act Release No. 34-41725, 1999 WL 600427, at *5 (Aug. 11, 1999) (Comm'n Op.) (finding break-even rates of 15-21% to be indicative of excessive trading); *In re Peter C. Bucchieri*, Exch. Act Release No. 34-37218, 1996 WL 254677, at *4 (May 14, 1996) (Comm'n Op.) (cost-to-equity rate of 20-30%).

The turnover ratios in the relevant customer accounts were exceedingly high: an average of 161 across the accounts. Ex. 1 at 8. The cost-to-equity ratios in the customer accounts were also astonishingly high – an average of 168.2%, meaning that an account would have to earn 168% returns in order to break even. *Id*. These numbers alone, which are levels rarely seen in reported cases, prove the extreme nature of the recommendations made by Dean and Fowler. No reasonable basis evidence exists because such trading recommendations are indefensible.

And there can be no dispute that Dean and Fowler were the ones responsible for these patterns of excessive, high-cost trading. Nine customers have stated under oath that Dean or Fowler made all trading decisions. SMF ¶¶ 56-64. And the trade tickets, which Dean and Fowler marked, show that 98.3% of the 2,975 total trades were the result of a broker recommendation. Ex. 1 at 162.

7

### C.  Dean and Fowler Failed to Meet their Duty to Conduct Due Diligence to Ensure That Their Recommendations Were Suitable For at Least Some Customers

Dean and Fowler violated the securities laws because they engaged in the foregoing trading patterns without an adequate and reasonable basis to believe that their strategy would be suitable for anyone. A broker violates the foregoing antifraud provisions of the securities laws by recommending a security without an adequate and reasonable basis. *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir. 1969) ("A securities dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents he has an adequate basis for the opinion he renders."); *see also SEC v. Hasho,* 784 F. Supp. 1059, 1107 (S.D.N.Y. 1992) ("By making a recommendation, a securities dealer implicitly represents to a buyer of securities that he has an adequate basis for the recommendation"). [1]

*First,* Dean and Fowler knew of their reasonable basis and suitability obligations.  SMF ¶¶ 27-44.  They were trained on suitability as part of a broker's basic licensing process, and they agreed in writing not to make any customer recommendations "which do not have a reasonable basis."  SMF ¶ 32.  Dean and Fowler also participated in training at J.D. Nicholas where they

---

[1]    In interpreting the federal securities laws, many courts have considered opinions of the Commission.  *See In re New Times Sec. Servs.,* 371 F.3d 68 (2d Cir. 2004) (noting that the Commission's interpretation weighs in favor of deference because the SEC is responsible for regulating broker-dealers, administering securities exchanges, and protecting the investing public under the securities laws).  The Commission has repeatedly recognized that the duty to conduct a reasonable basis suitability analysis extends to a particular trading strategy recommended or directed by the broker.  *See In re F.J. Kaufman and Co. of Va., et al.,* Exch. Act Release No. 34-27535, 1989 WL 259961, at *3-7 (Dec. 13, 1989) (Comm'n Op.) (upholding the NASD's finding that a registered representative violated the NASD suitability rule because he lacked a reasonable basis to recommend a buy-write options strategy).  The Commission reasoned that "it is self-evident that a broker cannot determine whether a recommendation is suitable for a specific customer unless the broker understands the potential risks and rewards inherent in that recommendation." *Id.* at *3.  *See also In re Kuznetz,* Exch. Act Release No. 34-23525, 1986 WL 625417, at *3 (Aug. 12, 1986) (Comm. Op.) ("When a securities salesman recommends securities, he is under a duty to ensure that his representations have a reasonable basis").

learned that "a broker must perform reasonable diligence to understand the nature of the recommended strategy or investment strategy . . . as well as the risks and rewards." SMF ¶ 39. In addition, FINRA Rule 2111, which Dean and Fowler knew they were bound to follow, *id.* SMF ¶¶ 38-44, required them to have a reasonable basis for customer recommendations.[2] *See also Cody v. SEC*, 693 F.3d 251, 259 (1st Cir. 2012) ("The responsibility to investigate belonged to [the broker]").

*Second*, there is a complete absence of any reasonable basis due diligence by either Dean or Fowler before making any recommendation. Summary judgment is therefore appropriate. In *SEC v. Platinum Inv. Corp.*, No. 02 Civ. 6093 (JSR), 2006 WL 2707319, at *1-2 (S.D.N.Y Sept. 20, 2006), Judge Rakoff granted the SEC's motion for summary judgment against a broker who was "not a leader or organizer" of an offering fraud but who, when making customer recommendations, "did nothing" to confirm that his recommendations had any reasonable basis. Citing *Hanly*, the court stated that customers "are entitled to presume that the representations made were the result of reasonable investigation." *Id.* at *3. The broker in *Platinum*, however, much like Dean and Fowler, "failed to take even the most rudimentary steps to make sure his recommendations to his clients were responsible and reasoned," *id.*, and had thus violated the law.

---

[2]     FINRA Rule 2111(a) states: "A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation."

Dean and Fowler failed to fulfill their duty to ensure that their recommendations had a reasonable basis, which constitutes recklessness. *See SEC v. Shainberg*, 316 F. App'x. 1, 2 (2d Cir. 2008) ("A breach of this [broker's] duty can constitute reckless disregard and therefore, the requisite scienter to make out a violation").   In this case, as in *Platinum*, there is no evidence of any reasonable basis determination by either Dean or Fowler.  In discovery in this action, Dean and Fowler have had to admit that they have no documents showing any reasonable basis or suitability determinations.  SMF ¶¶ 128-135.  And although Dean and Fowler have speculated that relevant documents at one time may have existed within J.D. Nicholas, the SEC's thorough pre-Complaint investigation – in which all documents relating to their handling of customer accounts was subpoenaed and produced – did not reveal any evidence of reasonable basis determinations.  SMF ¶¶ 136-140.

As the persons who recommended the trades (SMF ¶¶ 35-64) – and there were nearly 3,000 trades across twenty-six accounts (Ex. 1 at 162) – Dean and Fowler should be held responsible for their violations.  As the evidence shows, the equity in the accounts was relentlessly depleted through the trading they directed and the use of margin in each of the accounts significantly increased the buying power and also exposed the customers to more risk. Ex 1 at 3-4.  Such a strategy is indefensible and has no purpose except to enrich Dean and Fowler.  *See Rizek v. SEC*, 215 F.3d 157, 158-160 (1st Cir. 2000) (broker's strategy "magnified the risk by trading the accounts on margin" without economic logic).

As the SEC's expert found: "The rapid in-and-out trading eroded account equity to the point where it was remote, if not impossible, to rise above the break-even point to profitability." Ex. 1 at 6.  In addition, the cost structure of the trading strategy implemented by Dean and Fowler had no reasonable basis.  Ex. 1 at 3-7.  In view of the heavy weight of the costs of the in-

and-out trading, even a minimal profit was impossible. *Id.* "[I]n and out [trading strategy] is a practice extremely difficult for a broker to justify." *Costello v. Oppenheimer & Co., Inc.*, 711 F.2d 1361, 1369 n.9 (7th Cir. 1983) (discussing the use of statistical evidence showing a pattern of "in and out" trading to prove a churning violation).

### D.  Dean and Fowler Made Other Material Misrepresentations and Omissions

In addition to recklessly failing to meet their duty to conduct any suitability analysis for their high-cost, excessive trading strategy, Dean made overt material misrepresentations and omissions to their clients.  Exs. 2, 3, 4; SMF ¶¶ 185-323.  Namely, Dean and Fowler failed to disclose to their customers that they had no reasonable basis for their strategy, and failed to disclose that due to the commissions and frequency of trading, the customers were almost guaranteed to lose money, and misrepresented their intended strategy as one that had the potential for profit.  *Id.* These misrepresentations and omissions were at a minimum highly reckless and violated the antifraud provisions.  *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1250 (11th Cir. 2012) (broker's misrepresentations and omissions to individual investors can be considered in total mix of materiality analysis); *SEC v. Landberg*, 836 F. Supp. 2d 148, 154-55 (S.D.N.Y. 2011) ("Reckless conduct is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care … to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it."); *see also Hasho*, 784 F. Supp. at 1110 (without knowledge of the costs associated with a recommended trade, customers were "deprive[d] . . . of the knowledge that [their] registered representative[s] might be recommending a security based upon the registered representative's own financial interest rather than the investment value of the recommended security.").

The recordings of Dean's conversations with Eugene Bernardo, Albert Claycomb and Steve Hellwig demonstrate the deceptive and misleading manner in which Dean communicated with customers.  While Bernardo, who installs kitchens and bathrooms for a living, repeatedly tried to tell Dean about his concern over the mounting losses in his account due to Dean's trading, Dean is continually upbeat and encourages Bernardo to stick with the game plan.  Ex. 75 at 3-12.  Dean never says a word about the sky-high costs that are erasing Bernardo's equity.  *Id*. The remarkably high level of trading in Bernardo's account from August 2012 through March 2013 is apparent from the trade blotter summary.  Ex. 1 at 83-94.  In Dean's recorded conversations with Bernardo, however, he never once tells Bernardo that the real reason for his losses – Bernardo lost in total a staggering $474,958 – was the strategy's cost structure.  Ex. 75 at 3-12.

In Dean's recorded conversations with Claycomb, who is concerned and upset about the losses, Dean repeatedly urges Claycomb to stick with his "game plan" and to make more purchases.  Ex. 75 at 3-4.  Dean knows that Claycomb is worried about the in-and-out trading, and told Claycomb: "I get it, I understand where you are, you wanted less trading and I realize that."  *Id*.  Dean nevertheless tells Claycomb to stick with his strategy, telling Claycomb that they should "get back down to the game plan . . . we really have to be proactive, we can't just sit here on our hands."  *Id*.  Claycomb, who deposited a total of $50,938 in his J.D. Nicholas account, paid a total of $46,800 if commissions and fees (Ex. 1 at 161) and ended up with losses of $22,840 (Ex. 1 at 11).

In Dean's brief recorded conversation with Hellwig, Dean exudes confidence, telling Hellwig that the "market's still very confident, breaking through highs."  Ex. 75 at 14-15. Hellwig paid a total of $114,970 in commissions and fees, and suffered an overall loss of

$40,498.  Ex 1 at 8.  In these recordings, Dean never speaks a word about the true factor determining the profitability in the account: the costs imposed by his trading decisions.

### E.  Dean and Fowler Acted With Scienter

Under these facts, there is no triable issue of fact as to Dean and Fowler's scienter, which is demonstrated through the excessiveness of the trading recommendations made by Dean and Fowler.  These recommendations were not in the customers' interests and served no purpose but to enrich Dean and Fowler.  The deceptive and manipulative device under Section 10(b) is "implicit in the nature of the conduct."  *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983); *see also Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 767 F.2d 1498, 1502 (11th Cir.1985) ("plaintiffs' expert also testified that the velocity of trading in plaintiffs' account made no sense, other than to generate commissions.... which was sufficient evidence ....").

Moreover, Dean and Fowler's scienter is established by the fact that it was they who made the trading decisions (SMF ¶¶ 45-64), *see supra* at II.B, and by the additional misrepresentations that Dean and Fowler made to certain customers, *see supra* at II.D.

### F.  Dean and Fowler Acted Negligently

Section 17(a)(2) of the Securities Act makes it unlawful to obtain money or property by means of misstatements or omissions about material facts, and Section 17(a)(3) proscribes any transaction, practice, or course of business that operates as a fraud or deceit upon a purchaser.  *Softpoint*, 958 F. Supp. at 861.  A showing of negligence suffices for liability under Sections 17(a)(2) and 17(a)(3).  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *see also SEC v. Markusen, et al.*, Civ. No. 14-3395, 2016 WL 1629267, at *8 (D. Minn. Apr. 25, 2016) ("[S]cienter is required to prove a violation of Section 10(b), Rule 10b-5, and Section 17(a)(1), while Sections 17(a)(2) and (3) are proven by showing a defendant acted at least negligently.").

13

Dean and Fowler violated Sections 17(a)(2) and 17(a)(3) of the Securities Act by obtaining money through the use of misrepresentations and omissions, and in engaging in a course of business that operated as a fraud.

Dean and Fowler negligently breached their duty to have a reasonable basis for their recommendations. SMF ¶¶ 128-135. Dean and Fowler also failed to take any steps to determine whether the strategy they recommended was suitable when they had a duty to do so. Their conduct was thus inherently unreasonable and beyond what is expected of a typical broker (as Dean and Fowler knew, SMF ¶¶ 27-44), and therefore, at a minimum, negligent.

### III.   DEAN AND FOWLER VIOLATED THE ANTIFRAUD PROVISIONS BY MAKING UNSUITABLE CUSTOMER-SPECIFIC RECOMMENDATIONS WITHOUT ANY REASONABLE BASIS

In addition to their reasonable basis duty, Dean and Fowler had customer-specific duties. In other words, and as Dean and Fowler were instructed, "a broker must have a reasonable-basis to believe that a recommendation of a security or investment strategy . . . is suitable for the particular customer based on the customer's investment profile." Ex. 76 at 14-14. *See also Cody v. SEC*, 693 F.3d 251, 255, 258-259 (1st Cir. 2012) (broker who engaged in "a pattern of in-and-out trading" violated customer-specific suitability rules; affirming Commission order)

The evidence shows that Dean and Fowler used a one-size-fits-all approach with their customers. All 26 account opening forms had the same high-level objectives and risk tolerances, all customers were made to sign margin agreements (Ex. 70), and all the accounts were traded in the same aggressive manner. Ex. 1 at 9; SMF ¶¶ 171-184. Many of the customers, however, were not savvy or sophisticated investors.

Frank Philipps was a retired auto mechanic whose annual salary, at its peak, never topped $50,000. Ex. 4. Clay Miller worked as a manual laborer doing insulation and construction for 33 years, and is now retired. Ex. 3. Kenneth Bayer was a farmer in Nebraska who did not even

own a computer.  Ex. 2.  Robert Weathers and Eugene Bernardo both had serious medical issues that hindered their mental faculties.  Ex. 11 at 6; Ex. 75 at 8; Ex. 15 at 3.

Other investors, including Bobby Pilkington, Allen Deuschle, Hector Estrada and Steve Hellwig, testified that they did not follow the stock market or investments.  SMF ¶¶ 225-323. Although these customers may have been accomplished in their particular career paths, they were not at all sophisticated with regard to investments.  Dean and Fowler had a duty to know this, but they never did.

The transcripts of the confirmation calls made by J.D. Nicholas supervisors are clear-cut evidence of the way Dean and Fowler ignored customer-specific facts.  Many customers stated that they did not want to use borrowed money to buy stocks.  SMF ¶¶ 76-122.  Although Dean and Fowler are not making these calls, the transcripts show that many customers were open about their intentions not to use margin.  SMF ¶¶ 83, 87, 90, 94, 99, 103, 109.  Clay Miller, moreover, repeatedly told Dean and Fowler that he did not want margin used in his account, to no avail.  Ex. 3.  Dean and Fowler traded excessively on these customers' accounts anyway.  Ex. 1 at 8

## IV.   DEAN AND FOWLER ENGAGED IN UNAUTHORIZED TRADING ON CERTAIN CUSTOMERS' ACCOUNTS

A broker who trades in a customer's account without authority may be liable under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.  *See, e.g.*, *Caiola v. Citibank, N.A.*, 295 F.3d 312, 323 (2d Cir. 2002) (claim for unauthorized trading, which occurs when a broker intentionally places trades without obtaining the customer's approval, historically has been well-established under Rule 10b-5); *In re Sandra K. Simpson*, Exch. Act Release No. 34-45923, 2002 WL 987555, at *13 (May 14, 2002) ("A

broker who trades in a customer's account without authorization commits fraud if there is accompanying deceptive conduct.").

Unauthorized trades are actionable under the antifraud provisions "when accompanied with 'deception, misrepresentation, or non-disclosure.'"  *Hasho*, 784 F. Supp. at 1110 (*citing Pross v. Baird Patrick & Co.*, 585 F. Supp. 1456, 1459 (S.D.N.Y. 1984)).  *See also In re William C. Piontek*, (Comm'n Op.) Exch. Act Release No. 34-48903, 2003 SEC LEXIS 2940, at *20 (Dec. 11, 2003) ("[a] broker who trades in a customer's account without authorization commits fraud if there is accompanying deceptive conduct.").  "The deceptive element is established when the broker omits 'to inform the customer of the materially significant fact of the trade before it is made.'"  *Id.*  (*citing Donald A. Roche*, (Comm'n Op.) Exchange Act Release No. 38742, 1997 SEC LEXIS 1283, at *17 (June 17, 1997)); *see also In re Steven E. Muth*, (Comm'n Op.) Exch. Act Release No. 34-52551, 2005 SEC LEXIS 2488, at *37 (Oct. 3, 2005) (finding deceptive conduct requirement met by registered representative's failure "to inform [customers] in advance about his effecting trades in their accounts, the quantity of securities he was purchasing on their behalf, and his use of margin.").

Dean and Fowler knew that they were required to obtain customer authorization prior to entering an order.  SMF ¶ 142.  Given that all of their customers were hundreds of miles away, and all communications were by telephone, there should be a phone call or text message between customer and broker before every order.  The SEC staff obtained the records of all phones used by Dean and Fowler from 2011 through 2014, and also listed every phone number used by the customers.  By comparing the customer phone records with the trading records, the SEC determined which orders were not preceded by a text message or phone call.  SMF ¶¶ 142-158.

16

This evidence shows widespread unauthorized trading in 25 of the 26 accounts.  SMF ¶¶ 157-158.

### V.       THE RELIEF SOUGHT IN THE AMENDED COMPLAINT IS WARRANTED

#### A.  Injunctive Relief is Appropriate

Permanent injunctions against future violations of the securities laws may be ordered as part of a judgment if a factual basis for that relief exists.  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir. 1975).  Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), entitle the Commission to obtain permanent injunctive relief upon a showing that: (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future.  *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978); *SEC v. Manor Nursing*, 458 F.2d 1082, 1100-01 (2d Cir. 1972).  Here, the securities law violations are established by the evidence demonstrating the violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

In considering whether there is a reasonable likelihood that the defendant will commit future violations of the securities laws, the Second Circuit weighs various factors, including: (1) the egregiousness of the violation; (2) the degree of scienter involved; (3) the isolated or repeated nature of the violations; and (4) the defendant's recognition of the wrongful nature of his conduct.  *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Commonwealth Chem. Secs. Inc.*, 574 F.2d at 100-01.  Dean and Fowler have securities licenses and continue to work at a broker-dealer doing the same work they did at J.D. Nicholas.  Their conduct was not an isolated incident, but took place over several years and affected 26 customers.  Defendants also have

expressed no regret or recognition of wrongful conduct. As a result, injunctive relief is appropriate.

### B. Dean and Fowler Should Disgorge Their Ill-Gotten Gains

Courts have long recognized the importance of requiring securities law violators to disgorge all the proceeds of their fraud. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974).

Dean and Fowler earned a total of $630,986.20 in commissions for their illegal conduct. SMF ¶¶ 163-170. This amount should be disgorged. *Hasho*, 784 F. Supp. at 1112 ("Due to the pervasive nature of the fraud in this case, the proper measure of disgorgement is the amount of commissions earned by each defendant in each of the customer witnesses' accounts."); *In re Ralph Calabro*, Rel. No. 9798, 2015 WL 3439152, at *44 (May 29, 2015) (Comm'n Op.) (ordering disgorgement of commissions earned by brokers who churned account).

Dean and Fowler split all commission revenue earned by them 50/50. SMF ¶ 164. It is also well-settled that courts may impose joint and several disgorgement liability where two or more defendants have collaborated in the illegal conduct. *SEC v. Calvo*, 378 F.3d 1211, 1215-16 (11th Cir. 2004) (citing cases); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997). Dean and Fowler should be held jointly and severally liable for disgorgement of the proceeds of the fraudulent conduct.

Although the SEC bears the ultimate burden of persuasion that its disgorgement figure approximates the amount of unjust enrichment, once a disgorgement figure is shown the burden then shifts to Dean and Fowler who must clearly demonstrate that the disgorgement figure is not a reasonable approximation of their proceeds from the fraud. *SEC v. First City*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *SEC v. Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987). Here, the

SEC has shown evidence of the payout that Dean and Fowler received pursuant to their agreement with J.D. Nicholas.  SMF ¶¶ 163-170.

### C.  Dean and Fowler Should be Ordered to Pay Prejudgment Interest

The Court should require Dean and Fowler to pay prejudgment interest on $630,986.20, the full amount of disgorgement.  Such an award is a proper exercise of judicial discretion, and courts typically impose prejudgment interest in Commission enforcement actions.  *See, e.g., Calvo*, 378 F.3d at 1217.  Prejudgment interest deprives a defendant of an interest-free loan in the amount of his or her ill-gotten gains, thereby preventing further unjust enrichment.  In determining prejudgment interest, it is appropriate to use the IRS underpayment rate, *see* 26 U.S.C. § 6621(a)(2), and the interest should be compounded quarterly.  *See* 17 C.F.R. § 201.600(b); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

### D.  Civil Penalties Are Appropriate

Dean's and Fowler's violations warrant third tier civil penalties, which are appropriate for violations that involved fraud and resulted in, or created a significant risk of, substantial losses to other persons.  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  These requirements are clearly satisfied here.  The maximum amount of third tier penalties available for each violation here is either the "gross amount of pecuniary gain to such defendant as a result of the violation" or $110,000 against an individual, whichever is greater.  *See* 17 C.F.R. §§ 201.1001 and 201.1002 (adjusting the maximum penalty amounts pursuant to the Debt Collection Improvement Act of 1996).

Civil penalties are meant to punish the individual wrongdoer as well as to deter him and others from future securities law violations.  *SEC v. Kenton Capital, Ltd.*, 69 F.Supp. 2d 1, 17 (D.D.C. 1998); *SEC v. Friendly Power*, 49 F. Supp. 2d 1363, 1373 (S.D. Fla. 1999).  Because

civil penalties, like a permanent injunction, are imposed in part to deter the wrongdoer from similar conduct in the future, courts apply the same factors for determining injunctive relief in assessing civil penalties. *SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003). Various factors may be considered in determining the appropriate amount of the penalty, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; and (4) whether the defendant's conduct was isolated or recurrent. *See, e.g., SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (listing factors); *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602 (RWS) (S.D.N.Y. Oct. 22, 2002). All of the factors justify a penalty. Dean and Fowler' antifraud violations were particularly egregious; they knew what they were going; their conduct created substantial losses to their customers; and the defendants' conduct was recurrent over several years.

## CONCLUSION

The SEC respectfully requests that the Court grant its motion for summary judgment

against the defendants and impose the requested relief.

Dated: New York, New York
      February 9, 2018

Respectfully submitted,

By:     _David Stoelting_

       David Stoelting
       Jorge G. Tenreiro
       Kristin M. Pauley
       *Attorneys for Plaintiff*
       U.S. Securities and Exchange Commission
       New York Regional Office
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       Tel: (212) 336-0174 (Stoelting)
       Tel: (212) 336-9145 (Tenreiro)