Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 1

1             UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - -

4    SECURITIES AND EXCHANGE      )

5    COMMISSION,                  )

6              Plaintiff,  ) CASE NO.

7    v.                           ) 17-CV-00139-GHW

8    GREGORY T. DEAN and          )

9    DONALD J. FOWLER,            )

10             Defendants.  )

11   - - - - - - - - - - - - - - -

12

13

14

15

16     VIDEOTAPED DEPOSITION OF EUGENE F. BERNARDO

17          TUESDAY, OCTOBER 3, 2017

18

19

20

21     BEHMKE REPORTING AND VIDEO SERVICES, INC.

22   BY:  STEPHANIE A. BATTAGLIA, CSR NO. 084-003337

23          160 SPEAR STREET, SUITE 300

24          SAN FRANCISCO, CALIFORNIA 94105

25                    (415) 597-5600

---

Page 2

1

2

3

4

5

6

7     Videotaped Deposition of EUGENE F. BERNARDO,

8    taken on behalf of Plaintiffs, at 10 Brook Lane,

9    Palos Park, Illinois, commencing at 9:06 A.M.,

10   TUESDAY, OCTOBER 3, 2017, before Stephanie A.

11   Battaglia, Certified Shorthand Reporter, CSR No.

12   084-003337, pursuant to Notice of Videotaped

13   Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFF:

3      U.S. SECURITIES AND EXCHANGE COMMISSION

4      BY: KRISTIN M. PAULEY, ATTORNEY AT LAW

5          DAVID STOELTING, ATTORNEY AT LAW - (TELEPHONICALLY)

6      200 Vesey Street, Suite 400

7      New York, New York 10281

8      Telephone: (212) 336-0174

9      Email: stoeltingd@sec.gov

10          pauleyk@sec.gov

11

12   FOR THE DEFENDANTS:

13      McCORMICK & O'BRIEN LLP

14      BY:  LIAM O'BRIEN, ATTORNEY AT LAW

15      9 East 40th Street, 4th Floor

16      New York, New York 10016

17      Telephone:  (212) 286-4471

18      Email: lobrien@mcoblaw.com

19

20   ALSO PRESENT:

21      GREGORY DEAN

22      BEV BERNIE BERNARDO

23      DMITRY ANANYEV, VIDEOGRAPHER

24

25

---

Page 4

1                  INDEX

2    TUESDAY, OCTOBER 3, 2017

3    EUGENE BERNARDO                     PAGE

4      Examination by MS. PAULEY           13

5      Examination by MR. O'BRIEN         117

6    P.M. SESSION                        154

7      Examination resumed by MR. O'BRIEN 154

8      Examination by MS. PAULEY         268

9

10                  -oOo-

11

12   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

13          PAGE     LINE

14          None.

15

16

17

18

19

20

21

22

23

24

25

---

Plaintiff Ex 11 - 1

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 13

1  this case, and one of the defendants is here today,
2  Mr. Gregory Dean, as well.
3         THE VIDEOGRAPHER: The court reporter
4  today is Stephanie Battaglia, Certified Shorthand
5  Reporter, contracted by Behmke Reporting and Video
6  Services.
7         Would you state -- would you swear in the
8  witness.
9         (Witness sworn.)
10        THE VIDEOGRAPHER: Please proceed.
11            EUGENE BERNARDO,
12  called as a witness herein, having been first duly
13  sworn was examined and testified as follows:
14            EXAMINATION
15        BY MS. PAULEY:
16    Q.   Good morning, Mr. Bernardo.
17    A.   Good morning.
18    Q.   As I mentioned, my name is Kristin Pauley
19  and David Stoelting is my colleague who is on the
20  phone and we both represent the Securities and
21  Exchange Commission in this litigation.
22         Today I am going to be asking you
23  questions, and both my questions and your answers are
24  going to be recorded by the court reporter so it is
25  important that you answer my questions orally as

---

Page 14

1  opposed to nodding or gesturing so that way the
2  transcript can be accurate.  And it is also helpful if
3  you let me finish my question first before you begin
4  your answer so that way she can more easily transcribe
5  what we are saying here today.
6         We are going to be taking regular breaks
7  throughout the day, but if at any point you would like
8  to take a break, let us know and we will go off the
9  record.
10        Is there any reason why you can't testify
11  truthfully here today?
12    A.   No.
13    Q.   Do you have any questions before we
14  begin?
15    A.   No.
16    Q.   I would like to mark this exhibit as
17  Exhibit No. 185.
18        (Document marked Plaintiff's Exhibit 185
19          for identification.)
20  BY MS. PAULEY:
21    Q.   Mr. Bernardo, please review Exhibit 185
22  and let me know when you are ready.
23    A.   I believe I am ready.
24    Q.   Is Exhibit 185 the subpoena pursuant to
25  which you are testifying here today?

---

Page 15

1    A.   Yes.
2    Q.   You can put that aside.
3         Mr. Bernardo, when were you born?
4    A.   Redacted
5    Q.   And so you are 73 today?
6    A.   No, Redacted
7    Q.   44, so do the math for me, you are --
8    A.   I am 73.
9    Q.   73, okay.
10        And what is your address?
11    A.   Redacted , Illinois,
12  60464.
13    Q.   How long have you lived at 10 Brook Lane?
14    A.   Twenty years.
15    Q.   And are you married?
16    A.   Yes.
17    Q.   Who is your wife?
18    A.   Bev Bernie Bernardo.
19    Q.   And how long have you and Ms. Bernie Bev
20  been married?
21    A.   Approximately 30 years, it is about
22  29 years, I believe.
23    Q.   Do you have any children?
24    A.   I have a child from a first marriage.
25    Q.   What is his name, his or her name?

---

Page 16

1    A.   Redacted Bernardo.
2    Q.   Do you have any grandchildren?
3    A.   Yes, I have two granddaughters, one is 16
4  and one is 15, name is Redacted .
5    Q.   Can you please list all of the telephone
6  numbers you have used during the past five years?
7    A.   I will try. Redacted -2354,
8  Redacted -1517 Redacted -9355, cell number is
9  Redacted -2122, and my wife's cell is Redacted -2354.
10    Q.   Can you tell me -- for each of these
11  numbers I am wondering who the service provider is.
12        So for the 2354, do you know which
13  service provider you use, like Verizon or AT&T?
14    A.   AT&T.
15    Q.   Okay.
16        What about the one ending in 1517?
17    A.   AT&T.
18    Q.   And the one ending in 9355?
19    A.   AT&T.
20    Q.   The one ending in 2122?
21    A.   I think it is called Consolidated, it is
22  basically for seniors, Consolidated.
23    Q.   Consolidated?
24    A.   I think that is what it is called, I am
25  not positive.

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

**Plaintiff Ex 11 - 2**

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

**Page 17**

1    Q.   Okay.
2         What about your wife's cell phone number,
3    the one ending in 2354?
4    A.   I don't remember, it is Ameritech maybe.
5    Q.   Okay, that is okay.
6         Can you please list any e-mail addresses
7    that you have used in the last five years?
8    A.   Redacted                          ,
9    .net, that is what my e-mail has been, I have had it
10   for years, so I don't have.
11   Q.   What is the highest level of education
12   that you received?
13   A.   Basically a high school education with a
14   partial one year of college.
15   Q.   When did you graduate from high school?
16   A.   1962.
17   Q.   And then you went to one year of college
18   after high school?
19   A.   It could have been a year or two after.
20   Q.   And where did you do the year or two of
21   college?
22   A.   It is in Chicago Heights, it is Bloom
23   Township, I can't remember the name, it is Bloom
24   Township College, it is --
25   Q.   That is okay.

---

**Page 18**

1    A.   -- Public College.
2    Q.   And what did you study when you were in
3    -- for the year or two in college?
4    A.   Basically computers.
5    Q.   Computers?
6    A.   When they were first coming out.  We had
7    the big machines that took up a whole wall, I can't
8    even remember it, it is not good anymore, that is for
9    sure.
10   Q.   After you did the year or two of college
11   what did you do next, where did you work?
12   A.   Well, when I -- I went to -- let me
13   backtrack a little bit.
14        When I went to -- when I graduated high
15   school I went to work for Ford Motor Company in
16   Chicago Heights, Illinois, where we assembled -- we
17   made car parts and I went to school at night so I was
18   working a job and going to school.
19   Q.   So for the year or two you did of college
20   you were working during the day?
21   A.   Yes, I was working during the day.
22   Q.   And you said when you were at Ford Motor
23   you were working on the assembly line?
24   A.   Yes, but it was assembling -- putting
25   doors together, which would be shipped to get painted

---

**Page 19**

1    and then be put on the cars.  We just stamped out, it
2    was a stamping plant, we stamped out, we made all the
3    parts out of rolled steel.
4    Q.   And after Ford Motor did you work
5    somewhere next?
6    A.   Yes.  I worked for Chicago Title & Trust.
7    Q.   And what did you do there?
8    A.   I don't know what to call the title, they
9    have a title for it.  I would go out and go to homes
10   that were being sold and I would have to go to the
11   homes check for encroachments, where maybe the fence
12   was not on their property line or the gutters were too
13   far over or something like that.
14   Q.   And after you worked at Chicago -- you
15   said Chicago Title?
16   A.   Uh-huh.
17   Q.   After Chicago Title where did you work
18   after that?
19   A.   I worked at Pioneer Title for a short
20   period of time, I can't remember, maybe a year.
21   Q.   What did you do at Pioneer?
22   A.   Same thing.
23   Q.   Then after Pioneer Title where did you
24   work?
25   A.   I went to work for Pitney Bowes, and they

---

**Page 20**

1    sold mailing equipment and copiers and sorters and
2    things like that.
3    Q.   So you were in sales?
4    A.   I was in sales.
5    Q.   And after Pitney Bowes where did you
6    work?
7    A.   Let me think where I worked after Pitney
8    Bowes.
9         Well, I went to work for Field
10   Syndication, and I was -- I was one of five, they had
11   five people working in the -- they had the secretary
12   and so on, but five people that would go out to all
13   the newspapers in the country and they would introduce
14   new products coming out, syndication, so I would show
15   them new products coming out.  I would renegotiate --
16   the contracts were coming up so I would renegotiate
17   their contracts and I would take care of any customer
18   relation problems, like if they were not making their
19   payments and so on, things like that.
20   Q.   And after -- you said that was called
21   Field -- I am sorry, the name was Field --
22   A.   Field Syndication, as in Marshall
23   Field's, Marshall Field's owned it.
24   Q.   Got it.
25        After Field Syndication, where did you

---

Plaintiff Ex 11 - 3

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 21

1  work?
2      A.   I went to work for a company called
3  Cabinet Pac.
4      Q.   What did you do there?
5      A.   I was a salesman for cabinet refacing.
6          MS. REPORTER: What is the company
7  called?
8          THE WITNESS: Cabinet Pac, C-a-b-i-n-e-t
9  P-a-k -- no, P-a-c, P-a-c, I am sorry.
10 BY MS. PAULEY:
11     Q.   And after Cabinet Pac what did you do?
12     A.   I started my own company.  Cabinet Pac
13 almost closed down because when Reaganomics came and
14 the interest rates were so high and so on people
15 weren't buying anything, all the installers were laid
16 off.  We had one installer, they kept me as one
17 salesman, I was the only guy, and I would get a lead
18 or two a week and I couldn't live off a lead or two a
19 week.
20          I always wanted my own company, I saw
21 what Marshall Field's made and I knew what he made
22 approximately and I knew that having your own business
23 would be the way to go if you are going to be a hard
24 worker and I started my own company.  And I called two
25 of the installers and had coffee with them to see if

---

Page 22

1  they wanted to work for me and they said yes, one
2  installer left after a while because he was nervous
3  that I would make it, but I made it.
4          My first year I made minus $12,000 from
5  March to December, minus 12,000.  My second year I
6  made 20,000.  And then my third year I started making
7  money, I made 50,000.  Then I went to 100,000 a year.
8      Q.   What was the name of your company?
9      A.   I still have it, it is Bernardo Kitchen &
10 Bath, Ltd., -- no -- Ltd., yes.
11     Q.   And what does Bernardo Kitchen & Bath do?
12     A.   We sell new kitchens, whether it is just
13 the cabinets and counters or complete kitchens like
14 flooring and lighting and so on.  We sell bathrooms,
15 we redo bathrooms, we do bathrooms, build new
16 bathrooms.  And we sell cabinet refacing.
17     Q.   And it is still in operation today?
18     A.   Still in operation.
19     Q.   And what are you doing, what is your role
20 at the company today?
21     A.   With my health my role of the company is
22 to walk in, stay there about two hours, find out what
23 is going on, if we have any problems with any
24 customers if everything is going well, if there is any
25 repairs, where we stand budget-wise, have any leads

---

Page 23

1  come in, have any leads canceled, and I take that in
2  for the first two hours and I am done for the day.
3      Q.   And approximately how many homes do you
4  -- how many customers do you have during a given year?
5      A.   I would say 150 to 200 customers.
6      Q.   And what is your -- for the past few
7  years what is your take-home pay through your
8  business?
9          MR. O'BRIEN: Objection, vague and
10 ambiguous.
11          THE WITNESS: My -- would you repeat the
12 question?
13 BY MS. PAULEY:
14     Q.   For the past few years, since let's say
15 the past five years on average what is your take-home
16 pay?
17     A.   Nothing.
18          MR. O'BRIEN: Objection.
19 BY MS. PAULEY:
20     Q.   Nothing.
21     A.   Nothing, I don't make any money at all.
22 I don't take a salary anymore because my company is in
23 trouble right now because of some bad times we had, so
24 I just volunteer my time trying to bring it back up.
25     Q.   How long have you been volunteering your

---

Page 24

1  time for?
2      A.   You hit it on the head, about two years.
3      Q.   Two years, okay.
4          So prior to that time what would you --
5  what would your take-home pay be?
6          MR. O'BRIEN: Objection.
7          THE WITNESS: I would say Redacted,
8  plus I had benefits, a lot of benefits like insurance
9  and gasoline and car payment and the telephones and
10 whatever we come up with I got a lot of benefits from
11 that.
12 BY MS. PAULEY:
13     Q.   What other sources of income do you have
14 besides any money you make through the business?
15          MR. O'BRIEN: Objection, relevance.
16          THE WITNESS: It is the money I am making
17 on my investments, the stock market.
18 BY MS. PAULEY:
19     Q.   Anything else, any other money coming in
20 the door?
21     A.   No.
22     Q.   Are you on Social Security?
23     A.   Yes, I am sorry, I am on Social Security.
24          MR. O'BRIEN: Objection.
25

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Plaintiff Ex 11 - 4

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

**Page 25**

BY MS. PAULEY:

1    Q.   So besides money, any money you make
2 through your business, your investments, Social
3 Security, are there any other sources of income that
4 you have coming in your house?
5      MR. O'BRIEN: Objection, leading.
6      THE WITNESS: No, not that I know of.
7 BY MS. PAULEY:
8    Q.   And what about your wife, does she work?
9    A.   She has worked when we have been married
10 -- first got married, she worked for many years, but
11 she has been retired now I would say for a couple of
12 years.
13    Q.   And what does your wife do?
14    A.   She worked for an advertising agency.
15    Q.   And what was her annual salary?
16      MR. O'BRIEN: Objection, vague,
17 ambiguous.
18      THE WITNESS: I think it was Redacted a
19 year.
20 BY MS. PAULEY:
21    Q.   So other than the income that you receive
22 what other assets do you and your wife own?
23    A.   Well, I own -- we own this home. My
24 parents passed away and I inherited their home and I


**Page 25**

1 BY MS. PAULEY:
2    Q.   So besides money, any money you make
3 through your business, your investments, Social
4 Security, are there any other sources of income that
5 you have coming in your house?
6      MR. O'BRIEN: Objection, leading.
7      THE WITNESS: No, not that I know of.
8 BY MS. PAULEY:
9    Q.   And what about your wife, does she work?
10    A.   She has worked when we have been married
11 -- first got married, she worked for many years, but
12 she has been retired now I would say for a couple of
13 years.
14    Q.   And what does your wife do?
15    A.   She worked for an advertising agency.
16    Q.   And what was her annual salary?
17      MR. O'BRIEN: Objection, vague,
18 ambiguous.
19      THE WITNESS: I think it was Redacted a
20 year.
21 BY MS. PAULEY:
22    Q.   So other than the income that you receive
23 what other assets do you and your wife own?
24    A.   Well, I own -- we own this home. My
25 parents passed away and I inherited their home and I

**Page 26**

1 bought a condominium in -- what is the name of that
2 town, I can't remember, Countryside -- west of
3 Hinsdale. I am sorry, my mind isn't too good, I can't
4 remember the name of the town.
5    Q.   That is okay, in the Chicagoland area.
6    A.   In the Chicagoland area.
7    Q.   Can you describe for me what your
8 expenses, what your household expenses are?
9    A.   I would say Redacted a year.
10      MR. O'BRIEN: Objection, relevance.
11 BY MS. PAULEY:
12    Q.   What is the Redacted a year comprised
13 of?
14    A.   My home is paid for. But it pays my
15 taxes, which are pretty high, I think. It pays my
16 monthly maintenance because the grounds are kept up
17 here. It pays my water, my electric, and my gas bill,
18 natural gas bill, pays for all my groceries, pays for
19 any repairs we might have to have. It pays for a
20 little bit of entertainment, we don't go a lot of
21 money, we go out for entertainment once in a while.
22 And -- did I say groceries?
23    Q.   Uh-huh.
24    A.   Whatever comes up.
25    Q.   Okay.

**Page 27**

1      Do you have any other debt obligations
2 or, you know, any other obligations that you are
3 responsible for?
4      MR. O'BRIEN: Objection, leading.
5      THE WITNESS: I owe Redacted on -- I
6 refinanced the house because I needed money so I owe
7 about Redacted on the house right now. I put that money
8 into my business.
9 BY MS. PAULEY:
10    Q.   Okay.
11      So you mentioned before, you know, you
12 received a high school education and you went to a
13 year or two of college.
14      Can you describe for us any training you
15 have received, either formal or informal, in finance
16 or investing?
17    A.   Not in finance or investing, but I
18 received marketing training.
19    Q.   And where did you receive marketing
20 training from?
21    A.   Pitney Bowes had a school of their own in
22 Connecticut and they sent me there for two weeks for
23 marketing. Then they sent me to IBM training, IBM has
24 a training school and they sent me there. Then they
25 sent me to Xerox training school.

**Page 28**

1      I had about $30,000 worth of training, it
2 cost them about $30,000. It was the best $30,000 for
3 me that they ever invested.
4      When I was with Pitney Bowes at the
5 height of my career I was number two salesman in the
6 country out of 1750 men, and when I was with Cabinet
7 Pac I was the number one salesman.
8    Q.   Great.
9      So the marketing that you received
10 through Pitney Bowes — the training you received
11 through Pitney Bowes was focused on marketing?
12    A.   Yes.
13    Q.   So have you received any training at all
14 in the securities markets?
15    A.   No.
16      MR. O'BRIEN: Objection, leading.
17 BY MS. PAULEY:
18    Q.   What about any informal training, do you
19 read any books, watch television shows, listen to
20 radio shows concerning finance or investing?
21      MR. O'BRIEN: Objection, form, leading.
22      THE WITNESS: Yes, I do, but I don't get
23 any training on, just on and off once in a while, half
24 hour here and half hour there, but I didn't get any
25 training really.

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

(7) Pages 25 - 28

**Plaintiff Ex 11 - 5**

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017



Page 29

1   BY MS. PAULEY:
2      Q.   What shows do you listen to?
3      A.   I listen to A&E. I listen to the History
4   Channel. I listen to the -- it starts with an A, it
5   is an educational channel. I go to Fox News. I go to
6   the local news. I go to Stock Market Report.
7            Basically -- I don't watch too many
8   movies at all.
9            I am trying to remember, Smithsonian,
10  that is the other one I watch quite a bit.
11  BY MS. PAULEY:
12     Q.   Can you describe what your current health
13  condition is?
14     A.   It is not good.
15     Q.   In what way?
16          MR. O'BRIEN: Objection, relevance.
17          THE WITNESS: I have Parkinson's disease,
18  which I -- which came upon me in the year 2009, and I
19  have trigeminal neuralgia, it is a horrifying disease.
20  It is a disease where a nerve in my brain is hitting a
21  blood vessel and they rub together and the pain is
22  excruciating. I have had five operations in the
23  last five years; two of them didn't work and the
24  three -- other three did work.
25

Page 30

1   BY MS. PAULEY:
2      Q.   So you mentioned that you were diagnosed
3   with Parkinson's in 2009?
4      A.   Yes.
5      Q.   And --
6      A.   September of 2009.
7      Q.   Is that when you first began to
8   experience the symptoms of Parkinson's disease?
9      A.   What happened was -- let me explain this.
10          We were on a job on the southeast side of
11  Chicago and it is a ghetto area, it is very bad. I
12  took one of my installers and I met him there. When
13  we parked the car in front of the home or in front of
14  the home this other guy wanted the spot, it was --
15  there was an altercation. The guy said "How would you
16  like to die?" and he pulled out a gun and shot my
17  installer in the head and killed him, he was dead
18  within two minutes, and I went into shock, started
19  shaking like crazy.
20          The police drove me to the police -- to
21  the police station and then to the hospital because I
22  couldn't drive, I was shaking too much, and that was
23  it.
24          Redacted
25  Redacted

Page 31

1            Redacted
2                       Redacted
3   Redacted
4                   Redacted
5   Redacted
6   Redacted
7      Q.   When did that begin to affect you?
8      A.   I am going to have to guess on that, I
9   would have to say --
10          MR. O'BRIEN: Objection.
11          THE WITNESS: -- hold on, let me think a
12  think, this is 2017? I would say around 2004 maybe,
13  something like that.
14  BY MS. PAULEY:
15     Q.   So prior to when you were diagnosed with
16  Parkinson's?
17     A.   Yes, prior.
18     Q.   And what treatment do you receive for
19  Parkinson's?
20          MR. O'BRIEN: Objection, relevance.
21          Redacted
22                       Redacted
23                  Redacted
24                  Redacted
25  the phone if I were talking on the phone for ten

Page 32

1                       Redacted
2   Redacted
3   Redacted
4   Redacted
5                   Redacted
6            Redacted
7                       Redacted
8   Redacted
9   BY MS. PAULEY:
10     Q.   So you receive physical therapy to help?
11     A.   Yes, I receive physical therapy.
12     Q.   Are you on any medications?
13                  Redacted
14  Redacted
15                  Redacted
16  Redacted
17                  Redacted
18  Redacted
19  Redacted
20     Q.   Okay.
21          Redacted
22                  Redacted
23  Redacted
24  Redacted
25     Q.   What are those, do you know?

Plaintiff Ex 11 - 6

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

**Page 33**

1    A.   No, I don't know.
2    Q.   And you mentioned you had I think you
3    said five brain surgeries, is that correct?
4    A.   Yes.
5    Q.   Do you remember when the first one
6    occurred?
7    A.   I could find out for you, but I don't
8    remember exactly.  Five years ago, I guess.
9         MR. O'BRIEN: Objection.
10        THE WITNESS: No, that is -- I am not
11   sure if I am right about that.
12   BY MS. PAULEY:
13   Q.   That is okay.
14        Anything other than the Parkinson's and
15   the trigeminal neuralgia, any other health conditions
16   that have affected you?
17   A.   Not that I can think of.
18   Q.   And the medications that you mentioned, I
19   know some of them you couldn't remember the specific
20   names for, but how long have you been taking these
21   medications for, since your diagnosis in 2009?
22   A.   Yes.
23        MR. O'BRIEN: Objection, leading.
24        THE WITNESS: One thing I would like to
25   say, I am losing my memory.  I had a test for

---

**Page 34**

1    dementia, and we have a letter on it from the doctor,
2    and it came out that I have the beginning phases of
3    dementia.
4    BY MS. PAULEY:
5    Q.   Switching gears, are you familiar with
6    the former brokerage firm that was based in New York
7    called J.D. Nicholas?
8    A.   Yes, I am.
9    Q.   How did you first hear about J.D.
10   Nicholas?
11   A.   Through a cold call, they called my home.
12   Q.   Do you remember who called you?
13   A.   It wasn't Gregory Dean, it was his
14   partner, I can't remember his name.  If you told me I
15   would know, I can't remember his name, he put me on
16   with Gregory Dean and said I knew Gregory Dean right
17   away, Gregory Dean got information about me right
18   away, my name, where do I live, different questions
19   like that.
20   Q.   How did -- what did Mr. Dean tell you
21   during the initial cold call?
22   A.   I don't remember, to tell you the truth.
23   Q.   Did he describe J.D. Nicholas --
24        MR. O'BRIEN: Objection, leading.
25

---

**Page 35**

1    BY MS. PAULEY:
2    Q.   -- in any way?
3    A.   No, he didn't describe J.D. Nicholas.
4    Q.   Did he describe what he does?
5         MR. O'BRIEN: Objection, leading.
6         THE WITNESS: No.
7    BY MS. PAULEY:
8    Q.   Did he recommend a particular stock to
9    you?
10        MR. O'BRIEN: Objection, leading.
11        THE WITNESS: Yes.
12   BY MS. PAULEY:
13   Q.   Do you remember what that stock was?
14        MR. O'BRIEN: Objection, leading.
15        THE WITNESS: He recommended me stocks
16   everyday.
17   BY MS. PAULEY:
18   Q.   What, if any, conversations did you have
19   with Mr. Dean about what the -- he was going to be
20   doing on your behalf as a customer of J.D. Nicholas?
21   A.   He was going to be selling stocks and
22   making money for me.
23   Q.   And what, if any, conversations did you
24   have with Mr. Dean or anyone else at J.D. Nicholas
25   about what the cost associated --

---

**Page 36**

1         MR. O'BRIEN: Objection, leading.
2    BY MS. PAULEY:
3    Q.   -- having an account at J.D. Nicholas
4    would be?
5    A.   No, that was not part of it.
6    Q.   Did you ask any questions?
7    A.   No, I didn't.
8    Q.   Why not?
9    A.   Because I was not -- I was a guy that
10   should have never been in stocks, I was not a -- I
11   didn't know what to ask.  But everyday -- he would
12   call me every morning, basically every morning, and
13   tell me about another stock and what it is worth and
14   what is going to happen and that why I should take it
15   and I would okay it.
16   Q.   You mentioned during the initial call
17   that Mr. Dean asked you some questions about yourself
18   and your name and where you lived.  What other
19   questions did he ask you about you?
20   A.   I think he wanted to know -- he might
21   have wanted to know what I do for a living or wanted
22   to know how much my net worth was.
23   Q.   Did you have any conversations about what
24   your investment objective was?
25        MR. O'BRIEN: Objection, leading.

---

**Plaintiff Ex 11 - 7**

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 37

1      THE WITNESS: Yes.  I wanted to make some
2   money to retire on.
3   BY MS. PAULEY:
4      Q.   And what, if anything, did you tell
5   Mr. Dean about your medical condition?
6      MR. O'BRIEN: Objection, leading.
7      THE WITNESS: I am sure I told him that I
8   had Parkinson's, but I don't know if I told him I had
9   trigeminal neuralgia.
10  BY MS. PAULEY:
11     Q.   Do you remember a specific conversation
12  about your health with Mr. Dean?
13     A.   No, just came across as maybe a one- or
14  two-minute conversation.
15     Q.   So after you had that initial cold call
16  with Mr. Dean, what happened next?
17     A.   Well, he did what he said he was going to
18  do, he was going to sell stocks, he called me every
19  single morning, and he brought my account up one
20  $24,000 at one time, and I was really, really happy,
21  and then from there on it went downhill.
22     Q.   At some point did you receive paperwork
23  from J.D. Nicholas?
24     A.   Yes, I did.
25     MS. PAULEY: Could we please mark this as

---

Page 38

1   Exhibit 186.
2      (Document marked Plaintiff's Exhibit 186
3       for identification.)
4   BY MS. PAULEY:
5      Q.   Mr. Bernardo, please review Exhibit 186
6   and let me know when you are ready.
7      A.   Okay, I am ready.
8      Q.   Do you recognize Exhibit 186?
9      A.   No, I don't, but I believe that is my
10  signature.
11     Q.   Your signature on Page 2 of Exhibit 186?
12     A.   Yes.
13     Q.   So Exhibit 186 is titled Investment
14  Account Application.
15         Do you see that portions of Exhibit 186
16  are typed and portions are in handwriting, do you see
17  that?
18     A.   Yes.
19     Q.   Is the handwriting your handwriting?
20     MR. O'BRIEN: Objection, leading.
21     THE WITNESS: Of my signature, of my name
22  it is.
23  BY MS. PAULEY:
24     Q.   What about flipping pack to Page 1, are
25  the handwritten portions of Exhibit 186 is that your

---

Page 39

1   handwriting?
2      MR. O'BRIEN: Objection, leading.
3      THE WITNESS: With the black ink, dark
4   black ink, like my address and phone number and so on,
5   that is my handwriting.
6   BY MS. PAULEY:
7      Q.   And what about the typed portions, did
8   you type that in?
9      A.   No, I didn't do any typing.
10     MR. O'BRIEN: Objection, leading.
11  BY MS. PAULEY:
12     Q.   What about the highlighting, did you do
13  the highlighting?
14     MR. O'BRIEN: Same objection.
15     THE WITNESS: No.
16     THE VIDEOGRAPHER: Excuse me, can you
17  state your objection and you repeat your answer so I
18  have a clear record?
19     THE WITNESS: Do what?
20     MR. O'BRIEN: Objection.
21     You may want to explain objections to
22  him.
23  BY MS. PAULEY:
24     Q.   If Mr. O'Brien makes an objection, just
25  let him make his objection and then you begin your

---

Page 40

1   answer.  Like I mentioned at the beginning --
2      A.   I am sorry.
3      Q.   No problem.
4      MR. O'BRIEN: I have been trying to work
5   my objections in before you answer, but if you just
6   pause a moment and allow just a nanosecond, if I am
7   going to state an objection, then you can proceed with
8   your answer.
9      THE WITNESS: Okay.
10  BY MS. PAULEY:
11     Q.   When you received Exhibit 186 from J.D.
12  Nicholas, what did you do?
13     A.   With the black ink I filled out the
14  forms, I put in my address, I put in my phone number,
15  I put in my employer area.  And the back page I didn't
16  do anything, I signed the back page.
17     Q.   Did you review the portions that had been
18  typed?
19     MR. O'BRIEN: Objection, leading.
20     THE WITNESS: I don't know if I did.  I
21  don't think so, because I have 100,000 -- maybe at
22  that time I was making over 100,000.
23  BY MS. PAULEY:
24     Q.   Well, why don't we look at some of the
25  boxes on Page 2.

---

Plaintiff Ex 11 - 8

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 41

1  The first box at the top here says annual
2  income, do you see that?
3  A. Yes.
4  Q. And it lists Redacted at the bottom. Is
5  that accurate?
6  A. No.
7  MR. O'BRIEN: Objection, leading.
8  BY MS. PAULEY:
9  Q. What was your annual income in or around
10  May of 2012?
11  A. I was still making good money, I was
12  probably making around Redacted, and plus my
13  benefits that I had.
14  Q. And if you see the box to the right, the
15  one that is titled net worth excluding residence, it
16  lists Redacted.
17  What was your net worth in or around May
18  of 2012?
19  MR. O'BRIEN: Objection, leading.
20  THE WITNESS: That is with real estate
21  and everything?
22  BY MS. PAULEY:
23  Q. It just says net worth excluding
24  residence.
25  A. I would say it might have been close to 2

---

Page 42

1  million, that is including the real estate that I
2  have, not my home residence, but the other two places
3  I have.
4  Q. And if you look over to the right where
5  it says liquid net worth and it lists Redacted, what
6  was your liquid net worth in or around May of 2012?
7  MR. O'BRIEN: Objection, leading.
8  THE WITNESS: My stocks. I don't know
9  what they were back then.
10  BY MS. PAULEY:
11  Q. You can see in the box over to the right
12  where it says tax bracket, what was your tax bracket
13  in or around May of 2012?
14  A. It was Redacted percent.
15  Q. Going down to the second row, do you see
16  where it says investment objective?
17  A. Yes.
18  Q. What was your investment objective in or
19  around May of 2012?
20  A. Well, to make a decent living where I get
21  five percent or more.
22  Q. What conversations, if any, did you have
23  with Mr. Dean about your investment objectives?
24  A. In the beginning I was very happy with
25  Mr. Dean, everything went good.

---

Page 43

1  As things started going down, and they
2  were going downhill rapidly, I says I can't -- we are
3  losing a lot of money here.
4  One day I went to -- I called his home on
5  a Sunday, I believe, I was very upset, and I told him
6  what is going on, I got a big loss here, he told me if
7  you can't take the heat get out.
8  So then I tried another strategy towards
9  the end, I knew I was in trouble now, so my strategy
10  was make an investment that he would bring out to me,
11  and then I called him up in the afternoon, I say
12  Gregory -- Greg, I say, how is the stock we took out
13  this morning? And he said it is up $3,000, for an
14  example, and I say, let's sell it, let's sell it now,
15  let's go, let's try to get the money back by going
16  investing and then as it gets up there if it goes up
17  to sell right away and try to make a few thousand here
18  and a few thousand there and bring it up that way. He
19  says I want to wait until the end of the day. I find
20  out the end of the day it went down 2000. So not only
21  did I not make the 3000, it went down 2000 at the end
22  of the day.
23  Q. What is your -- speculation is checked
24  off on Exhibit 186. What is your understanding of
25  what speculation means?

---

Page 44

1  MR. O'BRIEN: Objection, leading.
2  THE WITNESS: I am not really sure.
3  BY MS. PAULEY:
4  Q. What is your understanding of the risks
5  associated with having a speculative investment
6  objective?
7  A. Back then I didn't have any understanding
8  of it.
9  Q. Did Mr. Dean explain to you what
10  speculation meant?
11  A. No.
12  Q. Did he explain to you the risks of having
13  a speculative investment objective?
14  A. No.
15  MR. O'BRIEN: Objection, leading.
16  BY MS. PAULEY:
17  Q. Here on Exhibit 186, speculation is
18  defined as maximum total return involving a higher
19  degree of risk through investment in a broad spectrum
20  of securities.
21  Was that your investment objective with
22  your account at J.D. Nicholas?
23  MR. O'BRIEN: Objection, leading.
24  THE WITNESS: Would you do that one more
25  time, please?

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 45

1  BY MS. PAULEY:
2      Q.  Maximum total return involving a higher
3  degree of risk through investment in a broad spectrum
4  of securities.
5          My question is is that what your
6  investment objective was with your account at J.D.
7  Nicholas?
8      A.  If I understand what that says, it says
9  making -- maximum amount on your investment, making
10  big money, but you are under risk of losing your money
11  because it is --
12     Q.  What was your investment objective with
13  your account?
14         MR. O'BRIEN: Objection, asked and
15  answered.
16         THE WITNESS: To tell you the truth, five
17  percent.
18  BY MS. PAULEY:
19     Q.  And going to the box over on the right
20  where it says investment experience, it has mutual
21  funds and then it says 26 years.  What -- how many
22  years had you been invested in mutual years as of
23  2012?
24         MR. O'BRIEN: Objection, leading.
25         THE WITNESS: Many, but I don't remember

Page 46

1  exactly.
2  BY MS. PAULEY:
3      Q.  How many years --
4      A.  Wait, nine years, I believe.
5      Q.  How many years had you been invested in
6  variable products?
7      A.  None.
8      Q.  How many years had you been invested in
9  bonds?
10     A.  That is what I meant by nine years.
11     Q.  Bonds, you meant to mean mutual funds?
12     A.  No.  I was in mutual funds, too, but
13  bonds I was -- that was my main thing.
14     Q.  So you said approximately nine years?
15     A.  Yes.
16     Q.  And how many years had you been invested
17  in stocks as of 2012?
18     A.  When I got out of it I took my money out
19  of bonds because they weren't doing well and I went
20  into stocks, which was like in -- I was with him for a
21  couple years and then I wanted -- he wasn't making any
22  money for me so I moved on.
23     Q.  And how many years had you been invested
24  in options?
25     A.  I don't even know because I didn't know

Page 47

1  what options were.
2      Q.  And then you can see over to the right
3  where it says risk exposure and there is four choices,
4  it says low, moderate, aggressive, speculative,
5  speculative was checked off.
6          What was your risk exposure for your
7  account at J.D. Nicholas?
8      A.  I thought it was low to moderate, I will
9  say low to moderate.
10     Q.  And the box that is titled investment
11  knowledge, there is three choices, limited, good,
12  excellent, and excellent was checked off.
13         What was your investment knowledge as of
14  2012?
15     A.  Limited.  Am I saying it right, my
16  understanding is right?
17     Q.  My question is just -- there is three
18  choices, limited, good, and excellent, and my question
19  is which one do you think appropriately described your
20  investment knowledge as of 2012?
21     A.  Limited, poor.
22     Q.  So if some of these -- I see you
23  mentioned before your signature is down here at the
24  bottom of Page 2 of Exhibit 186.  Why did you sign
25  Exhibit 186 if portions of this document were

Page 48

1  inaccurate?
2      A.  It wasn't explained to me and I was told
3  something else, I can't remember what I was told, but
4  I had to do this for -- I had to do this to get
5  through with the line of stocks or something, there
6  was a story line to it, I can't remember exactly what
7  it was.
8      Q.  You were told you had to sign this
9  document?
10     A.  You had to sign it and send it in for
11  some reason, I can't remember what the reason was.
12     Q.  And who told you that?
13     A.  It could have been Gregory Dean.
14         MR. O'BRIEN: Objection.
15         MS. PAULEY: I think your microphone
16  might have fallen off a little bit.  Bev, do you want
17  to help him put it back on?
18  BY MS. PAULEY:
19     Q.  You testified a moment ago that you had
20  some experience investing in mutual funds and bonds
21  and stocks.
22         Had you held other brokerage accounts
23  prior to J.D. Nicholas?
24     A.  I -- I had what is it, Shearson -- one of
25  the big stockbrokers.

Plaintiff Ex 11 - 10

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 49

1　Q.　So -- okay.
2　　　When did you open your account with --
3　A.　Shearson Lehman I believe it is.  Is that
4　the name?
5　Q.　That is a name.
6　A.　That was a company, Shearson Lehman.
7　Q.　And when did you -- had you had your
8　account with Shearson Lehman for a long time?
9　A.　Probably had it for -- when I went into
10　business in about my second or third year I went it
11　Shearson Lehman to start investing my money and got
12　out five years ago.  Gregory Dean was the second
13　person I went with.
14　Q.　How much money had you invested with
15　Shearson Lehman, approximately?
16　A.　What I did, when I had my good years with
17　Bernardo Kitchen & Bath, I was making [Redacted] a
18　year, even [Redacted] a year, I was living on [Redacted] a
19　year, and I would take the rest, which would be
20　another [Redacted], I would take that, pay taxes on it,
21　which left me about [Redacted] and I put it into
22　investments.  Every year I would invest probably about
23　25, 30,000.
24　Q.　And what types of securities was that
25　money being invested in?

---

Page 50

1　A.　It wasn't in securities, it was bonds.
2　Q.　Okay.
3　A.　My money doubled, in eight years it
4　doubled.
5　Q.　What type of bonds, do you know?
6　A.　It was municipal bonds.
7　Q.　Did you have a broker who you were
8　working with at the firm?
9　A.　Yes.
10　Q.　And what was your involvement in
11　selecting the municipal bonds for your account?
12　A.　He set me up with that.
13　Q.　Do you know what your investment
14　objective was for that account?
15　A.　To make money.  I really don't have --
16　probably make five or six percent, something like
17　that.
18　Q.　And what other brokerage accounts have
19　you had other than the Shearson Lehman account?
20　A.　A company called Chelsa.
21　MS. REPORTER:  What is the company?
22　THE WITNESS:  Chelsa, c-h-e-l-s-a, for a
23　short period of time.
24　MS. PAULEY:  I would like to mark this
25　document as Exhibit 187, please.

---

Page 51

1　　　(Document marked Plaintiff's Exhibit 187
2　　　for identification.)
3　BY MS. PAULEY:
4　Q.　Mr. Bernardo, if you could please review
5　Exhibit 187 right here.
6　MR. O'BRIEN:  Object to leading.
7　BY MS. PAULEY:
8　Q.　Let me know when you are ready.
9　A.　Do you want me to read all this?
10　Q.　No, you don't need to read every word.  I
11　can direct you to where I was going to begin if you
12　had a chance to review.
13　A.　Okay.
14　Q.　Actually, you are on the page I wanted to
15　start out at, it is page --
16　A.　5, 1 of 5.
17　Q.　Yes, I think it is Page 6 of Exhibit 186.
18　And it is titled -- you are on the right place, it is
19　titled New Account Application, do you see that?
20　A.　Yes.
21　Q.　Do you recognize Page 6 of Exhibit 187?
22　A.　No, I don't.
23　Q.　So it mentions here -- it says account
24　name Eugene Bernardo, do you see that?
25　A.　Yes.

---

Page 52

1　Q.　Date of birth [Redacted].  Is that your
2　date of birth?
3　A.　Yes.
4　Q.　If you flip to the next page, the bottom,
5　is that your signature on the bottom of the second
6　page?
7　A.　It looks like my signature.
8　Q.　And then is this the new account
9　application that you had for your account at Chelsea?
10　MR. O'BRIEN:  Objection, leading.
11　THE WITNESS:  I don't know.
12　BY MS. PAULEY:
13　Q.　And then if you look at the -- do you
14　recall having an account number -- let's go back one
15　page.
16　　　Do you recall having an account number
17　ending in 6716, right here.
18　A.　No, I do not.
19　Q.　Why did you open your account at Chelsea?
20　MR. O'BRIEN:  Objection.
21　THE WITNESS:  They gave me a call and
22　said it was a good stock, that Dunkin' Donuts was
23　going to go through the roof.
24　BY MS. PAULEY:
25　Q.　You received a cold call from a broker?

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Plaintiff Ex 11 - 11

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 53

```
 1      A.   Yes.
 2      Q.   And why did you agree to open the
 3   account?
 4      A.   Thought I would give it a try and see
 5   what would happen.
 6      Q.   Was this the first time you had opened an
 7   account in response to a cold call?
 8      A.   I can't remember if I went with Gregory
 9   Dean first or if I went with them first.  Again, I
10   think I was already with Gregory Dean.
11      Q.   Okay.
12           And do you know what your investment
13   objective was with your account at Chelsea Financial?
14      A.   Again, to make a little money.
15      Q.   And was the broker that you were working
16   with at Chelsea was he recommending security trades --
17   stocks to you?
18      A.   Yes, he did.
19           MR. O'BRIEN:  Objection, leading.
20   BY MS. PAULEY:
21      Q.   What involvement did you have in
22   selecting securities for the account?
23      A.   No involvement.  He told me that
24   something was going to happen with Dunkin' Donuts was
25   going to go through the roof.
```

---

Page 54

```
 1      Q.   Do you still have your account with
 2   Chelsea?
 3      A.   No.
 4      Q.   Why did you close it?
 5      A.   Because I saw what was happening with --
 6   I caught on to how these investors work.
 7      Q.   What do you mean by that?
 8      A.   Well, they wanted to make a buck fast and
 9   I guess they gamble the money.
10      Q.   Do you know when you closed the account
11   with Chelsea?
12      A.   I didn't have it long, that is for sure.
13      Q.   We can put Exhibit 187 aside.  Let me
14   take yours and put this one up here.
15           MS. PAULEY:  Can you please mark this as
16   Exhibit 188.
17           (Document marked Plaintiff's Exhibit 188
18            for identification.)
19   BY MS. PAULEY:
20      Q.   Please review Exhibit 188 and let me know
21   when you are ready.
22      A.   Boy, they sure came up with some weird
23   numbers here.
24      Q.   Do you recognize Exhibit 188?
25      A.   No, I don't, but I am sure I would never
```

---

Page 55

```
 1   -- it says liquid net worth, they have here for me
 2   over a million dollars.
 3      Q.   Where are you seeing that?
 4      A.   In the middle of the page.
 5      Q.   Right here where it says over Redacted
 6   for liquid net worth, is that the box you are looking
 7   at?
 8      A.   Where it it says --
 9           MR. O'BRIEN:  Objection.
10           THE WITNESS:  Where it says liquid net
11   worth.
12           MR. O'BRIEN:  Leading.
13   BY MS. PAULEY:
14      Q.   Can you point to Exhibit 188 where you
15   are seeing it?
16      A.   (Indicating).
17      Q.   Okay.
18           So you are saying that the box that is
19   checked off under liquid net worth was not accurate
20   for you?
21      A.   No.
22           MR. O'BRIEN:  Objection, leading.
23   BY MS. PAULEY:
24      Q.   Do you recognize Exhibit 188?
25      A.   No, I don't.
```

---

Page 56

```
 1           MR. O'BRIEN:  Just for the record, it
 2   doesn't say a million dollars under liquid net worth,
 3   the witness is misreading that.
 4   BY MS. PAULEY:
 5      Q.   I believe it says Redacted, over
 6   Redacted ?
 7      A.   That is okay, I misread it.
 8      Q.   That is okay, the font is really small.
 9           When, if ever, have you had an account
10   with Aegis Capital?
11           MR. O'BRIEN:  Objection, mischaracterizes
12   the document.
13   BY MS. PAULEY:
14      Q.   Let me repeat my question since you
15   interrupted me.
16           When, if ever, have you had an account
17   with Aegis Capital?
18      A.   After I left Dean.
19      Q.   After you left J.D. Nicholas?
20      A.   Yes.
21      Q.   So if you flip back to the first page of
22   Exhibit 188, you can see here it is dated August 16,
23   2012 and to Aegis Capital, do you see that?
24      A.   Yes.
25      Q.   And how did you come to open your account
```

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 57

1 at Aegis Capital?
2     A.   The same way.
3     Q.   What do you mean by that?
4     A.   I believe it was a cold call.
5     Q.   A cold call from a broker?
6     A.   Yes.
7     Q.   Do you remember the broker's name?
8     A.   No, I don't.  I had two brokers, I had
9 one and switched over to another one.
10    Q.   Why did you switch from one to the other?
11    A.   Because he told me some things like he is
12 going to do well for me and I should trust him and he
13 would never do what the other companies did for me --
14 to me.
15    Q.   What do you mean by that?
16    A.   He lost all the money --
17        MS. REPORTER: I am sorry, I didn't hear
18 the answer, I didn't get the answer, would you repeat
19 it.  I had the question "What do you mean by that?"
20 And then --
21        MS. PAULEY: I think re-read a couple
22 lines.
23        (Record read as requested.)
24 BY MS. PAULEY:
25    Q.   Can you give your answer again?

Page 58

1     A.   Well, I said it was a horrible thing that
2 they did to me and that I could trust him.
3     Q.   How much money, approximately, did you
4 invest with Aegis Capital?
5     A.   Right now I have about 450,000 in there.
6     Q.   You have an account with Aegis today?
7     A.   Yes.
8     Q.   And --
9     A.   The same broker.
10    Q.   What is the broker's name?
11    A.   It is -- my mind just goes blank, I am
12 sorry.
13    Q.   That is okay, that is okay.
14    A.   It is Corey Johnson.
15    Q.   And what type of securities is your Aegis
16 Capital account invested in?
17    A.   He has got me into a lot of Walt Disney
18 and has got me into named brand accounts.
19    Q.   And what involvement, if any, do you have
20 in selecting the securities for the account?
21    A.   Nothing, no involvement.
22    Q.   Does Mr. Johnson make trade
23 recommendations to you?
24    A.   He calls me and tells me how good it is
25 doing and so on, and would I -- I found out I haven't

Page 59

1 really lost much money with him, but I have -- haven't
2 made any money either, and I believe the money is
3 going in the commissions.
4     Q.   Is your account at Aegis Capital traded
5 actively, meaning are there trades done on a regular
6 basis?
7        MR. O'BRIEN: Objection, foundation,
8 leading.
9        THE WITNESS: Yes, there is probably
10 three or four transactions a week being done.
11        MS. PAULEY: And we can set aside
12 Exhibit 188.
13        Can we please mark this as Exhibit 189.
14        (Document marked Plaintiff's Exhibit 189
15         for identification.)
16 BY MS. PAULEY:
17    Q.   Mr. Bernardo, please review Exhibit 189
18 and let me know when you are ready.
19    A.   I think I have it in my head anyway.
20    Q.   Can you please flip to Page 3 of
21 Exhibit 189, first page of the account statement.
22        Do you recognize this account statement
23 on Exhibit 189?
24        MR. O'BRIEN: Objection.
25        THE WITNESS: I recognize it, yes.

Page 60

1 BY MS. PAULEY:
2     Q.   What is it?
3     A.   What do you mean?
4     Q.   What is Exhibit 189 that you are looking
5 at?
6     A.   Would it be the beginning of my account?
7     Q.   No, I was asking you more simple.
8        Exhibit 189, does this appear to be one
9 of the account statements that you received from Aegis
10 Capital?
11        MR. O'BRIEN: Objection, leading.
12        THE WITNESS: I don't remember.
13 BY MS. PAULEY:
14    Q.   It lists Eugene F. Bernardo.  Is that
15 you?
16    A.   Yes.
17    Q.   And below Eugene F. Bernardo it says your
18 investment objective and it says speculation, do you
19 see that right there?
20    A.   Yes.
21    Q.   What was your understanding of what your
22 investment objective was at Aegis Capital?
23        MR. O'BRIEN: Objection, leading.
24        THE WITNESS: It was the same thing, try
25 to make a little -- make some money.

Plaintiff Ex 11 - 13

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 61

1    BY MS. PAULEY:
2       Q.   And, again, what type of securities were
3    you -- was your Aegis Capital account invested in?
4       A.   The stocks, is that the right word?
5       Q.   Well, I am asking you.
6            There was some stocks that you were
7    invested in with Aegis Capital?
8       A.   Yes.
9       Q.   Any other types of securities you were
10   invested in?
11      A.   Not that I know of.
12      Q.   And what involvement did you have in
13   selecting stocks for your Aegis Capital account?
14      A.   Broker --
15           MR. O'BRIEN: Objection, relevance.
16   Sorry, just objection.
17   BY MS. PAULEY:
18      Q.   What was your answer, your broker?
19      A.   Yes.
20      Q.   Meaning your broker selected the stocks
21   for you?
22      A.   Yes.
23           MR. O'BRIEN: Objection, leading.
24           We can put Exhibit 189 aside.
25           Can we take a break?

---

Page 62

1            MS. PAULEY: I have one more document.
2            THE WITNESS: There is a restroom in
3    hallway.
4            MR. O'BRIEN: That is all right, we will
5    wait until she is ready to take a break.
6            MS. PAULEY: I have one last document and
7    we will take a break.
8            Can we please mark this as Exhibit 190.
9            (Document marked Plaintiff's Exhibit 190
10           for identification.)
11   BY MS. PAULEY:
12      Q.   If you can please flip to Page 4 of
13   Exhibit 190, right there, yes, Page 4.
14           So what was your investment objective for
15   your -- that you see the account number that is listed
16   ending in 6716, what was your investment objective for
17   the account ending in account number 6716?
18           MR. O'BRIEN: Objection, leading.
19           THE WITNESS: Just to make five percent
20   more.
21   BY MS. PAULEY:
22      Q.   You can read on the Page 4 of Exhibit 190
23   that it says your investment objective speculation,
24   and then down at the bottom of the page, speculation
25   speculative is defined as taking larger risks, usually

---

Page 63

1    by frequent trading with hope of higher than average
2    gains, want increase in value of investments, high
3    risk.
4       A.   No, I don't remember getting this sheet.
5            MR. O'BRIEN: Objection, leading and no
6    question pending.
7    BY MS. PAULEY:
8       Q.   Let me just ask the question first.
9            My question is is that definition of
10   speculation speculative an accurate description of
11   what your objective was for your Aegis Capital
12   account?
13           MR. O'BRIEN: Same objection.
14           THE WITNESS: No, I wasn't -- I didn't
15   know what is going on with these terms, I never got
16   this piece of paper.
17   BY MS. PAULEY:
18      Q.   You don't believe you got this?
19      A.   No.
20      Q.   Okay.
21           MS. PAULEY: Why don't we then go off the
22   record and take a break for a few minutes.
23           THE VIDEOGRAPHER: Going off the record
24   at, the time is now 10:11 a.m.
25           (Recess taken.)

---

Page 64

1            THE VIDEOGRAPHER: This is the beginning
2    of Disk No. 2 in the video deposition of Eugene
3    Bernardo, the time is now 10:26 a.m., please proceed.
4    BY MS. PAULEY:
5       Q.   Mr. Bernardo, we mentioned --
6            MS. PAULEY: Let's go off the record one
7    second and let me dial in.
8            THE VIDEOGRAPHER: Going off the record,
9    the time is now 10:27 a.m.
10           (Recess taken.)
11           THE VIDEOGRAPHER: Going back on the
12   record, the time is now 10:28 a.m., please proceed.
13   BY MS. PAULEY:
14      Q.   Mr. Bernardo, we talked about some of the
15   other brokerage accounts that you had, like Shearson
16   Lehman, Aegis, Chelsea Financial.
17           Can you think of any other brokerage
18   accounts that you have held?
19      A.   No, I can't.
20      Q.   Have you ever held any self-directed
21   accounts, meaning accounts such as like Ameritrade or
22   E*TRADE or Charles Schwab where you were placing the
23   trades yourself?
24      A.   No.
25      Q.   Since closing your account at

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 65

1    J.D. Nicholas have you opened any other accounts in
2    response to a cold call?
3        A.   No.
4        Q.   And why not?
5        A.   Because I learned my lesson, I think.
6        Q.   What do you mean by you are learning your
7    lesson?
8        A.   Well, I don't think it was -- it did me
9    any good going on a cold call, but from a cold call
10   I think I would shop this time to make sure I am safe.
11       Q.   What do you mean it didn't do you any
12   good going on a cold call?
13       A.   Well, I didn't -- it didn't turn out
14   right for me every time I went -- accepted these cold
15   calls, it didn't work out for me.
16       Q.   So why did you agree to open your account
17   with J.D. Nicholas?
18       A.   Because I thought it would do all right
19   with them.
20       Q.   How much money did you invest with
21   J.D. Nicholas?
22       A.   I am guessing half a million dollars
23   maybe.
24       Q.   And was that --
25           MR. O'BRIEN: Objection.

---

Page 66

1    BY MS. PAULEY:
2        Q.   Was that in cash or did you transfer
3    securities or both?
4        A.   I transferred --
5           MR. O'BRIEN: Objection, leading.
6           THE WITNESS: Transferred securities.
7    BY MS. PAULEY:
8        Q.   And what portion of your net worth did
9    your account at J.D. Nicholas consist of?
10       A.   What do you mean consist?
11       Q.   So you mentioned that your account you
12   thought was around $500,000.
13           My question is what portion of your net
14   worth was that?
15           MR. O'BRIEN: Objection, foundation,
16   leading.
17           THE WITNESS: It was maybe
18   three-quarters.
19   BY MS. PAULEY:
20       Q.   Did you tell Mr. Dean that you had
21   invested approximately three-quarters of your net
22   worth with J.D. Nicholas?
23       A.   No.
24       Q.   Why not?
25       A.   Never thought to and he never asked me.

---

Page 67

1        Q.   And was that money that you invested with
2    J.D. Nicholas was it earmarked for any other
3    particular purposes?
4           MR. O'BRIEN: Objection, leading.
5           THE WITNESS: Yes.
6    BY MS. PAULEY:
7        Q.   What were they?
8        A.   I was going to help send my
9    granddaughters, I have two granddaughters, to college.
10   We could live a little better than we are living now,
11   not new homes or anything, if we wanted to take a
12   vacation or something we could do that.
13       Q.   The money you invested with J.D.
14   Nicholas, what was the source of that money, was that
15   from earnings or career?
16           MR. O'BRIEN: Objection, leading.
17           THE WITNESS: Well, it was previous
18   earnings from the first investor I went with, my mind
19   goes blank, it is Shearson Lehman.
20   BY MS. PAULEY:
21       Q.   Okay.
22           So you took the profits that you had
23   earned with Shearson Lehman and invested with
24   J.D. Nicholas?
25       A.   Yes.

---

Page 68

1           MR. O'BRIEN: Objection, foundation,
2    leading.
3    BY MS. PAULEY:
4        Q.   The money you invested with
5    J.D. Nicholas, how willing were you to lose that
6    amount of money?
7        A.   Not willing at all.
8        Q.   What do you mean by that?
9        A.   Repeat the question to me.
10       Q.   The money that you invested with
11   J.D. Nicholas, how willing were you to lose that money
12   in order to gain a return?
13           MR. O'BRIEN: Objection, leading.
14           THE WITNESS: I can't tell you, I don't
15   know. It is -- I am just heart broken, I didn't think
16   I would lose any money.
17   BY MS. PAULEY:
18       Q.   Why not?
19       A.   Because I thought they would do a good
20   job for me. I didn't find out that I had a bad
21   situation until it was too far gone.
22           MS. PAULEY: Can we mark this document,
23   are we at 191, I think.
24           MS. REPORTER: Yes.
25

---

Plaintiff Ex 11 - 15

Securities and Exchange Commission v.
Gregory T. Dean, et al.

<div align="right">Eugene F. Bernardo
October 03, 2017</div>

---

Page 69

1     (Document marked Plaintiff's Exhibit 191
2      for identification.)
3 BY MS. PAULEY:
4     Q.   Please review Exhibit 191 and let me know
5 when you are ready.
6     A.   Okay.
7     Q.   Do you recognize Exhibit 191?
8     A.   Definitely not.
9     Q.   So Exhibit 191 is called a margin account
10 agreement.  What is margin?
11        MR. O'BRIEN: Objection, leading.
12        THE WITNESS: I don't know.
13 BY MS. PAULEY:
14     Q.   What conversations, if any, did you have
15 with Mr. Dean about margin?
16     A.   I don't think I had any with him.
17     Q.   So Mr. Dean never explained to you what
18 margin meant?
19        MR. O'BRIEN: Objection, leading.
20        THE WITNESS: No.
21 BY MS. PAULEY:
22     Q.   Did you have any understanding of what
23 the risks associated with having margin account were?
24        MR. O'BRIEN: Objection, leading.
25        THE WITNESS: No.

---

Page 70

1 BY MS. PAULEY:
2     Q.   If you flip to Page 2 of Exhibit 191, is
3 that your signature at the bottom of Page 2?
4     A.   Yes, it looks like it is my signature.
5     Q.   And why did you sign Exhibit 191?
6     A.   I don't know.  This don't -- I don't
7 remember these sheets at all.
8     Q.   Had you traded on margin before?
9     A.   No.
10     Q.   Why did you agree to open a margin
11 account at J.D. Nicholas?
12     A.   I probably didn't know I was opening a
13 margin account if you want to know the truth.
14     Q.   We can set Exhibit 191 aside.
15        MS. PAULEY: Can we please mark this
16 document as Exhibit 192.
17        (Document marked Plaintiff's Exhibit 192
18         for identification.)
19 BY MS. PAULEY:
20     Q.   We can put this -- do you still want to
21 look at it?  If you can just please look at 192 and
22 let me when you are ready.
23     A.   Okay.
24     Q.   Do you recognize Exhibit 192?
25     A.   Definitely not.

---

Page 71

1     Q.   So Exhibit 192, there is two letters, one
2 is dated July 30, 2012, and one is dated August 7,
3 2012, do you see that, the two dates?
4     A.   Yes.
5     Q.   And each one is titled General Account
6 Margin Call.
7        What is your understanding of what a
8 margin call is?
9        MR. O'BRIEN: Objection, foundation,
10 leading.
11        THE WITNESS: I don't know.
12 BY MS. PAULEY:
13     Q.   So you have no recollection of
14 receiving --
15     A.   No.
16     Q.   -- these letters?
17        MR. O'BRIEN: Objection, leading.
18 BY MS. PAULEY:
19     Q.   When, if ever, did you deposit money in
20 response to a margin call?
21     A.   I don't think I deposited money into a
22 margin call.
23     Q.   Okay.
24        So you don't remember having any
25 conversations with Mr. Dean or anyone else at

---

Page 72

1 J.D. Nicholas about a margin call?
2        MR. O'BRIEN: Objection, leading.
3        THE WITNESS: No.
4 BY MS. PAULEY:
5     Q.   You can put this aside.
6        MS. PAULEY: Can we please mark this as
7 Exhibit 193.
8        (Document marked Plaintiff's Exhibit 193
9         for identification.)
10 BY MS. PAULEY:
11     Q.   You can put Exhibit 192 aside.  And if
12 you want to take a look at Exhibit 193 and let me know
13 when you are ready.
14     A.   Okay.
15     Q.   Do you recognize Exhibit 193?
16     A.   No.
17     Q.   So Exhibit 193 is titled Option Account
18 Agreement, do you see that?
19     A.   Yes.
20     Q.   What is your understanding of what an
21 option is?
22     A.   I don't know.
23     Q.   What conversations, if any, did you have
24 with Mr. Dean about options?
25     A.   I didn't have any.

---

Plaintiff Ex 11 - 16

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 73

1    Q.   Had you ever traded in options before?
2    A.   No.
3    Q.   Do you -- flipping to Page 2 of
4    Exhibit 193, is that your signature on the bottom of
5    Page 2?
6    A.   You know, I am starting to wonder, I
7    don't think this is my signature on this page.
8    Q.   You don't believe that is your signature?
9    A.   No.
10   Q.   What makes you think that?
11   A.   Because the size -- my signature is
12   larger than that and the size of the Bernardo -- the
13   size of it is crunched together like the R-D-O, I
14   would like to compare with some other signatures I
15   might have.
16   Q.   Do you have any recollection of signing
17   an option account agreement at J.D. Nicholas?
18   A.   No, I don't.
19   Q.   Do you have any recollection of any
20   options trades that were placed in your account at
21   J.D. Nicholas?
22   A.   No.
23   Q.   Flipping to Page 3 of Exhibit 193, the
24   next page, do you see where it says "Dear
25   Mr. Bernardo, this document is to establish that you

---

Page 74

1    have read and received a copy of the characteristics
2    and risks of standardized options booklet.  Please
3    sign in the indicated area to confirm that you have
4    received the information on options."
5        Is that your signature on Page 3 of
6    Exhibit 193?
7    A.   I don't write that small.
8    Q.   Do you believe you received the
9    Characteristics and Risks of Standardized Options
10   booklet?
11   A.   No, I did not.
12   Q.   Flipping to Page 4 of Exhibit 193, the
13   last page, do you see the signature at the bottom, is
14   that your signature?
15   A.   It looks like my signature.
16   Q.   Do you have any recollection of signing
17   Page 4 of Exhibit 193?
18   A.   No.
19   Q.   I would like to read some of the
20   disclosures that are listed on Exhibit -- I am sorry,
21   Page 4 of Exhibit 193.
22       Do you see the first paragraph here it
23   says "I understand that trading in options is highly
24   speculative and contains a high degree of risk and
25   that options trading is not suitable for all

---

Page 75

1    investors," do you see that right here?
2    A.   Yes, I do.
3    Q.   What was your understanding of the risks
4    associated with options trading?
5        MR. O'BRIEN: Objection, leading.
6        THE WITNESS: I didn't know about it so I
7    didn't know what is going on, I can't tell you what
8    my --
9    BY MS. PAULEY:
10   Q.   Did Mr. Dean have any conversations with
11   you in which he explained the risks associated with
12   options trading?
13   A.   No.
14       MR. O'BRIEN: Objection, leading.
15   BY MS. PAULEY:
16   Q.   Skipping down two paragraphs to the third
17   paragraph it says "I will only apply for an options
18   account if based on that review I am fully prepared
19   financially to undertake such risks, withstand any and
20   all losses incurred, including total loss of premium,
21   plus transactions costs."
22       What is your understanding of what that
23   paragraph means?
24   A.   Well, it says just what it says, I agree
25   that prior to completing the options account that I

---

Page 76

1    have carefully reviewed and considered my financial
2    situation risk, following investment objections, I
3    haven't reviewed anything, I don't remember this
4    sheet.
5    Q.   Flipping to a few more paragraphs, so the
6    third from the last, the paragraph that begins with "I
7    am aware that I may lose all of my investment if my
8    option contracts expire worthless.  I am aware that in
9    the event that I sell uncovered naked options that I
10   may lose more than the proceeds received from the
11   sale."  Do you see that?
12   A.   Yes, I do.
13   Q.   Did you have any conversations with Dean
14   with the possibility of losing all of your investment
15   if your option contract expires worthless?
16   A.   No.
17       MR. O'BRIEN: Objection, leading.
18       THE VIDEOGRAPHER: Excuse me?
19       MR. O'BRIEN: Objection, leading.
20       THE WITNESS: No, I don't have any idea.
21   I wouldn't do it if I had known that, what it says
22   there, you would have to be very off the wall to sign
23   something like that.
24   BY MS. PAULEY:
25   Q.   So why did you sign Page 4 of

---

Plaintiff Ex 11 - 17

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 77

1    Exhibit 193?
2        A.   Is this Page 4 here?
3        Q.   Yes, exactly, the page you are looking
4    at.
5        A.   I don't know.
6        Q.   Going back to Page 2 of Exhibit 193, the
7    -- this one, you can see that there is checkmarks box,
8    you see the boxes, a number of the boxes are
9    checkmarked, do you see that?
10       A.   Yes, I do.
11       Q.   Did you make those checkmarks?
12       A.   No.
13       Q.   Did you receive Page 2 of Exhibit 193
14   with those marks already checked off?
15           MR. O'BRIEN: Objection, leading.
16           THE WITNESS: I don't know if I even got
17   this copy.
18   BY MS. PAULEY:
19       Q.   Did you ask -- strike that.  We can put
20   Exhibit 193 aside.
21           Did Mr. Dean recommend a particular
22   investment or trading strategy to you?
23       A.   I believe he told me about some stocks
24   that were going to go -- were going to make a lot of
25   money on.

---

Page 78

1        Q.   So Mr. Dean was recommending trades to
2    you?
3        A.   Yes.
4            MR. O'BRIEN: Objection, leading.
5    BY MS. PAULEY:
6        Q.   And Mr. Dean is sitting in the room here
7    today. Have you had the chance to meet Mr. Dean in
8    person before?
9        A.   No.
10       Q.   How would Mr. Dean make the trade
11   recommendations to you?
12       A.   He would call me in the morning and --
13   not early, maybe 8:30, 9:00 o'clock, and tell me what
14   new stocks are coming out with and he thinks we should
15   make the investment on a certain stock and the reason
16   why we should make the investment.  I went along with
17   it and that is that.
18       Q.   Did you communicate with Mr. Dean in any
19   other way besides talking to him on the telephone?
20       A.   Basically, no.
21           We did talk about Christmas, Merry
22   Christmas to you and your family and his daughter a
23   little bit here and there, nothing heavy, nothing --
24       Q.   I am wondering, did Mr. Dean send you
25   e-mails, for example?

---

Page 79

1        A.   No, but he sent me a cheesecake for
2    Christmas.
3        Q.   And did Mr. Dean ever communicate with
4    you in writing, like did you receive letters from him?
5        A.   No.
6        Q.   So your primary mode of conversation with
7    Mr. Dean was over the telephone?
8        A.   Yes.
9        Q.   And did -- Mr. Dean when he would call
10   with the various trade recommendations how would he
11   explain what he wanted to do with the trade, how would
12   he explain the recommendation?
13       A.   He didn't explain a recommendation, he
14   just told me about the stocks.
15       Q.   What do you -- when he told you about the
16   stocks, what do you mean by that?
17       A.   We said this is ABC stock and they are
18   coming out with a new product, when it comes out --
19   this is an example, when it comes out it is going to
20   hit the -- going to do real well, believe it is going
21   to do real well so on and so on, and that is it.
22       Q.   What understanding did you have as to
23   when -- how long the position was going to be held
24   for?
25       A.   I didn't have any idea at all, but there

---

Page 80

1    were a lot of trades made, a lot of trades made.  I
2    say two a day at least.
3        Q.   And did Mr. Dean explain to you what the
4    costs associated with the trades would be?
5        A.   No.
6        Q.   Did you ask any questions?
7        A.   No.
8        Q.   Why not?
9        A.   Because I didn't know to ask questions, I
10   didn't know what to ask.
11       Q.   Did you accept the trade recommendations
12   that Mr. Dean made to you?
13       A.   Yes.
14       Q.   Did you ever reject any of his
15   recommendations?
16       A.   No.
17       Q.   You can't think of any examples where you
18   said, no, I don't want to do that?
19       A.   I don't remember -- I didn't know what he
20   was picking, I thought it was a good stock.
21       Q.   Did you ever perform any research in
22   connection with any of the recommendations Mr. Dean
23   made before you gave him the okay?
24       A.   No.
25       Q.   The answer is no?

---

Plaintiff Ex 11 - 18

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 81

1     A.   The answer is no.
2     Q.   Why did you not perform any research?
3     A.   Because as illiterate, I was just stupid,
4   I guess.
5     Q.   I would like --
6     A.   That is why I hired Mr. Dean, to handle
7   the account.
8     Q.   What do you mean by that?
9     A.   He is supposed to do a good job for me
10   and he is supposed to be responsible for my account.
11     Q.   Let's take a look at another document.
12   We can put these back over here.
13         MS. PAULEY: So can we please mark this
14   as Exhibit 194.
15         (Document marked Plaintiff's Exhibit 194
16          for identification.)
17   BY MS. PAULEY:
18     Q.   No need to look at every page of
19   Exhibit 194. I am going to ask you to -- actually,
20   generally speaking, do you recognize Exhibit 194?
21     A.   Are these all the moves he made,
22   transactions, is this what this?
23         MR. O'BRIEN: Objection.
24   BY MS. PAULEY:
25     Q.   Leak at Page 1 of Exhibit 194, if you go

Page 82

1   back to the top, it you read it says Premier Account
2   Statement, and then do you see it says Eugene F.
3   Bernardo for your name?
4     A.   Uh-huh.
5     Q.   Do you recall receiving account
6   statements from J.D. Nicholas?
7         MR. O'BRIEN: Objection, leading,
8   foundation.
9         THE WITNESS: Daily statements, yes.
10   BY MS. PAULEY:
11     Q.   I am sorry, what was your answer?
12     A.   Daily statements, yes, you know, like a
13   statement when he buys a stock.
14     Q.   So you would receive a paperwork whenever
15   he would buy or sell any stocks?
16     A.   Yes.
17     Q.   And then separate and apart did you
18   receive statements on a monthly basis summarizing the
19   activity in your account?
20         MR. O'BRIEN: Same objections.
21         THE WITNESS: I am not sure, I am not
22   sure.
23   BY MS. PAULEY:
24     Q.   Well, so looking at Exhibit 194, do you
25   see that your name, it says Eugene F. Bernardo, 10

Page 83

1   Brook Lane, Palos Park, Illinois, 60464-1204, do you
2   see that?
3     A.   Yes.
4     Q.   Is that your name and address?
5     A.   Yes.
6     Q.   So does Exhibit 194 appear to be copies
7   of statements that you received in connection with
8   your account at J.D. Nicholas?
9         MR. O'BRIEN: Objection, leading,
10   foundation.
11         THE WITNESS: It could be, yes.
12         MR. O'BRIEN: Objection.
13   BY MS. PAULEY:
14     Q.   I would like to flip to the statement for
15   the month ending October 31 of 2012. I will help you
16   get there. It is quite a ways back. I think you
17   passed it up. Let's see. There we go.
18         MS. PAULEY: Do you have it, Liam?
19         MR. O'BRIEN: What page are we on?
20         MS. PAULEY: The pages aren't numbered,
21   it is Page 1 of 10 for the month ending October 31,
22   2012.
23         MR. O'BRIEN: I have that.
24   BY MS. PAULEY:
25     Q.   Do you see it says Page 1 of 10 for a

Page 84

1   period ending October 31, 2012, do you see that?
2     A.   Yes.
3     Q.   I would like to flip to Page 5 of 10 from
4   month, so it says 2 of 10, a few more back. Is that 5
5   of 10? Perfect.
6         If you want to just take a look at this,
7   I will make it so you can see it a little better. It
8   says on the top Assets Bought, do you see that?
9     A.   Yes.
10     Q.   And then do you see there is a number of
11   trades listed in chronological order, can you see
12   that?
13     A.   It just says purchase, purchase,
14   purchase.
15     Q.   Right.
16         So do you see the third trade listed it
17   says date 10/4/2012 and then it says purchase 10,000
18   shares at $44.80 Sarepta Therapeutics, Inc., total it
19   says negative $448,490.95, do you see that, it is the
20   fourth -- sorry, the third trade listed. Do you see
21   the one listed right on this row right here, do you
22   see that?
23     A.   Yes.
24     Q.   What is your understanding of what
25   Sarepta Therapeutics is?

Plaintiff Ex 11 - 19

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 85

1    MR. O'BRIEN: Objection, foundation,
2  leading.
3    THE WITNESS: I never heard of that
4  company.
5  BY MS. PAULEY:
6    Q.  Do you have any recollection of trades
7  being done in your account in Sarepta Therapeutics?
8    A.  No.
9    Q.  Do you see that it says total negative of
10 approximately $448,000 for that trade?
11   A.  Yes.
12   Q.  So I would like to flip to the first page
13 of September 30, 2012, it is a few pages back.
14   MS. BERNARDO: Backwards?
15   MS. PAULEY: This way, further back into
16 the document.
17   MS. BERNARDO: I think you counted five.
18   MS. PAULEY: One more, there we go.
19 BY MS. PAULEY:
20   Q.  So this is Page 1 of 10 for the period
21 ending September 30, 2012, do you see that?
22   A.  Yes.
23   Q.  And then you can see where a little below
24 that it says total net portfolio value as of September
25 30, 2012, $521,600.72, do you see that right here?

---

Page 86

1    A.  Yes, I do.
2    Q.  The trade that was done in Sarepta
3  Therapeutics on October 4, 2012, as we mentioned a
4  moment ago, was approximately $448,000 as compared to
5  your -- the net portfolio value in your account as of
6  the month before, which was $521,000, approximately.
7    What did Mr. Dean tell you with respect
8  to the size of the trades he was going to place in
9  Sarepta Therapeutics?
10   MR. O'BRIEN: Objection, leading,
11 mischaracterizes the witness' prior testimony.
12   THE WITNESS: He never told me anything
13 about it.
14 BY MS. PAULEY:
15   Q.  I also wanted to show if you flip back a
16 little bit to the Page 5 of 10, from October 30, the
17 month ending October 30, 2012, the page we were
18 looking at before, if you go down a little bit further
19 you will see under the date column you will see that
20 there are seven trades listed as having been placed on
21 October 15, 2012. Do you see that, the trades done
22 October 15, 2012?
23   A.  Yes.
24   Q.  What was your understanding of how
25 frequently your account was going to be traded at

---

Page 87

1  J.D. Nicholas?
2    MR. O'BRIEN: Objection, leading.
3    THE WITNESS: I thought it would be
4  traded which I will call normally where you buy
5  something and hold on to it for a period of time and
6  then you may sell it and may keep going with it, but
7  not a trade one day and we have five trades like that.
8  BY MS. PAULEY:
9    Q.  Do you remember speaking with Mr. Dean
10 several times everyday?
11   A.  No, but I remember speaking with him
12 everyday.
13   Q.  And you can see that the last three
14 trades that were done on October 15, 2012, the three
15 right here, you can see the first one is a call in
16 Sarepta Therapeutics, the one below that is a put in
17 Sarepta Therapeutics, and the third one is a put in
18 Sarepta Therapeutics, do you see that?
19   A.  Yes, I do.
20   Q.  What is your understanding of what a call
21 and a put is?
22   MR. O'BRIEN: Objection, leading.
23   THE WITNESS: I don't know.
24 BY MS. PAULEY:
25   Q.  If you go back to the trade that was

---

Page 88

1  placed on October 4, 2012, the 10,000 shares at $44.80
2  that we looked at a moment ago, if you flip to the
3  next page, Page 6 of 10, just one page up, so you can
4  see that there is a new category titled Assets Sold
5  Redeemed, do you see that?
6    A.  Yes, I see that.
7    Q.  And then you can see under Activity it
8  lists sales for the most part, do you see that?
9    A.  Yes.
10   Q.  And then can you see that on October 10,
11 2012 there were two sales of Sarepta Therapeutics,
12 each one for 5,000 shares, do you see that?
13   A.  Yes.
14   Q.  So this is the sale of the 10,000 shares
15 that we looked at that were purchased on October 4th
16 and you can see that they were sold six days later on
17 October 10th, do you see that?
18   A.  Yes.
19   Q.  And if you look at the totals amount for
20 those two trades, I am estimating, but it is around
21 $300,000 if you add $154,818.09 with $155,510.61.
22   A.  It sold for $400,000.  If you add the two
23 up it is --
24   Q.  It is a little over 300,000.
25   MR. O'BRIEN: Objection, leading.

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 89

1       THE WITNESS: About 310,000.
2    BY MS. PAULEY:
3       Q.   Right.
4            So as compared to if you go back to the
5    page before, if you compare it to the $448,000 for the
6    buy, do you see that?
7       A.   Yes.
8       Q.   So it appears from that trade that you
9    lost about $137,000. What was your -- did you have
10   any conversations with Mr. Dean about the loss on that
11   one trade in Sarepta?
12      A.   As far as I know, no, I haven't had any
13   -- unless it was a -- he called me on Sunday and saw
14   there was a $12,000 I think commission fee or
15   something, I am not sure what it was, off my
16   statement.
17      Q.   So you remember having a conversation
18   with Mr. Dean on a Sunday about a commission that was
19   charged?
20      A.   I think it might have been a commission,
21   but I didn't know anything about the Sarepta
22   Therapeutics, Incorporated, did not know a thing about
23   it.
24      Q.   Okay.
25           Did -- we can put Exhibit 194 aside.

---

Page 90

1            Did Mr. Dean have your authority to place
2    trades in the account in your account without your
3    permission?
4       MR. O'BRIEN: Objection, leading.
5       THE WITNESS: I would say he did.
6    BY MS. PAULEY:
7       Q.   He did.
8            Did you give him that authority in
9    writing?
10      A.   No.
11      Q.   And why do you believe he had your
12   authority to place trades without speaking to you?
13      A.   Because from Day 1 that is the way we did
14   it.
15      Q.   Did you have a conversation in which you
16   told him it was okay to do that?
17      A.   Well, every morning he would tell me
18   about the stock he was buying and I would listen. I
19   says, okay, you can go ahead with it.
20      Q.   And you mean go ahead with it, go ahead
21   with that particular trade?
22      A.   Make the transaction.
23      Q.   If he was to do -- if that was a buy
24   transaction, for example, if he wanted to sell the
25   position did you expect him to call you back and get

---

Page 91

1    your authority to sell the position?
2       MR. O'BRIEN: Objection, leading.
3       THE WITNESS: No, I didn't.
4    BY MS. PAULEY:
5       Q.   You told him he could go ahead and trade
6    in your account without speaking to you first?
7       MR. O'BRIEN: Objection, leading.
8       THE WITNESS: We sort of -- he talked to
9    me every morning about what he was going to buy for
10   the day.
11   BY MS. PAULEY:
12      Q.   And you mentioned that these
13   conversations always occurred over the telephone?
14      A.   Yes, they were always over the telephone.
15      Q.   Did you -- you mentioned -- you testified
16   earlier that you would receive I believe what is
17   called confirmations or statements about trades that
18   had been done in your account in the mail, is that
19   correct?
20      A.   Yes.
21      Q.   Did you have ever receive confirmations
22   concerning trades that you and Mr. Dean had not talked
23   about?
24      MR. O'BRIEN: Objection, leading.
25      THE WITNESS: I don't know.

---

Page 92

1    BY MS. PAULEY:
2       Q.   Did you review the confirmations when you
3    received them in the mail?
4       A.   Yes, flipped them over to see if I made
5    money or lost money on them.
6       Q.   How could you tell if you made money or
7    lost money based on the confirmations?
8       A.   Because on the confirmation sheet it
9    would say what I paid for the stocks and what they
10   were worth when they were sold.
11      Q.   Okay.
12           Do you mean in the confirmations or in
13   your statements?
14      A.   In my statements.
15      MR. O'BRIEN: Objection, leading.
16   BY MS. PAULEY:
17      Q.   So you could look and see what the buy
18   cost and what the sell cost and you would compare the
19   difference?
20      A.   Right.
21      MR. O'BRIEN: Objection, leading.
22   BY MS. PAULEY:
23      Q.   Other than Mr. Dean did you speak with
24   anyone else at J.D. Nicholas?
25      A.   His partner once in a great while.

---

Plaintiff Ex 11 - 21

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 93

1    Q.   Donald Fowler?
2        MR. O'BRIEN: Objection, leading.
3        THE WITNESS: Donald Fowler.
4    BY MS. PAULEY:
5    Q.   What did you and Mr. Fowler discuss?
6    A.   What would happen is the only time I
7    talked to Mr. Fowler is if Mr. Dean wasn't in for the
8    day or some reason, he was ill or had something to do
9    that day and Mr. Fowler would take over for the day
10   and he would talk about the stocks, too.
11   Q.   So why don't we look at a couple of the
12   trade confirmations.
13       MS. PAULEY: Can we please mark this as
14   Exhibit 195.
15       (Document marked Plaintiff's Exhibit 195
16       for identification.)
17   BY MS. PAULEY:
18   Q.   We can actually look at the first page
19   first and move on from there, if you wanted to look at
20   the first page of Exhibit 195, and let me know when
21   you are ready.
22   A.   What do you mean by 195?
23   Q.   Yes, that is the number of the exhibit.
24   A.   I don't think I received this.
25   Q.   Well, so you testified earlier that you

---

Page 94

1    would receive statements concerning trades that had
2    been placed in your account, is that correct?
3    A.   That's correct.
4    Q.   So does Exhibit 195 appear to look like
5    those statements that you would receive?
6        MR. O'BRIEN: Objection, leading.
7        THE WITNESS: No.  It had more
8    information.
9    BY MS. PAULEY:
10   Q.   What other information?
11   A.   It looked like -- probably told what the
12   stock was bought at and what it sold for and so on,
13   how many transaction fees, how much money it cost.
14   Q.   Okay.
15       So looking at the first page of
16   Exhibit 195, you can see that it has your name and
17   your address, Eugene F. Bernardo, 10 Brook Lane, Palos
18   Park, Illinois 60604-1264, do you see that?
19   A.   Yes.
20   Q.   And then it has your account number
21   ending in 4186, do you see that up here?
22   A.   Yes.
23   Q.   And then it lists here it says you can
24   see the trade date was 10/4/2012, this is a trade we
25   looked at a few minutes ago, Sarepta Therapeutics,

---

Page 95

1    10,000 shares were purchased at a price of $44.80, do
2    you see that?
3    A.   Yes.
4    Q.   Looking at this trade confirmation on
5    Exhibit 195 what amount of commission did Mr. Dean
6    receive in connection with this trade?
7        MR. O'BRIEN: Objection, leading.
8        THE WITNESS: Three percent, pretty much,
9    it is high.
10   BY MS. PAULEY:
11   Q.   Three percent of what?
12   A.   448,000.
13   Q.   What is your understanding of where it
14   says Special Remarks for This Transaction, it says
15   Reported, you see the section right here, reported
16   price $44.50, commission equivalent 3¢ per share, what
17   is your understanding of what that means?
18   A.   I have to take $44.50 times what is the
19   percent charge here, that is what it comes up to.
20   Q.   What conversations, if any, did you have
21   with Mr. Dean about the commission that he was going
22   to be charging you in connection with this?
23   A.   We never had, we never had conversations
24   about commissions on anything.
25   Q.   If you look over at firm commission do

---

Page 96

1    you see in the box over the right?
2    A.   Yes.
3    Q.   It says forty-nine ninety-five, what was
4    your understanding of what that meant?
5    A.   It was for insurance, I believe, it was
6    for insurance, if you were ever sued or something, it
7    goes into the pot.
8    Q.   If you flip two pages back, you can see
9    this page references a trade that was placed on
10   October 15, 2012, do you see that?
11   A.   Yes.
12   Q.   So what is your understanding based on
13   this trade commission of the commission that Mr. Dean
14   received in connection with this trade?
15       MR. O'BRIEN: Objection, leading.
16       THE WITNESS: I see it here but I can't
17   understand.  It was $100 commission.
18   BY MS. PAULEY:
19   Q.   And then did Mr. Dean explain to you why
20   commissions were reported on the trade confirmation in
21   one way in one place and then a different way in a
22   different place?
23       MR. O'BRIEN: Objection, foundation.
24       THE WITNESS: No.
25

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 97

BY MS. PAULEY:
1    Q.   If you flip back to the last trade
3 confirmation in Exhibit 195, so here you can see this
4 is for another trade in Sarepta Therapeutics placed on
5 October 15, 2012, there is 5,000 shares sold, do you
6 see that?
7    A.   Uh-huh.
8    Q.   And then under Special Remarks here do
9 you see where it says Unsolicited, do you see what
10 that means, where it says unsolicited?
11   A.   Yes.
12   Q.   Do you have an understanding of what
13 means?
14   A.   No, I don't.
15   Q.   Did you ever tell Mr. Dean that you —
16 did you ever suggest I want to buy or sell any amounts
17 of Sarepta?
18   A.   No.
19   Q.   Did Mr. Dean — we can put Exhibit 195
20 aside, I will put it up here in the pile.
21        Did Mr. Dean ever tell you what the total
22 amount of commission and fees you were being charged
23 in your account was?
24   A.   No.
25        MR. O'BRIEN: Objection, leading.

---

Page 98

BY MS. PAULEY:
2    Q.   Did you ever ask that question?
3    A.   No.
4    Q.   Why not?
5    A.   Because I didn't get to.
6    Q.   Did you have any conversations with
7 anyone else at J.D. Nicholas about the total amount of
8 commission and fees being charged to your account?
9    A.   No.
10   Q.   Did you receive any documents from
11 J.D. Nicholas concerning the total amount of
12 commission and fees that were being charged to your
13 account?
14   A.   No.
15   Q.   Sitting here today do you have any
16 understanding of what the commissions and fees were?
17   A.   I still don't know.
18   Q.   Did you make any effort to calculate what
19 the commission and fees were that were being charged
20 to your account?
21   A.   No, but I knew towards the end I knew
22 they were getting up there.
23   Q.   How did you know that?
24   A.   Because I was losing so much and because
25 there were so many sales being made a week.  We were

---

Page 99

1 buying in the morning and selling in the afternoon.
2    Q.   Was that — the buying in the morning and
3 selling in the afternoon, was that -- had you told
4 Mr. Dean that is the type of trading you wanted in
5 your account?
6    A.   Definitely not.
7        MR. O'BRIEN: Objection, leading.
8 BY MS. PAULEY:
9    Q.   Why not?
10       MR. O'BRIEN: Same objection.
11       THE WITNESS: I just didn't do it, I
12 thought he knew, I was crying to him everyday, we are
13 losing all this money, we have to bring it back, what
14 is going on.
15 BY MS. PAULEY:
16   Q.   Were you aware of the profit or loss that
17 was being incurred in your account?
18   A.   When I started to get down further, yes,
19 because I lost so much money.
20   Q.   How did you know you were losing money?
21   A.   Because when I got the statement it would
22 say on there the account is worth is $130,000 or
23 something and I knew I gave him maybe 500,000.
24   Q.   Sitting here today are you aware of how
25 much money you lost with J.D. Nicholas?

---

Page 100

1    A.   I have an idea.
2    Q.   How much?
3    A.   435,000.
4    Q.   And how do you — did you calculate that
5 information yourself or was that provided to you in
6 some way?
7    A.   It was provided to me in some way.
8    Q.   By whom?
9    A.   By the attorney, I don't know --
10   Q.   So at some point you hired an attorney to
11 review your account?
12   A.   Yes.
13   Q.   When was that?
14   A.   Before I pulled it out -- after I pulled
15 it out.
16   Q.   And did Mr. Dean ever provide you with
17 information concerning what the profits or losses in
18 your account were?
19       MR. O'BRIEN: Objection.
20       THE WITNESS: No.
21 BY MS. PAULEY:
22   Q.   Did anyone else at J.D. Nicholas?
23   A.   No.
24   Q.   The 435,000, approximately, that you
25 believe you lost with J.D. Nicholas how if at all has

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 101

1  that -- the loss of that amount of money impacted your
2  life?
3      A.   Well, health-wise I think it made me ill.
4  I am still going -- suffering today because I lost my
5  life savings, I considered that my life savings. I
6  worked hard, I worked -- when I started my company I
7  worked many years and I worked until 9, 10:00 o'clock
8  at night, I go on calls at night, stay in the office
9  during the day. The reason I went on calls at night
10 because that is when people wanted to see me, they
11 wanted to see me, they worked during the day.
12      I saved that money, just like I told you,
13 I worked for a number of years with Shearson Lehman, I
14 was making 80 to 100,000 a year, I lived on 35, 40,000
15 and invested it. Over eight years it doubled -- in
16 other words, what I invested the first year, eight
17 years later that same account it doubled. I learned
18 it the hard way, I was lucky I made money back then.
19      Q.   Has your life -- is your life today any
20 different than it would have been if you had the
21 $435,000?
22          MR. O'BRIEN: Objection, leading.
23          THE WITNESS: Yes, it is very different.
24 It is on my mind every day of the week, every morning
25 when I am in bed or at night, that was hard earned

Page 102

1  money I felt as though it wasn't managed correctly, it
2  was managed commission, when I put two and two
3  together I started to learn about this, how it
4  operates.
5  BY MS. PAULEY:
6      Q.   What do you mean by that?
7      A.   When I got into it I wasn't aware of him
8  buying massive amounts of stock at one time, I wasn't
9  aware of them buying and selling within a day or
10 something. I wasn't aware of a lot of things you told
11 me like options and margins and things like that, I
12 didn't know anything about that.
13      Q.   Is information about the amount of
14 commissions and fees you were being charged is that
15 information you would have wanted to know when your
16 account at J.D. Nicholas was opened?
17          MR. O'BRIEN: Objection, leading.
18          THE WITNESS: Probably, yes.
19 BY MS. PAULEY:
20      Q.   Why?
21      A.   Because I wanted to know how much I was
22 making or losing.
23      Q.   Did you have any understanding of what
24 amount of profit your account needed to achieve to
25 overcome the commissions and fees that were being

Page 103

1  charged?
2      A.   No.
3      Q.   Did you ever think to ask that question?
4      A.   No.
5      Q.   Why don't we look at another document.
6          MS. PAULEY: Can we please mark this as
7  Exhibit 196?
8          (Document marked Plaintiff's Exhibit 196
9          for identification.)
10 BY MS. PAULEY:
11      Q.   If you can please review Exhibit 196 and
12 let me know when you are ready.
13      A.   I don't remember this statement.
14      Q.   My question is do you recognize
15 Exhibit 196?
16      A.   No.
17      Q.   Did you ever request -- if you look at
18 the Page 1 of Exhibit 196, it appears to be a fax
19 transmission from Heather at J.D. Nicholas &
20 Associates to you. It says "Good morning,
21 Mr. Bernardo. As per your conversation with Gregory
22 Dean the following you will find what was requested.
23 Please feel free to call with any questions, thank
24 you, and have a great day."
25      Do you recall requesting any information

Page 104

1  concerning your account --
2          MR. O'BRIEN: Objection, leading.
3  BY MS. PAULEY:
4      Q.   -- in or about August of 2012?
5          MR. O'BRIEN: Leading.
6          THE WITNESS: No, I don't remember.
7  BY MS. PAULEY:
8      Q.   So you have no recollection of receiving
9  Exhibit 196?
10     A.   No. But I did keep my sheets, too, I
11 kept all my sheets when they came in.
12     Q.   What sheets?
13     A.   Everything that came in the mail I put
14 away.
15     Q.   We can put 196 aside.
16          MS. PAULEY: Can we please mark this
17 document as Exhibit 197.
18          (Document marked Plaintiff's Exhibit 197
19          for identification.)
20 BY MS. PAULEY:
21     Q.   For Exhibit 197 I am going to have you
22 flip to the first is to page -- they are not numbered,
23 it is the first one that says Intent to Maintain
24 Active Account. There we go. Do you see that?
25     A.   Yes, I do.

Plaintiff Ex 11 - 24

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

**Page 105**

1    Q.   It says -- you see on the top it says
2  name Eugene F. Bernardo, do you see that?
3    A.   Yes.
4    Q.   Do you remember receiving a document
5  entitled Intent to Maintain Active Account?
6        MR. O'BRIEN: Objection, foundation,
7  leading.
8        THE WITNESS: No.
9  BY MS. PAULEY:
10   Q.   So you don't have any -- do you have any
11 recollection of ever signing a document entitled
12 Intent to Maintain Active Account?
13       MR. O'BRIEN: Same objections.
14       THE WITNESS: No, I don't have no
15 recollection.
16 BY MS. PAULEY:
17   Q.   So flipping back to the second to last
18 page in the packet, it is a document called Day
19 Trading Risk Disclosure Statement.  Do you see that?
20   A.   Yes.
21   Q.   Is that your signature on the bottom of
22 the Day Trading Risk Disclosure Statement?
23   A.   It looks like it is.
24   Q.   What is -- do you recall receiving this
25 day trading risk disclosure statement?

---

**Page 106**

1        MR. O'BRIEN: Objection, asked and
2  answered.
3        THE WITNESS: No, I don't.
4  BY MS. PAULEY:
5    Q.   I would like to review some of the
6  portions of this document.  It says in Paragraph 2
7  "Day Trading" -- beginning right here, "Day trading
8  can be extremely risky," and it says "day trading is
9  generally is not appropriate for someone of limited
10 resources and limited investment or trading experience
11 and low risk tolerance.  You should be prepared to
12 lose all of the funds that you use for day trading.
13 In particular, you should not fund day trading
14 activities with retirement savings, student loans,
15 second mortgages, emergency funds, funds set aside for
16 purposes such as education or homeownership or funds
17 required to meet your living expenses.  Further,
18 certain evidence indicates that investments of less
19 than 50,000 will significantly impair the ability of a
20 day trader to make a profit.  Of course, an investment
21 of 50,000 or more will in no way guarantee success."
22 Do you see that?
23   A.   Yes.
24   Q.   What conversations, if any, did you have
25 with Mr. Dean about day trading?

---

**Page 107**

1        MR. O'BRIEN: Objection, leading.
2        THE WITNESS: Nothing.
3  BY MS. PAULEY:
4    Q.   Was it your intention to be day trading
5  in your account?
6    A.   No.
7    Q.   What is your understanding of what day
8  trading means?
9    A.   Where you buy stock and sell it again
10 right away.
11   Q.   And what conversations, if any, did you
12 have about the risks associated with day trading with
13 Mr. Dean?
14       MR. O'BRIEN: O, leading.
15       THE VIDEOGRAPHER: Can you repeat the
16 question?
17       MR. O'BRIEN: Objection, leading.
18       THE WITNESS: I didn't have any.
19 BY MS. PAULEY:
20   Q.   You know, in this paragraph it says that
21 "day trading generally is not appropriate for someone
22 of limited resources and limited investment or trading
23 experience and low risk tolerance."
24       Would you consider yourself someone of
25 limited investment or trading experience?

---

**Page 108**

1    A.   Definitely.
2    Q.   And as far as your risk tolerance, how
3  tolerant were you of risk in your account?
4        MR. O'BRIEN: Objection, leading.
5        THE WITNESS: Well, I wasn't -- I wasn't
6  -- I didn't realize that there was a big risk I was
7  involved with.
8  BY MS. PAULEY:
9    Q.   Why not?
10   A.   Because I didn't know that there would be
11 risk.
12   Q.   And if you go to the paragraph right
13 below, the third paragraph, it says "Be cautious of
14 claims of large profits from day trading.  You should
15 be wary of advertisements or other statements that
16 emphasize the potential for large profits in day
17 trading.  Day trading can also lead to large and
18 immediate financial losses."
19       Did you understand that day trading can
20 lead to large and immediate financial losses?
21   A.   No.
22   Q.   Did you read this --
23       MR. O'BRIEN: Objection, leading.
24 BY MS. PAULEY:
25   Q.   Did you read the day trading risk

---

Plaintiff Ex 11 - 25

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 109

1  disclosure statement before you signed it?
2      A.   Well, if that is my signature I probably
3  looked it over, but I would have never okayed this if
4  I would have read this.
5      Q.   I am sorry, so do you recall reading the
6  day trading risk disclosure statement before you
7  signed?
8      A.   I don't recall that.
9          Well, if I am looking at the date on the
10  bottom of this, I definitely didn't write October 6,
11  2012, I didn't put that down.
12      Q.   You don't believe that is your
13  handwriting?
14      A.   No, it is not my handwriting.
15      Q.   If you go down a few more paragraphs, the
16  same page, the paragraph that starts with "Day trading
17  will generate substantial commissions," do you see
18  that?
19          What was your understanding of the
20  commissions associated with day trading?
21      A.   Again, I didn't have any --
22          MR. O'BRIEN: Objection, leading.
23          THE WITNESS: -- any idea of substantial
24  commissions because I wasn't aware of -- I wasn't
25  aware of day trading, day trading how it worked.

Page 110

1  BY MS. PAULEY:
2      Q.   And then the paragraph below that says
3  "Day trading on margin or short selling may result in
4  losses beyond your initial investment," do you see
5  that, the second to last paragraph right here?
6      A.   Yes, I see that.
7      Q.   What was your understanding of the
8  potential for losses beyond your initial investment?
9          MR. O'BRIEN: Objection, leading.
10          THE WITNESS: I didn't know, I wasn't --
11  there was -- I wasn't aware.
12          MS. REPORTER: What did you say?
13          THE WITNESS: I didn't know, I wasn't
14  aware.
15  BY MS. PAULEY:
16      Q.   We can put Exhibit 197 aside.
17          MS. PAULEY: And then I would like to
18  mark this as Exhibit 198.
19          (Document marked Plaintiff's Exhibit 198
20           for identification.)
21  BY MS. PAULEY:
22      Q.   If you look at Exhibit 198 that was
23  placed before you, take a minute and let me know when
24  you are ready.
25      A.   Okay.

Page 111

1      Q.   You can see at the bottom it appears to
2  be your signature.  Is that your signature?
3      A.   Yes, it is.
4      Q.   And the date is December 19, 2012, do you
5  see that?
6      A.   Yes.
7      Q.   Do you believe that is your handwriting?
8      A.   No.
9      Q.   No, why not?
10      A.   Because this is all scrunched together,
11  if I wrote that --
12      Q.   I am sorry, do you believe the signature
13  is your handwriting?
14      A.   I have my questions about it.
15      Q.   And what about the date where it says 12,
16  19, 2012?
17      A.   I don't think that is my handwriting.
18      Q.   Why not?
19      A.   Because I write my name is different.
20      Q.   That is okay.
21      A.   I would write it down here.
22      Q.   That is okay, we will keep the document
23  as is, but thank you.
24          So do you have any recollection of
25  receiving a second day trading risk disclosure

Page 112

1  statement?
2      A.   No.
3      Q.   Because -- I will show you the one we
4  looked at a moment ago in Exhibit 197, if you recall,
5  in Exhibit 197 the risk disclosure statement was
6  dated October 6, 2012, do you see that?
7      A.   Yes.
8      Q.   And then in Exhibit 198 it is dated
9  December 19, 2012.  Do you have any recollection of
10  receiving two-day trading risk disclosure statements?
11      A.   No.
12          MR. O'BRIEN: Objection, leading.  ·
13  BY MS. PAULEY:
14      Q.   Going back to -- I just have one more
15  question about the -- some of the statements in here.
16  Going back to the paragraph that begins with "Day
17  trading will generate substantial commissions," do you
18  see that, this paragraph?
19      A.   Yes.
20      Q.   The last sentence says "For instance,
21  assuming that a trade costs $16 and an average of 29
22  transactions are conducted per day an investor will
23  need to generate an annual profit of $111,360 just to
24  cover commission expenses."  Do you see that sentence?
25      A.   Yes.

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 113

1      Q.   What was your understanding of what the
2   profit would need to be in your account to cover the
3   commission expenses in your account?
4            MR. O'BRIEN: Objection, leading.
5            THE WITNESS: This is all over my head.
6   BY MS. PAULEY:
7      Q.   Is your account at J.D. Nicholas still
8   open?
9      A.   I think it is gone, I took it out.
10     Q.   Why did you close your account at J.D.
11  Nicholas?
12     A.   Because things weren't getting better,
13  they were getting worse.
14     Q.   What conversations did you have with
15  Mr. Dean or anyone else at J.D. Nicholas about closing
16  your account?
17     A.   I told him I had to -- there was no -- I
18  remember the last call I made, what little I had I
19  said I want to take it out, I want my money, he had no
20  problem with that, they didn't fight with me or they
21  didn't explain to me or argue with me or anything,
22  they let me take it out.
23     Q.   And you mentioned -- you testified
24  earlier about an attorney that you had that worked
25  with you to review your account, is that correct?

---

Page 114

1      A.   Yes.
2      Q.   Who was that attorney?
3      A.   I don't remember his name.
4      Q.   And what did the attorney assist you
5   with, if anything?
6      A.   We did -- he checked out all the papers I
7   had and he went to the FINRA.
8      Q.   He went to -- you filed a complaint with
9   FINRA?
10     A.   Yes.
11           MR. O'BRIEN: Objection.
12  BY MS. PAULEY:
13     Q.   What was the -- do you know -- have an
14  understanding of what the allegations in that FINRA
15  complaint were, what you were claiming happened?
16           MR. O'BRIEN: Objection, relevance.
17           THE WITNESS: Well, exactly what we are
18  talking about today, I claimed I lost a lot of money
19  and he went over and he told me that trading was done
20  six times more than -- I think allowed -- might not
21  have said that, in other words, six times more than it
22  should be, and he took care of everything from now.
23           MS. PAULEY: I would like to mark this
24  document as Exhibit 199.
25

---

Page 115

1            (Document marked Plaintiff's Exhibit 199
2            for identification.)
3   BY MS. PAULEY:
4      Q.   Please take a minute to look at
5   Exhibit 199 and let me know when you are ready.
6      A.   Okay.
7      Q.   Do you recognize Exhibit 199?
8      A.   I think I have seen it before.
9      Q.   What is Exhibit 199?
10     A.   It is filing suit against Gregory Dean.
11     Q.   And it lists -- if you go back to the
12  first page where it says "You are hereby summoned and
13  required to serve upon Plaintiff's Attorney, James L.
14  Wideikis."
15           Is that the attorney that assisted you?
16           MR. O'BRIEN: Objection, leading.
17           THE WITNESS: He started to but then he
18  couldn't -- he couldn't proceed because he didn't go
19  through FINRA, he went through the federal courts and
20  he had to go through FINRA, he put me on with another
21  attorney that proceeded to handle it from there.
22  BY MS. PAULEY:
23     Q.   What was the outcome of the FINRA
24  proceeding?
25           MR. O'BRIEN: Objection, relevance.

---

Page 116

1            THE WITNESS: I received X number of
2   dollars back, but I can't remember exactly how much it
3   was.
4   BY MS. PAULEY:
5      Q.   Was there ever a FINRA trial or
6   arbitration that you -- that occurred?
7            MR. O'BRIEN: Objection, leading,
8   relevance.
9            THE WITNESS: I don't think so, I never
10  seen -- he called me up and said what happened and he
11  gave me -- he sent me a check.
12  BY MS. PAULEY:
13     Q.   Who sent you a check?
14     A.   I think it was FINRA.
15     Q.   Okay.
16     A.   There is another attorney involved.
17     Q.   Do you know how much money that you
18  received in the check?
19     A.   I did, but I don't remember now.
20           MS. PAULEY: I don't think I have any
21  further questions at this time, but I may do some
22  redirect at the end.
23           But I don't know if you want to take a
24  break, if you want to just --
25           MR. O'BRIEN: Do you want to take a break

---

Plaintiff Ex 11 - 27

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 129

1    of your testimony --
2        A.   No, for a long time -- when I said high
3    commissions, I didn't mean high percentages, I mean
4    there were so many trades being done everyday and they
5    are all commissions.
6        Q.   So you understood there was a commission
7    associated with each transaction --
8        A.   Yes.
9        Q.   -- in your J.D. Nicholas account?
10       A.   That wasn't the beginning, that was later
11   on.  It makes sense if you are going to make a lot of
12   transactions you get commissions each time.
13       Q.   It does.
14            Did you ever contact anyone at
15   J.D. Nicholas to tell them that there was something
16   inaccurate either in your monthly account statements
17   or your trade confirms?
18       A.   Not other than we are losing money and
19   things aren't going well and wanted the thing
20   straightened out.
21       Q.   Did the SEC ever ask you to provide
22   copies of your telephone records for the time period
23   that you had your J.D. Nicholas account open?
24       A.   No.
25       Q.   I believe you testified earlier that you

---

Page 130

1    spoke to Greg pretty much daily during the time that
2    your J.D. Nicholas account was open, is that pretty
3    much accurate?
4        A.   Yes.
5        Q.   When you spoke with Greg did you discuss
6    trading strategies with Greg?
7        A.   No.
8        Q.   Did you discuss individual stock trades
9    with Greg?
10       A.   No.
11       Q.   Did you discuss --
12       A.   I take that back, I discussed -- he
13   brought over -- he would tell me where the stock was
14   and what it was about, but I didn't talk about any
15   strategies and I didn't talk about the amount to be
16   purchased.
17       Q.   Did you ever suggest to Greg that you
18   should buy a certain amount of -- a certain number of
19   shares of a particular stock?
20       A.   No.
21       Q.   Did you ever speak to Greg about, you
22   know, increasing the size of a position you held in a
23   particular stock?
24       A.   No.
25       Q.   Did you ever discuss overall market

---

Page 131

1    performance or overall market activity with Greg?
2        A.   Yes, towards the end when I was losing a
3    lot of money I was asking what is going on here.
4        Q.   Did you ever discuss using stop loss
5    orders?
6        A.   No, but I think he did use stop loss
7    orders once in a while.
8        Q.   But you never suggested utilizing?
9        A.   No, he ran the whole ship.
10       Q.   So you have no recollection of ever
11   discussing utilizing a stop loss position on a
12   particular transaction?
13       A.   Towards the end of --
14       Q.   At any time.
15       A.   Towards the end of my business with
16   Gregory Dean I talked to him, I said we got to make
17   this money back, I lost so much money, so what my idea
18   was buy the stock and if it goes up a 1,000 or 2,000
19   or 3,000 sell it right away because we are $3,000 less
20   -- more than what we had and let's work on short term
21   if it is making money get rid of it, so bits and
22   pieces we would make a little bit of money here and a
23   little bit of money there to get it back.
24       Q.   So you were suggesting at some point in
25   your account doing short-term trades in order to

---

Page 132

1    capture quick profits?
2        A.   Well, he would do a trade everyday, so
3    what I would like to do is buy or keep our eye on it.
4    I would call him in the afternoon, Gregory, how is the
5    stock, he says we are up, this is an example, we are
6    up 3,000 today and I said, well, let's sell it and he
7    would say, no, I want to wait until the end of the day
8    and see if it does better, and I call at the end of
9    the day and it went down, I didn't make any profits, I
10   lost money.
11       Q.   That was just an example of one of many
12   similar-type conversations you had with Greg Dean,
13   correct?
14       A.   Later on in my transactions with Gregory
15   Dean, yes.
16       Q.   Going back to stop losses, do you know
17   what a stop loss order is?
18       A.   Yes, I believe I know what it is, if it
19   hits a certain amount put a stop on it.
20       Q.   And do you recall ever recommending
21   certain stop loss trades?
22       A.   No.  As I said, Gregory ran the ship.
23       Q.   Do you know what the risks are with doing
24   stop loss trades?
25       A.   No, I don't.

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 217

1    Q.   Okay.
2         I would like you to refer to Item 7,
3    Line 7 of this -- on this page, which indicates net
4    short term capital gain or loss, do you see that?
5    A.   Yes, I do.
6    Q.   And what does it indicate is the --
7    A.   The loss?
8    Q.   The loss in 20 -- that you were carrying
9    over from 2012 -- withdrawn.
10   A.   300 --
11   Q.   Let me rephrase the question.
12        What does it indicate what is the dollar
13   amount indicated in Item 7?
14   A.   $393,951.
15   Q.   As a loss, correct?
16   A.   Yes.
17   Q.   And was that a loss you were carrying
18   over from other prior tax years?
19   A.   I don't think so because we are only
20   allowed to take so much of a loss every year.
21   Q.   That's correct.
22        Would it indicate to you what your loss
23   was that you were carrying over from prior years?
24   A.   I don't know.
25   Q.   Do you recall having substantial

---

Page 218

1    investment losses prior to 2012?
2    A.   I don't know that.
3    Q.   Do you recall having investment losses in
4    2012 totalling $394,000 plus?
5    A.   It is when I left -- it is when I left --
6         THE WITNESS: What is the name of your
7    company again?
8    BY MR. O'BRIEN:
9    Q.   He can't answer.
10   A.   He can't answer, but the company that was
11   working with Gregory Dean, what was the name of the
12   company?
13   Q.   If you don't recall you don't recall.
14   A.   It is because I have a memory problem.
15   Q.   I understand.
16        Do you know if you also incurred losses
17   in any of your other brokerage accounts other than the
18   account that was handled by Gregory Dean?
19   A.   It could have been Morgan Stanley at
20   least in -- Morgan Stanley, what is the name of the
21   rest of the company?
22   Q.   Is that the SmithBarney, is that the
23   account you are referring to?
24   A.   Yes, SmithBarney.
25   Q.   In 2012 was your wife upset with the

---

Page 219

1    investment losses you were having in your various
2    brokerage accounts?
3         MS. PAULEY: Objection to form.
4         MR. O'BRIEN: I will rephrase it.
5    BY MR. O'BRIEN:
6    Q.   Was your wife aware of the investment
7    losses you were sustaining in your various brokerage
8    accounts in 2012?
9    A.   I am pretty sure she was.
10   Q.   What was her reaction to those losses?
11   A.   She was upset, but she didn't get mad at
12   me or anything, she kept it inside.
13   Q.   I am now going to play for you some
14   recordings and then we will mark them separately for
15   the record.
16        This is a recording, the only thing I can
17   do to differentiate this recording from the subsequent
18   recordings is that it appears to be 1,538 kilobytes.
19   The title on this recording is Eugene Bernardo JDN
20   Recording Bernardo SRPT Tweet.
21        I will ask you to listen to the recording
22   and then I will ask you questions about the recording.
23        (Audio recording played and transcribed
24        as follows:)
25        SPEAKER 1: Two months, two-and-a-half

---

Page 220

1    three months, by not -- by having a good game plan
2    and following it, now, we got caught in one small
3    bear trap yesterday with this bullshit Tweet thing
4    on Twitter, I think we just keep our heads screwed
5    on straight.  If anything, I think the better bet
6    would be to maybe own a little more of this IPO at
7    some point.
8         But, don't get me wrong, if I see this
9    SRPT stock moving, if not today, tomorrow, just
10   like you said, should we buy some more, I think it
11   would be a good idea to buy some more.
12        SPEAKER 2: Okay.
13        SPEAKER 1: How do you feel about it?
14        SPEAKER 2: Well, it if the word gets out
15   that it was a hoax I think that we (inaudible)
16   people buying the stock to make a fast buck.
17        SPEAKER 1: The word is definitely out
18   that it is a hoax, that it is confirmed, that it
19   is 100% --
20        SPEAKER 2: I mean, the people -- it has
21   been -- I think we should buy some more.
22        SPEAKER 1: Okay, well, you know what --
23        SPEAKER 2: -- punch back, but when I got
24   word I will be able to punch back.
25        SPEAKER 1: Exactly.  I mean, hey,

---

Plaintiff Ex 11 - 29

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 225

1      it would be a good idea to buy some more.
2          (End of audio recording clip.)
3    BY MR. O'BRIEN:
4       Q.   Do you recall ever telling Gregory Dean
5    that you should buy some more of SRPT in your account?
6       A.   No, no.
7       Q.   So you are saying the person in this
8    recording is far more savvy than you were?
9       A.   Yes, far more savvy.
10      Q.   And for more intelligent than you are?
11      A.   Yes.
12      Q.   And -- but you would agree with me that
13   that person in this recording appears to have a
14   greater knowledge of investments than you claim to
15   have?
16      A.   Yes.
17          MS. PAULEY: Objection to form.
18   BY MR. O'BRIEN:
19      Q.   Would you agree that the person in that
20   recording seems very knowledgeable about investments?
21          MS. PAULEY: Objection to form.
22   BY MR. O'BRIEN:
23      Q.   You can answer.
24      A.   Yes.
25          And I don't even Tweet, so that person

---

Page 226

1    have to go to the tweet on a computer to find out?
2       Q.   I don't know, but the person in this
3    recording seems to be well aware of the Tweet,
4    wouldn't you agree?
5          MS. PAULEY: Objection to form.
6    BY MR. O'BRIEN:
7       Q.   Would you agree --
8       A.   Yes, I would.
9       Q.   -- that the gentleman in this
10   recording -- both of the gentlemen, are discussing a
11   particular fraudulent Tweet?
12          MS. PAULEY: Objection to form.
13          THE WITNESS: Yes, I do.
14          That is not me definitely on there.
15   BY MR. O'BRIEN:
16      Q.   That is fine.
17          Let's move on to the next phone call.
18          MS. PAULEY: What is the source of that
19   recording?
20          MR. O'BRIEN: It was produced to you
21   about a week ago.
22          MS. PAULEY: By whom?
23          MR. O'BRIEN: By me.  I produced a batch
24   of recordings to you.
25          MS. PAULEY: Via what?

---

Page 227

1          MR. O'BRIEN: Via e-mail.
2          MS. PAULEY: I don't know if we received
3    that.
4          MR. O'BRIEN: I sent it to both you and
5    David.
6          MS. PAULEY: We might need you to resend
7    it, I am pretty sure we didn't get anything like that.
8          MR. O'BRIEN: Okay.
9          MS. PAULEY: Via e-mail?
10          MR. O'BRIEN: Via e-mail.
11          MS. PAULEY: I am pretty sure we didn't
12   get anything like that.
13          MR. O'BRIEN: I will re-forward the
14   e-mail to you.
15   BY MR. O'BRIEN:
16      Q.   This next recording is 1096 kilobytes, I
17   should say 1096 KB, which I interpret to mean
18   kilobytes long, I am going to play it for you and then
19   ask you some questions about it.
20          You know what, I am going to mark --
21   before we proceed that first recording we listened to
22   I am going to mark it as Defendant's 88 and this
23   recording that we are going to play now we will mark
24   as Defendant's 89.
25

---

Page 228

1          (Audio recording marked Defendant's
2          Exhibit 88 for identification.)
3          (Audio recording marked Defendant's
4          Exhibit 89 for identification.)
5          (Audio recording played and transcribed
6          as follows:)
7          SPEAKER 2: -- values or whatever it is
8    called.
9          SPEAKER 1: Correct, the market is down
10   in general now, about 40 points.  So --
11          SPEAKER 2: How about another five grand
12   maybe, how about, yes --
13          (End of audio recording clip.)
14   BY MR. O'BRIEN:
15      Q.   I am pausing the recording.
16          Do you recognize those voices on this
17   recording?
18      A.   I believe it is my voice.
19          (Audio recording played and transcribed
20          as follows:)
21          SPEAKER 1: Keep in mind this is typical
22   market fluctuation, you know, the market obviously
23   ebbs and flows.
24          I do believe, again, going forward that
25   this thing is going to most likely sky rocket at

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 229

1    some point as soon as everything catches pace to
2    once again where we were about a week ago.
3            But the reason why I strongly urged to
4    say let's not buy more yet, like you said let's
5    buy some more here and punch back, I just think
6    that, you know, we can probably get it a little
7    bit cheaper if the market continues this fashion.
8            Overall, I think the market is getting to
9    all time highs rather soon.  This might not be the
10   week it happens, so we will have to take our licks
11   a little bit, but we have enough (inaudible) if we
12   wanted to buy more to do it if we needed to.
13           SPEAKER 2:  Okay.
14           SPEAKER 1:  Let's wait for a little bit
15   is basically what I am trying to say.
16           SPEAKER 2:  All right, fine.
17           SPEAKER 1:  I will keep you back on the
18   horn in a little bit.
19           SPEAKER 2:  Thank you.
20           (End of audio recording clip.)
21           MS. PAULEY:  Before you ask your
22   question, I can confirm we never received these
23   recordings.
24           What is the original source of the
25   recordings?

---

Page 230

1            MR. O'BRIEN:  They are recordings made by
2    -- well, we can do this off the record.
3            MS. PAULEY:  I think it would be
4    important on the record to know what the source was.
5            MR. O'BRIEN:  The source was recordings
6    of Mr. Bernardo that were recorded by Gregory Dean.
7            MS. PAULEY:  And where were they
8    retained?
9            MR. O'BRIEN:  They were retained on a
10   recording on a device what you would call a flash
11   drive.
12           MS. PAULEY:  And why were they not
13   produced prior to what you say was a week ago?
14           MR. O'BRIEN:  Because they were
15   discovered not too long ago.
16           MS. PAULEY:  And how were they
17   discovered?
18           MR. O'BRIEN:  They were found in
19   paperwork related to Gregory Dean.
20           MS. PAULEY:  Paperwork where?
21           MR. O'BRIEN:  At his home.
22           MS. PAULEY:  Is there any other paperwork
23   that has been discovered that was not produced?
24           MR. O'BRIEN:  Well, the paperwork wasn't
25   relevant to this case, but the recordings were.

---

Page 231

1            MS. PAULEY:  Are there other recordings
2    like this that have not been produced?
3            MR. O'BRIEN:  No, they were all produced
4    about a week ago.
5            MS. PAULEY:  Again, I can confirm we did
6    not receive anything like this.
7            MR. O'BRIEN:  I can confirm that we did
8    forward it via e-mail and I will re-forward the
9    e-mail.
10           MS. PAULEY:  We just checked, we did not
11   receive an e-mail like this.
12           MR. O'BRIEN:  I can't control what made
13   it through your system or not, but we did send it.
14   BY MR. O'BRIEN:
15       Q.   Defendant's 89, that recording, did you
16   recognize the voices in that recording?
17       A.   I recognized my voice, I am not sure if
18   it was Gregory's voice or not.
19       Q.   Do you ever recall Gregory Dean
20   discouraging you from purchasing additional stock?
21       A.   No, I didn't.
22       Q.   Do you ever recall Gregory Dean ever
23   discouraging you from increasing a position in a
24   particular stock?
25       A.   I can't recollect.  I know that if --

---

Page 232

1    like I said, Gregory Dean ran the show, so he was
2    going to do what he thought was the best thing to do.
3        Q.   Did you ever tell Gregory Dean that you
4    wanted to buy more shares of a particular security?
5        A.   I don't think so, no.
6        Q.   When the gentleman in this recording
7    said, you know -- I am paraphrasing, "you know, I know
8    you want to buy more, but I don't think we should buy
9    more now," do you recall Gregory Dean ever counseling
10   you accordingly?
11       A.   No.
12           I think if that was the case I would have
13   said all right.  It sounds like my voice.
14           MR. O'BRIEN:  There is not much left on
15   the video.  Why don't we go off the record to allow
16   the videographer to change the video.
17           THE VIDEOGRAPHER:  This is Disk No. 3,
18   marks the end of this disk in the video deposition of
19   Eugene Bernardo, the time is now 4:10 p.m., going off
20   the record.
21           (Recess taken.)
22           THE VIDEOGRAPHER:  Had is the beginning
23   of Disk No. 4 in the video deposition of Eugene
24   Bernardo, the time is now 4:13, please proceed.
25

---

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 265

1  subpoena had been produced.
2       We also -- Liam, we want to demand that
3  everything be produced by close of business tomorrow,
4  all of these recordings, any other documents that are
5  responsive to our subpoena that we receive them by
6  close of business tomorrow.
7       If necessary, we may need to recall
8  Gregory Dean and Donald Fowler for additional
9  testimony.
10       MR. O'BRIEN: Well, like I said, you can
11  check your e-mail, I am looking at it here, we sent it
12  to you on September 26, 2017 at 1:48 p.m.  It was sent
13  to you with a cc to David, and it had the attached
14  recordings and the text reads "Kristin, attached
15  please find Defendant's supplemental discovery
16  comprised of recordings related to some of the JDN
17  customers."
18       MS. PAULEY: We would also request that
19  you produce that e-mail.  We do not have that e-mail.
20       MR. O'BRIEN: It is here in our system,
21  it didn't bounce back.
22       We can't obviously follow-up on every
23  e-mail to make sure they have been received, I know
24  you don't follow that practice when you send e-mails
25  to us, you don't follow-up and say did you get that

Page 266

1  e-mail.
2       The assumption is it is a reasonably
3  accurate way of communicating, and of course we have
4  communicated with you via those e-mail addresses
5  repeatedly.  So we had some idea of the reliability of
6  those e-mail addresses and the parties have exchanged
7  documents, et cetera, numerous times utilizing those
8  various e-mail addresses.
9       With regard to the rest of your
10  objections or demands with respect to discovery we are
11  not aware of any other additional documentation or
12  recordings.
13       I believe during one of Mr. Dean's
14  examinations, perhaps prior to the initiation of this
15  lawsuit, where the SEC examined him, he indicated that
16  his house had suffered extensive flooding as a result
17  of Hurricane Sandy and that there was significant
18  displacement of records and other material and so
19  things were not organized, et cetera.  And then I
20  believe on -- there was further testimony about what
21  records he believed were maintained after he left
22  J.D. Nicholas.
23       MS. PAULEY: What was the date of the
24  e-mail you were just reading?
25       MR. O'BRIEN: September 26, 2017.

Page 267

1       MS. PAULEY: I am looking at an e-mail I
2  sent to you on September 28th that says "Thank you.  I
3  received four documents from McCoy and 29 documents
4  for Bernardo.  Please let me know if I am missing
5  anything, Kristin."
6       I did not receive a response for that and
7  I believe it would have been appropriate for you to
8  say you also should have received recordings.
9       MR. O'BRIEN: Well, there is a lot of
10  things -- if we want to start critiquing each other's
11  handling of e-mails we can.
12       I want to point out Mr. Bernardo's
13  counsel sent you an e-mail with his records several
14  weeks ago and you asked us last week whether we had
15  received anything and I pointed out to you that in
16  fact Mr. Bernardo's counsel had sent records to both
17  us and to the SEC.
18       You responded that not that you hadn't
19  received the e-mail, it apparently must have escaped
20  your notice, but you then said in your e-mail that you
21  couldn't open the documents because they were sent via
22  Dropbox and that could we please send them.
23       And, again, it is not up to us to manage
24  your e-mail system or your management of the e-mails
25  that come in to your system.  It is not our

Page 268

1  responsibility.
2       We thought your e-mail system was
3  reasonably reliable, you do have the good faith and
4  credit of the Federal Government behind you, probably,
5  I can't even imagine what the SEC's budget is, so our
6  presumption is your e-mail system is reasonably
7  reliable.
8       Lastly, I point out, you do not make a
9  habit of acknowledging all of our e-mails, we assume
10  they go through and we don't make a habit of
11  acknowledging all of your e-mails.  We assume you know
12  we received them.
13       MS. PAULEY: Going forward I would
14  request that if we ask you to please confirm something
15  you would please confirm.
16       MR. O'BRIEN: We can do, and we will ask
17  you to do the same.
18       MS. PAULEY: And we have.
19       FURTHER EXAMINATION
20       BY MS. PAULEY:
21  Q.  I wanted to ask a few additional
22  questions about what we heard on those recordings.
23       A couple times on those recordings,
24  Mr. Bernardo, you talked about your Parkinson's and
25  the brain surgeries that you had had.

Plaintiff Ex 11 - 32

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

---

Page 269

1  My question is is what conversations or
2  questions did Mr. Dean ask you about medications that
3  you were receiving or treatment that you were
4  receiving or the impact of any of those medications on
5  your memory or your ability to comprehend things?
6  MR. O'BRIEN: Objection, leading and
7  form.
8  THE WITNESS: As far as I know we didn't
9  talk about any of that.
10 BY MS. PAULEY:
11 Q. I also noticed in those three recordings
12 that we heard that there was no discussion concerning
13 the commissions or fees that were going to be
14 associated with any of the trades that were being done
15 in your account that were discussed in those calls.
16 What conversations did you have with
17 Mr. Dean about the amount of commissions or fees that
18 you were going to be charged?
19 MR. O'BRIEN: Objection, form, leading.
20 THE WITNESS: There was no conversation.
21 BY MS. PAULEY:
22 Q. And you have testified a couple of times
23 here today that you spoke to Mr. Dean at least once a
24 day, I think you said oftentimes in the morning.
25 Have you made any effort to compare your

---

Page 270

1  phone records showing calls that you had with Mr. Dean
2  with the trades that were done in your accounts?
3  A. No.
4  Q. You also testified and we saw many
5  documents showing an investment objective of
6  speculation in your J.D. Nicholas account as well as
7  some of the other brokerage accounts that you held, do
8  you recall that?
9  A. Yes, I do.
10 Q. What — how was speculation described for
11 you by Mr. Dean, if at all?
12 MR. O'BRIEN: Objection, leading.
13 THE WITNESS: It is like gambling in a
14 sense.
15 BY MS. PAULEY:
16 Q. Is that what Mr. Dean told you?
17 A. No.
18 Q. That is your understanding?
19 MR. O'BRIEN: Objection, leading.
20 THE WITNESS: That is through my own
21 thoughts.
22 BY MS. PAULEY:
23 Q. Okay.
24 My question is is what did Mr. Dean tell
25 you a speculative account would entail?

---

Page 271

1  MR. O'BRIEN: Objection, leading.
2  THE WITNESS: I believe we didn't discuss
3  it.
4  BY MS. PAULEY:
5  Q. Did Mr. Dean tell you that there would be
6  -- you would be buying and selling positions within a
7  few days?
8  A. No.
9  MR. O'BRIEN: Objection, leading.
10 BY MS. PAULEY:
11 Q. Do you remember anything else about how
12 he described what the definition of speculation is?
13 MR. O'BRIEN: Objection, leading.
14 THE WITNESS: No, I -- we didn't talk
15 about speculation.
16 MS. PAULEY: Okay, we don't have any more
17 questions at this time, so we can go off the record.
18 MS. REPORTER: Did you want to discuss
19 reading of the transcript?
20 MS. PAULEY: We can do that after the
21 fact.
22 MR. O'BRIEN: Before we go off, give me
23 one second.
24 I would like to point out to me that your
25 e-mail to me dated September 28, 2017 dealt with a

---

Page 272

1  completely different issue, and that was the
2  production of documents responsive to the McCormick
3  and O'Brien subpoenas relating to Dr. McCoy and
4  Mr. Bernardo. So it had nothing to do with production
5  in general related to those two witnesses. It was
6  very specific to what documents McCormick and O'Brien
7  had received responsive to its subpoenas to
8  Mr. Bernardo and its subpoenas to Mr. McCoy and that
9  we had sent over to the SEC on September 28th.
10 I think it is a little misleading to try
11 to link those to our other production not related to
12 our subpoenas that we made on September 29th of the
13 recordings of various customers.
14 MS. PAULEY: That is your interpretation,
15 I think the e-mail will speak for itself.
16 MR. O'BRIEN: I agree.
17 Other than that I have no other
18 questions, thank you.
19 THE VIDEOGRAPHER: This is Disk No. 4,
20 marks the end of today's deposition of Eugene
21 Bernardo, the time is now 5:17 p.m., going off the
22 record.
23 (End of video recording.)
24 MS. REPORTER: Signature, did you want to
25 explain signature?

---

Plaintiff Ex 11 - 33

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Eugene F. Bernardo
October 03, 2017

Page 273

1          MS. PAULEY: We can do it after the fact.
2          MR. O'BRIEN: Let's go back on the record
3    with that.
4          We should talk about exhibits and whatnot
5    as well, how we want to manage the exhibits.
6          THE VIDEOGRAPHER: Going back on the
7    record, the time is now 5:18 p.m., please proceed.
8          MR. O'BRIEN: We are going back on the
9    record to discuss a few housekeeping issues.
10         First, we do demand that the deposition
11   be reviewed and signed by the witness in accordance
12   with the Federal Rules of Civil Procedure. We are
13   saying that that is the is appropriate step when a
14   demand is made by opposing counsel so we are making
15   that demand on the record.
16         With regard to our exhibits today, do we
17   want to keep our exhibits, scan them and send them to
18   each other or --
19         MS. PAULEY: I am fine with that or I
20   don't know if you need the exhibits in order to help
21   prepare the transcript.
22         I am also fine with the court reporter
23   taking them and then sending them back to us in
24   connection with the transcript.
25         MR. O'BRIEN: I am fine with that as

Page 274

1    well.
2          MS. REPORTER: What the about the audio
3    part?
4          MR. O'BRIEN: The audio I can e-mail
5    those three recordings to the court reporter that we
6    marked as Defendants 88, 89, and 90 and we have the
7    transcript in the -- the transcript of the deposition.
8          MS. REPORTER: Are you ordering the
9    transcript written?  I am getting the order on the
10   record.
11         MS. PAULEY: I don't remember exactly,
12   whatever we put in our form.
13         MS. REPORTER: And are you taking a copy
14   of the transcript?
15         MR. O'BRIEN: I will speak to the client
16   and I will get back to you on that.
17         THE VIDEOGRAPHER: This is Disk No. 4,
18   marks the end of today's deposition of Eugene
19   Bernardo, the time is now 5:19 p.m., going off the
20   record.
21         (At 5:19 P.M., the deposition proceedings
22         were adjourned.)
23
24   _____
25         EUGENE BERNARDO

Page 275

1    STATE OF ILLINOIS  )
2                       ) SS.
3    COUNTY OF DUPAGE   )
4          I hereby certify that the witness in the
5    foregoing deposition, EUGENE F. BERNARDO, was by me
6    duly sworn to testify to the truth, the whole truth,
7    and nothing but the truth, in the within-entitled
8    cause; that said deposition was taken at the time and
9    place herein named; and that the deposition is a true
10   record of the witness' testimony as reported by me, a
11   duly certified shorthand reporter and a disinterested
12   person, and was thereafter transcribed into
13   typewriting by computer.
14         I further certify that I am not
15   interested in the outcome of the said action, nor
16   connected with nor related to any of the parties in
17   said action, nor to their respective counsel.
18         IN WITNESS WHEREOF, I have hereunto set
19   my hand this 17th day of October, 2017.
20   Reading and Signing was:
21   __X__ requested _____ waived _____ not requested
22
23         _____
24
25         Stephanie A. Battaglia, CSR No. 084-003337



November 9, 2017

Kristin M. Pauley, Attorney at Law
U.S. Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, NY 10281

Re:  Securities and Exchange Commission v. Gregory T. Dean, et al.
     Case No. 17-CV-00139-GHW

Dear Ms. Pauley:

Enclosed please find a copy of the signed errata sheet we received in connection with the following deposition transcript:

       Eugene F. Bernardo             October 3, 2017

We have attached the original errata sheet to the original deposition transcript; the original deposition transcript has been sealed.

Sincerely,

BEHMKE REPORTING AND VIDEO SERVICES, INC.

Frances M. Behmke

FMB/rk
Enclosure

Plaintiff Ex 11 - 35

Re: SECURITIES AND EXCHANGE COMMISSION V. GREGORY T. DEAN, ET AL.

Case No.: 17-CV-00139-GHW

Witness: EUGENE F. BERNARDO

Date of Deposition: TUESDAY, OCTOBER 3, 2017

Control Number: 32407

Reporter: STEPHANIE A. BATTAGLIA, CSR NO. 084-003337

```
RECEIVED
NOV 08 2017
BEHMKE REPORTING AND
VIDEO SERVICES, INC.
```

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____  No changes need to be made to the transcript.

\_✓\_  Changes listed below.

*Eugene F. Bernardo*                    *11-3-17*
WITNESS SIGNATURE                       DATE SIGNED

Note:      Please check the appropriate column for add (+) or delete
           (-).  If you wish to add anything to the deposition, use the
           exact words you want to add.  If you wish to delete
           anything from the deposition, please use the exact words

| Page | Line | + - | |
|---|---|---|---|
| 3 | 22 | | Bev Berni-Bernardo |
| 5-11 | 2 | | Eugene Bernardo |
| 15 | 18 | | Bev Berni-Bernardo |
| 15 | 19 | | Berni-Bernardo |
| 16 | 1 | | Michael (last name not Bernardo) |
| ~~8-18~~ | | | |
| 16 | 8 + 18 | | 708-448-9855 |
| 17 | 4 | | Verizon (not Ameritech) |
| 20 | 23 | | Marshall Field (owned it) |
| 21 | 21 | | Marshall Field |
| 26 | 2 | | "Countryside" should be "Clarendon Hills" for the record |
| 31 | 12 | | for the record, trigeminal neuralgia was diagnosed around 2012 |
| 31 | 17 | | " " " , " " " stuff happened after, not "prior" to Parkinson's diagnosis |

BEHMKE REPORTING AND VIDEO SERVICES, INC.
160 SPEAR STREET   SUITE 300   SAN FRANCISCO, CA   94105
415.597.5600 tel   800.335.3376 toll free   415.597.5606 fax   behmke.com

| 32 | 24 | | no medications are necessary as operation was successful |

Re:  SECURITIES AND EXCHANGE COMMISSION V. GREGORY T. DEAN, ET AL.

Case No.: 17-CV-00139-GHW

Witness: EUGENE F. BERNARDO

Date of Deposition:  TUESDAY, OCTOBER 3, 2017

Control Number: 32407

Reporter:   STEPHANIE A. BATTAGLIA, CSR NO. 084-003337

RECEIVED
NOV 0 8 2017
BEHMKE REPORTING AND
VIDEO SERVICES, INC.

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____   No changes need to be made to the transcript.

___✓___   Changes listed below.

_Eugene F Bernardo_                              _11-3-17_
WITNESS SIGNATURE                                DATE SIGNED

Note:          Please check the appropriate column for add (+) or delete
               (-).  If you wish to add anything to the deposition, use the
               exact words you want to add.  If you wish to delete
               anything from the deposition, please use the exact words

| Page | Line | + - | |
|------|------|-----|---|
| 37 | no | $124,000 , (not $24,000) | |
| 43 | | ~~struck~~ | |
| 50 | 20 | 'Chelsea' for the record | |
| 225 | 10 | "for" should be "far" | |

BEHMKE REPORTING AND VIDEO SERVICES, INC.
160 SPEAR STREET    SUITE 300    SAN FRANCISCO, CA    94105
415.597.5600 tel    800.335.3376 toll free    415.597.5606 fax    behmke.com

**Plaintiff Ex 11 - 37**