Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 209

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - -
 4  SECURITIES AND EXCHANGE      )
 5  COMMISSION,                  )
 6         Plaintiff,            )
 7                               )  CASE NO.
 8  v.                           )  1:17-CV-00139-GHW
 9                               )
10  GREGORY T. DEAN and          )
11  DONALD J. FOWLER,            )
12         Defendants.           )
13    - - - - - - - - - - - - - - -
14
15      VIDEOTAPED DEPOSITION OF GREGORY T. DEAN
16           FRIDAY, OCTOBER 27, 2017
17           PAGES 209 - 300; VOLUME 2
18
19
20      BEHMKE REPORTING AND VIDEO SERVICES, INC.
21            BY:  JOSEPH B. PIROZZI, RPR
22            160 SPEAR STREET, SUITE 300
23          SAN FRANCISCO, CALIFORNIA 94105
24                      (415) 597-5600
25
```

Page 210

```
 1
 2
 3
 4
 5
 6
 7
 8      Videotaped deposition of GREGORY T. DEAN,
 9  VOLUME 2, taken on behalf of Plaintiff at the
10  Securities and Exchange Commission, 200 Vesey
11  Street, New York, New York, commencing at 1:00
12  p.m., Friday, October 27, 2017, Before Joseph
13  B. Pirozzi, Registered Professional Reporter,
14  Pursuant to Notice of Deposition.
15
16
17
18
19
20
21
22
23
24
25
```

Page 211

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFF:
 3      U.S. SECURITIES AND EXCHANGE COMMISSION
 4      NEW YORK REGIONAL OFFICE
 5      BY:  DAVID STOELTING, ATTORNEY AT LAW
 6           KRISTIN M. PAULEY, ATTORNEY AT LAW
 7      200 Vesey Street
 8      New York, New York 10281
 9      Telephone: (212) 336-0983
10      Email: stoeltingd@sec.gov
11            pauleyk@sec.gov
12
13  FOR DEFENDANTS GREGORY T. DEAN and
14  DONALD J. FOWLER:
15      McCORMICK & O'BRIEN LLP
16      BY:  LIAM O'BRIEN, ATTORNEY AT LAW
17      9 East 40th Street, Fourth Floor
18      New York, New York 10016
19      Telephone:  (212) 286-4471
20      Email: lobrien@mcoblaw.com
21
22  ALSO PRESENT:
23      DAVID J. SCHERECK, VIDEOGRAPHER
24      MICHAEL BENISON
25
```

Page 212

```
 1                      INDEX
 2  FRIDAY, OCTOBER 27, 2017
 3  GREGORY T. DEAN - VOLUME 2              PAGE
 4    Examination by MS. PAULEY              215
 5    Examination by MR. O'BRIEN             298
 6
 7                     -o0o-
 8
 9      QUESTIONS WITNESS DIRECTED NOT TO ANSWER:
10           PAGE    LINE
11               None.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean -  Vol. 2
October 27, 2017

Page 213

```
 1              EXHIBITS
 2       GREGORY T. DEAN - VOLUME 2
 3  Number      Description          Page
 4  Exhibit 251  Plaintiff's First Request for
 5               Production of Documents From Defendant
 6               Gregory T. Dean - 5 pages        216
 7
 8  Exhibit 252  Transcript of Gregory T. Dean dated
 9               July 13, 2007 in the matter of
10               Securities and Exchange Commission v.
11               Gregory T. Dean, et al. - 78 pages    229
12
13  Exhibit 253  Transcript of Gregory Dean dated
14               November 14, 2014 in the matter of
15               J.D. Nicholas & Associates, Inc.
16               - 53 pages                       236
17
18  Exhibit 254  Audio transcription in the matter of
19               JD Nicholas and Associates - 55 pages  244
20
21
22
23
24
25
```

Page 214

1    FRIDAY, OCTOBER 27, 2017; 1:00 P.M.

2

3    THE VIDEOGRAPHER: Here begins DVD number 1 -- I'm

4  sorry, number 7 in the volume 2 deposition of Gregory T.

5  Dean in the matter of Securities and Exchange Commission

6  versus Gregory T. Dean and Donald J. Fowler in the

7  United States District Court, Southern District of New

8  York.  Case number is 17-CV-139 GHW.

9    Today's date is October 27, 2017 and the time

10  is approximately 1 p.m.

11    My name is David Shereck with Behmke Reporting

12  and Video Services, 160 Spear Street, San Francisco,

13  California.

14    This deposition is taking place at 200 Vesey

15  Street, Suite 400, New York, New York, and was noticed

16  by Kristin Pauley of the Securities and Exchange

17  Commission.

18    Will counsels please identify yourselves and

19  whom you represent.

20    MS. PAULEY: Kristin Pauley and David Stoelting on

21  behalf of the Securities and Exchange Commission, and

22  we're joined by one of the interns in our office,

23  Michael Benison, B-E-N-I-S-O-N.

24    MR. O'BRIEN: Liam O'Brien on behalf of the

25  defendants.

Page 215

1    THE VIDEOGRAPHER: Thank you.

2    The court reporter today is Joe Pirozzi,

3  Certified Shorthand Reporter, also with Behmke.  And

4  would you please swear in the witness.

5

6    GREGORY T. DEAN,

7  called as a witness, having been duly sworn, testified

8  as follows:

9

10    EXAMINATION RESUMED

11  BY MS. PAULEY:

12    Q.  Good afternoon, Mr. Dean.  As you know, I'm

13  Kristin Pauley and this is David Stoelting and we

14  represent the Securities and Exchange Commission in this

15  case.

16    The same ground rules apply as your deposition

17  in July.  So I'll be asking you questions, you know.

18  Please let me know if you don't understand anything I've

19  asked you.  If you, you know, you need to answer my

20  questions orally so the court reporter can accurately

21  transcribe what is being said here today.  If you would

22  like to take a break at any time, please just let us

23  know.

24    I think that's about it, but any questions

25  before we begin?

Page 216

1    A.  Not at this point, no.

2    Q.  Okay.  And you understand that you continue to

3  be under oath during today's deposition, correct?

4    A.  Yes.

5    Q.  Okay.  Is there any reason why you can't

6  testify truthfully?

7    A.  Not that I know of, no.

8    MS. PAULEY: So I would like to mark this document

9  as Exhibit 251, please.

10    (Plaintiff's First Request for Production of

11    Documents From Defendant Gregory T. Dean marked

12    Exhibit 251 for identification)

13    Q.  So, Mr. Dean, please review Exhibit 251 and let

14  me know when you're ready.

15    (Pause)

16    A.  Okay.

17    Q.  Do you recognize Exhibit 251?

18    A.  Not necessarily offhand.

19    Q.  Have you seen it before?

20    A.  I believe at some point in the past.

21    Q.  When did you become aware of Exhibit 251?

22    A.  I don't remember exactly.

23    Q.  Do you know how it was brought to your

24  attention?

25    A.  No, not -- I guess it was sent to Liam, is that

Plaintiff Ex 17 - 2

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 217

1 right?
2 Q. Exhibit 251 was sent to Liam O'Brien, yes.
3 A. Okay.
4 Q. So do you remember when you became aware of
5 Exhibit 251?
6 A. Not offhand, no.
7 Q. Okay. Exhibit 251 is a request for the
8 production of documents directed to you in connection
9 with this litigation.
10    And have you reviewed this specific documents
11 requested prior to a moment ago?
12 A. Have I?
13 Q. Yes.
14 A. I believe I must have.
15 Q. It's a yes or no.
16    Yes or no, have you reviewed the --
17 MR. O'BRIEN: Objection to --
18 A. I believe so.
19 MR. O'BRIEN: Objection to the question. The
20 witness can't be instructed to answer in one form or
21 another.
22    You can provide a full answer. Don't feel
23 relegated to answering simply yes or no.
24 Q. What did you do when you learned of
25 Exhibit 251?

Page 218

1 A. I don't really recall exactly when I received
2 this.
3 Q. Okay. Can I direct your attention to page 3 of
4 Exhibit 251?
5 A. Okay.
6 Q. Request number 8. You'll see it requests all
7 documents concerning the customers and the customers are
8 defined in Exhibit 251 to include the list of
9 individuals included in the attachment on page 5.
10    Do you see that?
11 A. Okay.
12 Q. Request number 9 of Exhibit 251 also calls for
13 all documents concerning any communications between any
14 customer and J.D. Nicholas.
15    Do you see those?
16 A. I see those.
17 Q. Okay. Do you understand that exhibits -- I'm
18 sorry, that request numbers 8 and 9 of Exhibit 251 call
19 for the production of any recorded calls between you and
20 any of the customers listed in the attachment?
21 MR. O'BRIEN: Objection.
22 A. I would understand that that's the case.
23 Q. Did you make recordings of calls with your
24 customers?
25 A. Some.

Page 219

1 Q. Did you make recordings of calls with any of
2 the customers listed in the attachment?
3 A. I believe some.
4 Q. Which ones do you believe you made recordings
5 with?
6 A. The few that were provided was Eugene Bernardo,
7 Albert Claycomb, maybe Steve Hellwig, I'm not sure.
8 Q. Any others?
9 A. Potentially, I'm not -- I don't know.
10 Q. Can you describe your practice for recording
11 calls with customers when you were at J.D. Nicholas?
12 A. I didn't have a set practice. They would urge
13 us to record every so often. They wouldn't necessarily
14 mandate, but every so often they would get on a kick to
15 push people to recall -- to record.
16 Q. Who is "they"?
17 A. The owners. J.D. Nicholas.
18 Q. And who were they?
19 A. Dan Dvorznak, Jim Dolan, Nick Tsiketas.
20 Q. And they encouraged all the brokers to record
21 calls with customers?
22 A. Yes.
23 Q. And did you record calls with customers?
24 A. From time to time.
25 Q. Okay. And do you know why -- strike that.

Page 220

1    When you said that they would encourage you
2 every so often, how -- explain that a little bit more,
3 what do you mean by every so often?
4 A. Randomly, infrequently but randomly, they would
5 have a meeting in the morning, quick, everybody has a
6 recorder, if you have a recorder, when you get an order
7 from a customer, make sure that you are recording
8 conversations. Something along those lines.
9 Q. Did they provide you with a recorder?
10 A. I don't believe so. I don't know.
11 Q. Did you buy one on your own?
12 A. At one point I did.
13 Q. Did you buy tapes for the purposes of making
14 recordings?
15 A. I don't think so, no.
16 Q. How did you obtain tapes?
17 A. What do you mean?
18 Q. To make the recordings?
19 A. I didn't.
20 Q. How did you manually make the recordings?
21 A. So just got a recording device.
22 Q. How did the device work?
23 A. Plugged into the wall.
24 Q. Okay. And so how would you, when you intended
25 to record a call with a customer, describe for us what

Plaintiff Ex 17 - 3

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

---

Page 221

1  you would physically do to effect that recording.
2     A.  It would be a small device, I guess something
3  similar to that, connected to the phone and you hit
4  record.  There's a record button.
5     Q.  So there were no tapes contained within the
6  device?
7     A.  No.
8     Q.  So where was the recording saved to?
9     A.  On the device.
10    Q.  On the device itself?
11    A.  Yes.
12    Q.  Okay.  So then did you have more than one
13  device that you used over time?
14    A.  Numerous, they were crappy devices, for lack of
15  a better word.  So --
16    Q.  So, yes?
17    A.  They would break often, and once they broke or
18  crapped out, any information that was on them would
19  pretty much be lost.
20    Q.  So would you, would the devices that you were
21  using, would they run out of space?
22    A.  I'm not sure.
23    Q.  I guess what I'm getting confused is, I
24  understand you had a device that was hooked up to the
25  phone, correct?

---

Page 222

1     A.  Um-hmm.
2     Q.  And you would press play when you wanted to
3  record a call?
4     A.  I would press record.
5     Q.  Record.  Okay.
6        So then when -- where -- was it saved to the
7  device itself or was there some kind of tape?
8     A.  Yes, it would save to.  It was kind of like an
9  MP3 type of device, I guess.
10    Q.  So if it wasn't a tape, was it some kind of
11  digital recording?
12    A.  I believe so.
13    Q.  Was it saved to your computer?
14    A.  No.
15    Q.  Okay.  So after you record a call with a
16  customer, how would you maintain those recordings?
17    A.  They would stay on the device.
18    Q.  And what would you do with the devices?
19    A.  Keep them by my desk.
20    Q.  So you would go through -- you went through
21  numerous devices, correct?
22    A.  I think maybe two or three and either one or
23  two of them died.
24    Q.  So during your entire time at J.D. Nicholas,
25  you had one or two or possibly three devices that you

---

Page 223

1  used?
2     A.  I believe so, yes.
3     Q.  Okay.  And then after one of them was -- would
4  you finish with one or why would you move on to the
5  second one?
6     A.  They would potentially get lost, they weren't
7  well-made devices in the first place.  They were made by
8  Radio Shack.  They would just work one day, not work the
9  next, you couldn't turn it on.  For those reasons.
10    Q.  And then you maintained them at your office at
11  J.D. Nicholas?
12    A.  Yeah, I believe that they might have even
13  maintained them or took them in possession.
14    Q.  When you left J.D. Nicholas, what did you do
15  with those recording devices?
16    A.  I didn't take anything.  They didn't allow us
17  to come back into the office, no.
18    Q.  Did you make any effort to organize or
19  make a list of who the customers were that were, that
20  you had conversations with that were recorded to a
21  particular device?
22    A.  No.
23    Q.  So you have no -- you had no system for
24  organizing the recordings?
25    A.  No.

---

Page 224

1     Q.  If you wanted to go back and locate a
2  particular recording with a particular customer, how
3  would you go about doing that?
4     A.  At this point?  I couldn't.
5     Q.  At any point?
6     A.  I would pretty much, I guess, listen to the
7  whole thing.  There would be individual files, but just
8  listed by file number one, number two, number three.  So
9  like that.
10    Q.  What does file number one, number two, number
11  three mean?
12    A.  Each individual recording.
13    Q.  And would you number them one, two, three?
14    A.  No, the device would do it automatically.
15    Q.  How would you be able to look for recording
16  number two, for example, on the device?
17    A.  You have to manually scroll through it.
18    Q.  On the device?
19    A.  Yes.
20    Q.  Okay.  Did you search for any recordings with
21  any of the customers listed in the attachment to
22  Exhibit 251?
23    A.  At this point in time?
24    Q.  At any point in time.
25    A.  I didn't have any documents from J.D. Nicholas

---

Plaintiff Ex 17 - 4

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 225

1  when we left. They kept everything that was in our
2  drawers. They didn't allow us to take anything.
3  Q. So at any point, you've never searched through
4  your devices to locate recordings with any of the
5  customers listed on it, the attachment?
6  A. I didn't have any information in my possession
7  to.
8  Q. So you've never looked for any recordings with
9  customers listed in the attachment, is that correct?
10  A. Directly? No. Because nothing was in my
11  possession. Indirectly, I came across one device that I
12  apparently must have brought home.
13  Q. What do you mean indirectly?
14  A. I was cleaning out my garage.
15  Q. Okay. So you were cleaning out your garage at
16  home and you came across a recording device?
17  A. That's correct.
18  Q. And it was one of the recording devices that
19  you used when you were at J.D. Nicholas?
20  A. That's correct.
21  Q. And -- but you have no recollection of when or
22  why you brought it home?
23  A. I don't.
24  Q. Okay. And you said it was located in your
25  garage?

Page 226

1  A. That's right.
2  Q. When did you locate it?
3  A. Mid-to-late summer, maybe July.
4  Q. Of 2017?
5  A. Of this year.
6  Q. What were you doing in your garage when you
7  located it?
8  A. I was actually organizing. My daughter got a
9  bike, I was hanging a bike, pretty much just organizing
10  everything that was disorganized for a long time.
11  Q. Where was the recording located within your
12  garage?
13  A. It was in a bin, a storage bin. There was a
14  lot of stuff in the bin from my car and my wife's car,
15  summer stuff from years ago, fire wood, for some reason,
16  I don't know why that was in the bin. I don't know why
17  it was in there, but potentially it was in my car,
18  maybe.
19  Q. Were there any other documents related to your
20  time at J.D. Nicholas in the bin?
21  A. Nothing.
22  Q. What did you do when you located the recording
23  device?
24  A. I had called Liam to let him know.
25  Q. Did you listen to the recordings?

Page 227

1  A. After the fact.
2  Q. Did -- so in addition to locating that one
3  recording device in your garage, what effort, what other
4  efforts have you made to search for documents or
5  recordings responsive to Exhibit 251?
6  A. Originally, I have a small file cabinet in my
7  house that I looked through. That would be the only
8  spot for any type of work documents, but there was
9  nothing related.
10  Q. And did you -- you testified before that you
11  had more than one recording device that you used at J.D.
12  Nicholas.
13  A. Um-hmm.
14  Q. Did you leave those at J.D. Nicholas when you
15  left the firm?
16  A. Yes. Yeah, they wouldn't allow us to take
17  anything.
18  Q. Okay. Did anyone else assist you in your
19  search for recorded calls with customers, and
20  specifically the customers listed in the attachment?
21  A. No.
22  Q. Do you know why you brought the device home?
23  A. I don't know why, no. Potentially, somehow,
24  maybe I was changing it out with a different one. I
25  have no idea. I have a habit of taking pens home and

Page 228

1  stuff on accident. It could just be that.
2  Q. Did you find -- do you recall in, on July 13th
3  of 2017 appearing at this office for a deposition in
4  this matter?
5  A. Yes.
6  Q. Was it before or after that deposition that you
7  located the recording device in the bin in your garage?
8  A. It would have been after.
9  Q. Why do you think that?
10  A. Because I remember cleaning out the garage
11  towards the, I guess it must have been the beginning of
12  August. It was right before we went away, excuse me, we
13  went away to a water park upstate New York. And we went
14  there in mid, the third week of August, so it was right
15  before that. Beginning of August.
16  Q. So you believe that the recording device that
17  you located in your garage had been there since the time
18  that you had left J.D. Nicholas?
19  A. Potentially, yeah.
20  Q. But you have no recollection of bringing it
21  home or how it otherwise got to your home?
22  A. No.
23  Q. We can put Exhibit 251 aside.
24  Do you recall that the SEC had an investigation
25  titled In the Matter of J.D. Nicholas & Associates, it

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean – Vol. 2
October 27, 2017

Page 229

1  was, our internal number was NY 8919?
2  A.  I do.
3  Q.  And do you recall testifying in connection with
4  that investigation?
5  A.  I do.
6  Q.  And do you recall that the SEC had issued
7  document subpoenas to J.D. Nicholas in connection with
8  that investigation?
9  A.  I didn't know that, no.
10  Q.  You were not aware that the SEC had issued
11  document subpoenas to J.D. Nicholas?
12  A.  I don't believe I would be privy to that
13  information.
14  Q.  Did anyone from J.D. Nicholas ever ask you to
15  make an effort to locate documents in connection with an
16  SEC investigation?
17  A.  Not that I know of, no.
18  Q.  You don't recall anyone from J.D. Nicholas ever
19  coming to you and saying, please look for documents
20  concerning such and such customers in connection with an
21  investigation?
22  A.  No.
23  MS. PAULEY: Can we mark this document as
24  Exhibit 252, please.
25  (Transcript of Gregory T. Dean dated July 13,

Page 230

1  2007 in the matter of Securities and Exchange
2  Commission v. Gregory T. Dean, et al., marked
3  Exhibit 252 for identification)
4  Q.  So, again, you testified a moment ago that you
5  recall sitting for a deposition in this matter on July
6  13th of 2017, correct?
7  A.  Yes.
8  Q.  And my colleague David Stoelting asked you
9  questions at that deposition?
10  A.  Yes.
11  Q.  And you knew that you were under oath at that
12  deposition, correct?
13  A.  Yes.
14  Q.  Have you -- Exhibit 252 is a transcript of your
15  deposition.
16  Have you seen this before?
17  A.  Potentially.
18  Q.  Why do you say potentially?
19  A.  I believe we ordered it, right?
20  MR. O'BRIEN: You have to base it on your own
21  knowledge.
22  A.  Yeah, I believe we had ordered it and I read
23  through it.
24  Q.  So you read through Exhibit 252?
25  A.  I believe so, yes.

Page 231

1  Q.  Do you know if any of the statements made at
2  your deposition on July 13th, if any of the statements
3  made were false?
4  A.  I don't believe so.
5  Q.  Have you been asked to sign Exhibit 252?
6  A.  Sign it, no, I don't think so.
7  Q.  If you could please go to page 203 of
8  Exhibit 252.  Let's see, there's four pages per page, so
9  it's actually page 51 of the document.
10  A.  Is this it (indicating)?
11  Q.  Yes, that's correct.
12  So if you could take a look on page 203.
13  A.  Okay.
14  Q.  About two-thirds of the way down the page,
15  there's a question on line 18 that David Stoelting asked
16  you.  It said, "No, all I'm asking is whether you did
17  any search in your home or basement or wherever you keep
18  stuff or on your computers for documents that were
19  called for in this request."
20  Do you see that?
21  A.  Um-hmm.
22  Q.  And you responded, "I know I had looked.  I'll
23  continue to actively look.  I mean, a lot of the
24  information was kept by them when we left."
25  Do you see that?

Page 232

1  A.  I see that.
2  Q.  Okay.  When you say that "I know I had looked,"
3  can you describe what or how you looked for documents?
4  A.  The one file cabinet that I had for business
5  purposes, I looked through.  It was just outermost
6  related stuff.  Yeah.  There was piles of paper that
7  were my wife's that I looked through that were right
8  next to it, but that's what I looked through.
9  Q.  Do you have a home computer?
10  A.  I do.
11  Q.  Do you maintain any files in connection with
12  J.D. Nicholas on your home computer?
13  A.  No.
14  Q.  Did you, other than looking in that one file
15  cabinet, did you look anywhere else for documents
16  responsive to the document request?
17  A.  I looked in, I know I looked in a night table
18  next to my bed, but...
19  Q.  Why did you look there?
20  A.  It just would be a spot where I would throw
21  random stuff that I just happened to have in my pockets.
22  Q.  Anywhere else?
23  A.  No.  Not that I know of.
24  Q.  And then the second, you can see on line 25,
25  Mr. Stoelting asked you another question.  He said,

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 233

1  "Right, so you can't — you can't give us anything that
2  you don't have. So we know that. But the question is
3  just, you know, to the extent you have anything now that
4  was within the scope of those requests, whether you did
5  make an effort to look for it and if you found anything,
6  to give it to your counsel."
7       And you responded, "I did make an effort.
8  Continuing to make an effort. I will continue."
9       Do you see that?
10  A. Yes.
11  Q. When you said that you would continue to make
12  an effort, what did you intend to do?
13  A. To address other areas that potentially there
14  could be information, which obviously the garage in one
15  of the storage bins was.
16  Q. So you intended to look through the bins in
17  your garage as of July 13?
18  A. Not as of that date. But there was just a lot
19  of stuff, old stuff that was in the garage in bins. My
20  wife has a habit of putting stuff in bins.
21  Q. And why hadn't you looked through any of those
22  bins prior to July 13?
23  A. They were labeled, one was labeled Christmas
24  decorations and another was labeled Montauk. Which we
25  had, I just didn't assume that there would be anything

Page 235

1  Q. What do you mean you would assume so?
2  A. Well, you're asking me if I recalled on July
3  13th. I would assume I recalled it.
4  Q. You worked at J.D. Nicholas prior to 2014,
5  right, you left in November of 2014?
6  A. Correct.
7  Q. Okay. So when you came for your deposition in
8  July of 2017, you had already left J.D. Nicholas, right?
9  A. Correct.
10  Q. And you knew therefore that when you were at
11  J.D. Nicholas, that you had recorded calls with
12  customers?
13  A. Some.
14  Q. Some, what do you mean some?
15  A. Recorded some conversations with customers.
16  Q. Right, you had recorded conversations with
17  customers?
18  A. Okay.
19  Q. Correct?
20  A. Yes.
21  Q. Okay. So did you intentionally conceal from us
22  during your deposition in July of 2017 that you had
23  recorded calls with customers that you had not produced
24  to the SEC?
25       MR. O'BRIEN: Objection. Misstates the evidence.

Page 234

1  relevant in them.
2  Q. When you sat through your deposition on July
3  13th, did you recall having recorded calls with
4  customers at J.D. Nicholas?
5  A. I know --
6       MR. O'BRIEN: Objection to the form of the question.
7  I think it implies that the question was asked and I
8  don't believe it was.
9  Q. When you were sitting through your deposition
10  on July 13th, did you recall having recorded calls with
11  your customers at J.D. Nicholas?
12       MR. O'BRIEN: Same objections.
13  A. I can't remember if I recalled on July 13th.
14  Q. You knew, though, you had recorded calls with
15  customers, though, correct?
16       MR. O'BRIEN: Objection. Vague, ambiguous.
17  A. I can't answer that.
18  Q. I mean, you testified before that you had
19  recording devices that you used at J.D. Nicholas,
20  correct?
21  A. That's correct.
22  Q. Okay. Then you knew in July of 2017 that there
23  had been recording devices that you had used to record
24  calls with customers at J.D. Nicholas, correct?
25  A. I would assume so.

Page 236

1  Argumentative. Objection to form. Lack of foundation.
2  No evidence that that question was even asked during the
3  deposition. But you can go ahead and answer it.
4       MS. PAULEY: We'll get there.
5  Q. You can answer.
6  A. Can you rephrase that?
7  Q. Did you intentionally conceal from the SEC when
8  you were here in July for your deposition that you had
9  recorded calls with customers at J.D. Nicholas, the
10  customers that were listed in the attachment to the
11  document request?
12  A. No.
13  Q.
14       MS. PAULEY: Can we please mark another document.
15  This is going to be Exhibit 253.
16       (Transcript of Gregory Dean dated November 14,
17       2014 in the matter of J.D. Nicholas &
18       Associates, Inc., marked Exhibit 253 for
19       identification)
20  Q. So Exhibit 253 is the transcript of your
21  testimony that you gave on November 14th of 2014 in
22  connection with the SEC's investigation that we
23  mentioned a moment ago titled J.D. Nicholas &
24  Associates, Inc., it was file number NY 8919.
25       And, again, you testified earlier that you

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 237

1  recall sitting for your testimony back in November of
2  2014, correct?
3     A.  Yes.
4     Q.  Okay.  And I asked you questions during that
5  testimony session?
6     A.  Yeah, you and a few others.
7     Q.  And, again, you knew that you were under oath
8  when you appeared for testimony before the SEC, correct?
9     A.  Yes.
10    Q.  Have you seen Exhibit 253 before?
11    A.  No.
12    Q.  You've never reviewed the transcript of your
13  testimony before the SEC?
14    A.  No.
15    Q.  Do you believe any of the answers you gave when
16  you testified before the SEC in November of 2014 were
17  false?
18    MR. O'BRIEN: Objection.  Form, foundation.
19    Q.  You can answer.
20    A.  I don't believe so.
21    Q.  Okay.  Do you recall at your testimony in
22  November of 2014, that the staff asked you questions
23  about whether you recorded calls with customers?
24    A.  Not necessarily, no.
25    Q.  If we can please turn to page 83 and 84 of the

Page 238

1  transcript.  It's page 21 of Exhibit 253.
2     MR. O'BRIEN: I will just object to the use of the
3  transcript under the Federal Rules of Civil Procedure
4  and point out that it doesn't appear that the transcript
5  was ever reviewed or signed by the witness.
6     Q.  Do you see page 83?
7     A.  Yes.
8     Q.  Halfway down the page of 83 it's on line 13, do
9  you see a question that says, "Do you record any of your
10  calls?"
11    A.  Um-hmm.  I do.
12    Q.  Okay.  And you answered no, do you see that?
13    A.  I do.
14    Q.  Why did you respond no?
15    A.  I don't know.  Maybe it was at that time I was
16  referring to.
17    Q.  And do you see the question below that, it
18  says, "Have you ever?"  And you answered, "Very rarely."
19    Do you see that?
20    A.  Yes.
21    Q.  What do you mean by that -- what did you mean
22  by that?
23    A.  That was typically what I did, rarely, I would
24  generally speaking, forget to record and, again, it
25  wasn't a practice that was mandated in the office.  It

Page 239

1  was every so often when they wanted to us record for
2  some odd reason, they meaning J.D. Nicholas.
3     Q.  Did J.D. Nicholas give you any instructions as
4  to when you should or when you should not record?
5     A.  I know it was for -- I'm trying to recall.  I
6  remember something along the lines of when trades were
7  placed.  So when you get an order for a trade, make sure
8  you have that recording, but they would have these
9  meetings once in a quarter maybe.  So that was the
10  reason why.
11    Q.  What would be discussed at the meetings?
12    A.  The need to record.  They weren't very
13  well-conducted meetings.  They would be just kind of off
14  the cuff one morning because one of them had some fire
15  under their ass for whatever reason.
16    Q.  And did you have any personal practice for when
17  you chose to record versus when you did not?
18    A.  Not necessarily.
19    Q.  Did you record calls only with certain
20  customers but not with others?
21    A.  Not that I can think of, no.
22    Q.  So how would you decide when to hit record and
23  when not to?
24    A.  When I -- I guess when I remembered to.
25    Q.  Okay.  Do you see the next question down on

Page 240

1  line 18, it says, "Under what circumstances do you
2  record calls?"
3     Do you see that?
4     A.  Um-hmm.
5     Q.  Okay.  And then you answered, "Nothing in
6  particular.  I had a cassette recorder at one time, and
7  I actually forgot to use it a lot of times.  I tried to
8  make it into my process, but I kept forgetting to use
9  it.  There's no necessary standard."
10    Do you see that?
11    A.  Yes.
12    Q.  Okay.  Is that still accurate as far as you
13  recall from your time at J.D. Nicholas?
14    MR. O'BRIEN: Objection.  Vague and ambiguous.
15    A.  I assume so.
16    Q.  Do you recall, if I was to ask you that
17  question right now, under what circumstances did you
18  record calls at J.D. Nicholas, how would you answer it?
19    A.  For the most part, like that.  Yeah, I mean, I
20  had a cassette recorder at one point at the very
21  beginning.  It never worked and I replaced it with a
22  different recorder.  That's all.  That's the only
23  difference.
24    Q.  And then do you see the question below it says,
25  "Do you still sometimes record your calls?"  And you

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Page 241

1 answered no.
2     Do you see that?
3   A.  Yes.
4   Q.  Okay.  And why, had you stopped at some point
5 in time recording calls?
6   A.  This was right before we had left J.D.
7 Nicholas.
8   Q.  Okay.
9   A.  So at that point, yeah, we were in the process
10 of leaving.
11   Q.  Okay.  So that's why you stopped recording
12 calls?
13   A.  I believe we left maybe a week after.  I don't
14 think that there were many calls at that point.
15   Q.  And you can see the question below that, it
16 says, "When did you stop recording any calls?"  And you
17 answered, "When I threw the cassette player out."
18     And then you were asked, "When was that?"  And
19 you said, "Three years ago maybe, roughly."
20     Do you see that?
21   A.  Okay.
22   Q.  Yes, you see that?
23   A.  I do.
24   Q.  Okay.  So had you thrown a cassette player out
25 three years prior to November of 2014?

Page 242

1   A.  The date, I assume the date is probably wrong.
2 I don't know.  I really don't remember.
3   Q.  Was there a point in time in which you threw a
4 cassette player out?
5   A.  I threw a few of those digital recorders out
6 and a cassette player.  I mean, I guess a cassette
7 player is not the right word.
8   Q.  What would be the right word?
9   A.  A recorder.
10   Q.  The same recording device that you were talking
11 about testifying to earlier?
12   A.  Yes.
13   Q.  Okay.  So do you continue to record calls --
14 did you continue to record calls after you left J.D.
15 Nicholas?
16   A.  I have, a handful, yeah.
17   Q.  Going back to Exhibit 251, the document
18 request, the first exhibit we looked at, have all
19 recordings of calls with customers listed on the
20 exhibit, attachment to Exhibit 251 been produced?
21     Take your time and look at each of the
22 customers.
23   A.  Okay.  What was the question?
24   Q.  Have all recordings of calls with the customers
25 listed in the attachment been produced in this

Page 243

1 litigation?
2   A.  I believe so.  Unless I somehow find another
3 recorder, but I believe so.
4   Q.  Do you intend to continue searching?
5   A.  Yes.
6   Q.  Where else would you search?
7   A.  I would have no idea.  I mean, I would
8 definitely make Liam aware if I found something.
9   Q.  Is there anyplace you can think of sitting here
10 right now that you could look that could turn up
11 recorded calls with customers listed in the attachment?
12   A.  Probably one of J.D. Nicholas's owner's houses.
13   Q.  Why would recording devices be at one of their
14 houses?
15   A.  Because they kept everything that we had in and
16 on our desks.
17   Q.  When you left J.D. Nicholas in November of
18 2014, were the recording devices still at your desk?
19   A.  Everything that was on my desk was there.
20   Q.  Were the recording devices on your desk?
21   A.  I don't remember visually what was on my desk,
22 but whatever was on my desk was there.
23   Q.  What do you remember being on your desk?
24   A.  A phone, leads, folders with papers in them.
25 Computer, we eventually got, but they wiped them out

Page 244

1 completely.  Everything that was in my drawers, I just
2 don't remember what was in the drawers.
3   Q.  Where did you save the recording devices in
4 your desk when you were at J.D. Nicholas?
5   A.  They would be on my desk or in one of the
6 drawers.
7   Q.  Were there some on and some in your drawers?
8   A.  I don't remember.  Potentially, yeah.
9   Q.  Do you believe there were recording devices
10 either on your desk or in your drawers when you left?
11   A.  Might have been.
12   Q.  Okay.  Okay, we're going to listen to the
13 recordings that you recently produced.
14   MS. PAULEY:  Can we please mark this as Exhibit 254.
15     (Audio transcription in the matter of JD
16     Nicholas and Associates marked Exhibit 254 for
17     identification)
18   Q.  So Exhibit 254 is a transcript of the
19 recordings that your counsel produced to us.  I believe,
20 I believe it was on October 4th, but I could be wrong
21 about that, of 2016.
22     So what we're going to do is, I'll play each
23 recording and you can listen to it and then we'll go
24 over some of the questions and answers that were in the
25 recording using the transcript.

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 245

1    A.  Okay.
2    Q.  So I'll play the whole thing through one time.
3         We're going to skip the first one.  So we'll be
4    beginning on page 6 of Exhibit 254 with the recording
5    that's titled Albert Claycomb, JDN recording, Claycomb
6    1/8/14.
7         (Recording played)
8    Q.  Did you recognize your voice in that recording?
9    A.  Yes.
10   Q.  Who was the other voice?
11   A.  Al Claycomb.
12   Q.  And how do you know that?
13   A.  I just recall his voice.
14   Q.  Do you see on the transcript on page 6 that
15   this recording has a title of Albert Claycomb, JDN
16   recording, Claycomb 1/8/14?
17        Do you see that on page 6 of Exhibit 254?
18   A.  Yes.
19   Q.  Do you know who names this recording?
20   A.  That would be me.
21   Q.  And how did you do that?
22   A.  When I had spoke to Liam, he told me to put it
23   all on a disk.  So I transferred all the information
24   onto a disk and sent it to him.
25   Q.  So you transferred the recordings that were on

Page 246

1    the device that you found in the garage onto a disk?
2    A.  Correct.
3    Q.  And you were the one who titled each of the
4    recordings?
5    A.  Yes.
6    Q.  Were there other recordings on that disk other
7    than the ones that you produced in this litigation?
8    A.  No.
9    Q.  There were no recordings of any other
10   customers?
11   A.  No.
12   Q.  On the recording device?
13   A.  Potentially there were.  The device wasn't
14   good.  A lot of the times when you record afterwards, it
15   would be just fuzz you would hear in the background.
16   There are a couple of recordings of me and my wife that
17   somehow I guess I recorded, but...
18   Q.  So there were no -- other than Albert Claycomb,
19   Eugene Bernardo and Steven Hellwig, there were no
20   recorded calls with any other customers?
21   A.  I mean, potentially there were.  Nothing that I
22   remember, though, no.
23   Q.  I guess I don't understand what you mean by
24   potentially.
25        Did you listen to all of the recordings on the

Page 247

1    device?
2    A.  I believe I did.
3    Q.  So then how do you -- this was just in August,
4    you said, right?
5    A.  Yes.
6    Q.  How did you identify the recordings with Albert
7    Claycomb, Eugene Bernardo and Steve Hellwig?
8    A.  Because I actually remember the conversations.
9    Q.  You remember those specific conversations?
10   A.  I remember the voice, the client, the
11   conversation.
12   Q.  So did you listen to the entire device, all of
13   the recordings on the entire device from beginning to
14   end?
15   A.  I did.
16   Q.  Okay.  And the only conversations that were on
17   there were the ones with Albert Claycomb, Eugene
18   Bernardo, Steve Hellwig and the one with your wife?
19   A.  There's a few of my wife.  One when I called GM
20   financing from for my wife's car.  Yeah, a lot of just
21   stuff that wasn't relevant.
22   Q.  What do you mean not relevant?
23   A.  It had nothing to do with J.D. Nicholas.
24   Q.  So there were no other calls with any other
25   J.D. Nicholas customers other than those three customers

Page 248

1    on the device that you found in your garage?
2    A.  There potentially could have been, but I
3    couldn't make out who or what it was.
4    Q.  Okay.  So there were other calls, you just
5    couldn't hear, you couldn't understand who the voices
6    were on the calls?
7    A.  Correct, or I couldn't make out the actual call
8    itself.
9    Q.  What do you mean you couldn't make out --
10   A.  The quality of it was not good.
11   Q.  Okay.  So the only calls that you could
12   understand were the ones with Albert Claycomb, Eugene
13   Bernardo, Steve Hellwig, your wife, and one, I think you
14   said with who, GMC?
15   A.  Um-hmm, correct.
16   Q.  And none of the other recordings that were on
17   that, that were saved to that device, you couldn't
18   understand who was talking?
19   A.  From what I remember, there was about an
20   hour-long recording of nothing, which I had a habit of
21   leaving the device on when the conversation was over and
22   it would just keep recording.  So it was just white
23   noise.  Stuff like that.
24   Q.  Okay.  But no other J.D. Nicholas customers?
25   A.  Not that I remember, no.

Plaintiff Ex 17 - 10

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 249

1    Q.  Okay.  And so you titled this particular
2  recording Albert Claycomb, JDN recording, Claycomb
3  1/18/14, correct?
4    A.  Yeah, I guess so.
5    Q.  So how did you know that the recording was -- I
6  take it 1/18/14 means that was the date that the call
7  was recorded on?
8    A.  Yeah, or the date that would be on the digital
9  screen on the device.
10    Q.  So on the screen on the device it would say the
11  date that the recording was made?
12    A.  Correct.
13    Q.  So that's how you knew that this call had taken
14  place on January 8th of 2014?
15    A.  Yeah.  That doesn't mean the date's correct,
16  but that's what it says.
17    Q.  Why would you -- what would give you any reason
18  to believe that it was incorrect?
19    A.  If it ran out of batteries, for, you know,
20  reasons, I guess, that the recorder wouldn't be
21  functioning properly.
22    Q.  Okay.  But you made no effort to try and
23  determine when the conversation actually took place?
24    A.  No.
25    Q.  Okay.  So the 1/18/14 was just based purely on

Page 250

1  the date that was listed on the recording device in
2  connection with that call?
3    A.  Yes.
4    Q.  And, again, how was this recording made?
5    A.  It was from a digital device that would have
6  been connected to my phone at J.D. Nicholas.
7    Q.  Okay.  And, again, this is something that when
8  the call with Mr. Claycomb was taking place, you pressed
9  record?
10    A.  Yes.
11    Q.  And do you know how this recording was
12  retained?
13    A.  No, I don't.
14    Q.  It was retained on the recording device,
15  correct?
16    A.  Right.
17    Q.  Okay.  But you don't have any recollection as
18  to when or how that recording device came home to your
19  home?
20    A.  I don't know, I'm sorry.
21    Q.  And this is the same recording device that was
22  located in your garage, correct?
23    A.  Yes.
24    Q.  Did you recommend trades to Mr. Claycomb in
25  Voxeljet?

Page 251

1    A.  Yes.
2    Q.  And Akamai?
3    A.  Yes.
4    Q.  And Criteo?
5    A.  Yes, I believe so.
6    Q.  And in this particular call, what were you
7  recommending to Mr. Claycomb?
8    A.  Well, I mean, I do remember this call.  It was
9  after he was recommending to not trade anymore and hold
10  these stocks.  I don't remember how long it was, but I
11  remember a number of months and he didn't want to sell
12  them, he wanted to hold them and they kept going down.
13    Q.  Do you have an understanding as to why he
14  wanted to hold them?
15    A.  I don't.  He changed his mood like the wind.
16    Q.  And so you believed it was in his best
17  interest, or at least you believed that Mr. Claycomb
18  should be selling these three positions?
19    A.  I don't really remember.
20    Q.  Well, take a look at the transcript.  Take as
21  much time as you need.
22    A.  Um-hmm.
23    Q.  In the transcript of the recording from January
24  8 of 2014, are you recommending to Mr. Claycomb that he
25  sell the positions in Voxeljet, Akamai and Criteo?

Page 252

1    A.  No, I don't believe I was recommending
2  anything.  I think he was recommending to sell.
3    Q.  I'm sorry.  That's -- you testified, I thought,
4  the exact opposite a moment ago.
5      Explain to me what was happening.
6    A.  I think he was recommending that he wanted to
7  sell.
8    Q.  I thought you said a moment ago that he was the
9  one who wanted to hold the positions.
10    A.  He was, and then on this conversation, I
11  believe, is the conversation he said he wanted to sell.
12    Q.  Okay.  So he had been wanting to hold the
13  positions, but in this particular conversation, he was
14  telling you he wanted to sell?
15    A.  I believe so, yes.
16    Q.  Okay.  And let's turn to page 7.
17      So if you look halfway down the page on line
18  13, do you see where it says "But those other two
19  companies, I mean, those -- those were the two stocks
20  that we had in the account when we wanted to put the
21  brakes on, and unfortunately, I mean, we're holding two
22  stocks that haven't done shit, and the Voxeljet is the
23  only one that's at least been trading higher."
24      Do you see that?
25    A.  Yes.

Plaintiff Ex 17 - 11

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 253

1    Q.  So "put the brakes on" is a phrase you used,
2  correct?
3    A.  That's correct.
4    Q.  And what did you mean by that?
5    A.  When we had those three positions, when I say
6  "we," I'm really meaning him.  It was his suggestion to
7  put the brakes on, to stop trading in the account, to
8  hold.
9    Q.  What was your understanding as to why he wanted
10  to put the brakes on in the account?
11    A.  He would switch from one theory to another all
12  the time.
13    Q.  Was it because he believed the account was
14  being traded too actively?
15    A.  He might believe that.  I mean, at the point
16  when he wanted to put the brakes on, the account was up,
17  I think, close to 100 percent.
18    Q.  That's a separate answer from what my question
19  was.
20       My question was, had Mr. Claycomb expressed an
21  interest in putting the brakes on in the account because
22  the account had been traded too actively?
23    MR. O'BRIEN: Objection.  Vague and ambiguous.
24    A.  I don't know.  I don't really know.
25    Q.  You don't know or you don't recall?

Page 254

1    A.  I don't know and I don't recall.
2    Q.  Did Mr. Claycomb ever give you an instruction
3  that he wanted to put the brakes upon because the
4  account was being traded too actively?
5    A.  I don't remember.
6    Q.  If you go to the paragraph below that beginning
7  at line 19, it says, "Yeah.  And we're kind of -- we are
8  where we are.  I mean, I get it, I understand where you
9  are, you want the less trading, and I realize that."
10       Do you see that?
11    A.  Um-hmm.
12    Q.  Had Mr. Claycomb told you that he wanted his
13  account to be traded less frequently?
14    A.  I would assume so from that statement.
15    Q.  Do you have any recollection of what the
16  circumstances were of that instruction had he given it?
17    A.  I don't really remember.  I do remember that
18  when we bought those three positions, his account was up
19  significantly.  And then he became angry as those three
20  positions were going lower, still did not want to sell
21  them because he wanted to hold them for reason.  And
22  this, I believe, was that conversation where he wanted
23  to just sell them.
24    Q.  If we could turn to page 8, middle of the page
25  on line 13, it says unidentified male, who I take it to

Page 255

1  be Albert Claycomb.  And he says, "Save a drop of it for
2  (inaudible) Akamai and Criteo, I think I want to pull
3  back out of.  And yeah.  I just want to stick with the
4  program and -- and I want to have a little bit more
5  input and be a little bit more involved."
6       Do you see that?
7    A.  Yes.
8    Q.  What's your understanding of what Mr. Claycomb
9  was saying to you with that sentence?
10    A.  I don't know.
11    Q.  How did you interpret what he was saying?
12    A.  I don't remember now.
13    Q.  Sitting here today, how do you interpret what
14  he's saying in that sentence?
15    MR. O'BRIEN: Objection. Relevance.
16    A.  I still don't know.  He was extremely involved
17  all the time.
18    Q.  When you hear somebody say to you, such as Mr.
19  Claycomb is saying right here, he says, "I want to have
20  a little bit more input and be a little bit more
21  involved," what does that mean to you?
22    A.  That he wants to have a little bit more input
23  and be a little bit more involved.
24    Q.  And why would he say that?
25    MR. O'BRIEN: Objection.

Page 256

1    A.  You would have to ask him.  I have no idea.
2    Q.  If you could turn to page 9, and this is a
3  continuation from, you can see it, at the bottom of page
4  8, this is statements that you are making and at the top
5  of page 9 on line 2 it says, or you're saying, "It's
6  just -- it's unfortunate that we're just in this
7  position with three companies, whereas you look at a
8  broad-base market, and there's plenty of things that are
9  doing phenomenal, we just don't have the ability to own
10  them just because we're stuck where we are with the
11  three stocks."
12       Do you see that?
13    A.  Yes.
14    Q.  What do you mean that you're stuck where we
15  are?
16    A.  I would assume that we're -- we'd been holding
17  the three stocks that he wanted to put the brakes on
18  with and he's down in those three stocks or a
19  combination of.
20    Q.  And you believe that he should be holding other
21  positions?
22    A.  I don't really remember.
23    Q.  And if you go down to line 15, and this is Mr.
24  Claycomb, I believe, it says, "20 grand in June, now
25  it's January, seven months later, and I still haven't

Plaintiff Ex 17 - 12

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 257

1  gotten that, you know.  And we've gone down to, like,
2  30-something at some point."
3       And you say, "Sure."
4       And then he says, Mr. Claycomb says, "And then
5  we bounced all the way back up to 70."
6       And you say, "Sure.  Yeah.  And then came down.
7  I mean, a -- we -- we've had twinges, you know."
8       "Money when we were at 70, I would have been at
9  50, we would have lost a little bit less, and then I'd
10  probably be at 38, but I still would have 20 in my
11  pocket.  I mean, that's my crazy logic."
12       And you again say, "Sure.  No.  I get it.  I
13  mean, yeah."
14       What's your understanding of what Mr. Claycomb
15  is trying to say to you at that point?
16       MR. O'BRIEN: And I'll just object.  I think in line
17  23 of the transcript where it says twinges, I heard
18  swings.  So I think it's an inaccuracy in the
19  transcript.
20       MS. PAULEY: That's possible.
21       Q.  So, again, my question is, what was your
22  understanding of what Mr. Claycomb was trying to say?
23       A.  I mean, I think he summed it up in that last
24  sentence.  It's his crazy logic.  I think at one point
25  he was up close to 100 percent and I remember at that

Page 258

1  point he wanted to push it with trading to hit 100
2  grand, I remember the number being.  And then I think
3  what he's saying there is that he wanted -- I guess he
4  wanted at one point to pull 20 grand of profit out of
5  the account, and then it went down.
6       Now it's January, seven months -- yeah, and I
7  think just from holding the stocks that he was he was
8  down and he didn't want to pull the 20 out.
9       Q.  If you could turn to page 11.
10       A.  Okay.
11       Q.  Line 16.  This is a, you know, you're making a
12  statement beginning on line 4, but on line 16 you say,
13  "I thought we were, I'm frustrated that we're not doing
14  better, but I mean, I could tell you, if we could just
15  get back down to the game plan we had set forth a number
16  of months ago, I think there's no reason why we can't
17  have this account back to 60 if not 70.  But, I mean, we
18  really have to be proactive, we can't just sit here on
19  our hands and cross our fingers and just hope the
20  account goes higher."
21       Do you see that?
22       A.  Yes.
23       Q.  Okay.  And so you say in the beginning, you
24  say, "I'm frustrated that we're not doing better."
25       What was frustrating for you?

Page 259

1       A.  That we were holding three stocks that, I
2  pretty much say right there, that we're crossing our
3  fingers hoping went higher and they weren't as the
4  market was going higher.
5       Q.  And on line 18 you're referring to a game plan,
6  what was the game plan?
7       A.  The brunt of his return or performance in the
8  beginning, I guess, it was first six months, maybe,
9  first quarter was trading, actively trading.  The how
10  his account went from 30 to 70.  And then he did not
11  want to be active and the account in turn went from 70
12  to 30, and we were crossing our fingers hoping the
13  stocks went higher.
14       Q.  When you're saying, "We really have to be
15  proactive," what are you recommending to Mr. Claycomb?
16       A.  To not just be passive in holding the three
17  positions.
18       Q.  So you're recommending that he place additional
19  trades in his account?
20       A.  Not necessarily.
21       Q.  Well, what were you recommending?  What were
22  you recommending?
23       A.  To, again, just be proactive with the strategy.
24       Q.  What was the strategy?
25       A.  To go back to what we were doing in the

Page 260

1  beginning.  I don't really remember.
2       Q.  You said in the beginning you were actively
3  trading?
4       A.  More active than what was going on at that
5  point in time.
6       Q.  Okay.  So you're saying, "We really have to be
7  proactive, we can't just sit here on our hands and cross
8  our fingers and just hope the account goes higher,"
9  correct?
10       A.  That's correct.
11       Q.  So you're saying the opposite of sitting on
12  your hands, meaning to trade more frequently, is that
13  correct?
14       A.  I don't really know.  I don't perceive it that
15  way, but...
16       Q.  How do you perceive it?
17       A.  The way I perceive it was for the few months
18  that we were like this, he wouldn't return my calls, we
19  would be holding stocks that went down, and then every
20  once in a blue moon he would call in and bitching and
21  complaining why the stocks were going down.  And I said
22  we need to get back on the same page of being proactive
23  and doing something about this.
24       Q.  So doing something about this, you mean by
25  placing trades?

Plaintiff Ex 17 - 13

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 261

1    A.  Or just returning my phone call.
2    Q.  Or returning your phone call.
3        Why would you need him to return your phone
4    call?
5    A.  To speak about the account going down.
6    Q.  So that way you could place additional trades?
7    A.  I didn't say that.
8    Q.  Okay.  So why else would you speak on the
9    phone?
10   A.  I speak plenty of times with clients without
11   placing trades.
12   Q.  What else would -- what were you hoping Mr.
13   Claycomb to call you to speak about?
14   A.  To address the account.
15   Q.  What needed to be addressed?
16   A.  It's typical practice to speak to your client
17   constantly.
18   Q.  What --
19   A.  Talk about the market, situations, the overall
20   health of the market, you know, potential trades to put
21   on.
22   Q.  What in particular with respect to Mr.
23   Claycomb's account needed to be addressed?
24   A.  I don't remember, it was three and a half years
25   ago.

Page 262

1    Q.  Okay.  So your testimony is that when you say,
2    "We really have to be proactive, we can't just sit on
3    our hands and cross our fingers and just hope the
4    account goes higher," your testimony is that that means
5    you were not recommending to place additional trades in
6    the account?
7    A.  I'm not saying that.  I'm -- you're asking me
8    to recall dialogue from three and a half years ago.  I
9    don't remember the specifics of the conversation.
10   Q.  The words are your own, correct?
11   A.  They sure are.
12   Q.  All I'm asking you is, what did you mean?
13   A.  I don't remember.
14       MR. O'BRIEN:  We're going over an hour, can we take
15   a break now?
16       MS. PAULEY:  Sure.  We can go off the record.
17       THE VIDEOGRAPHER:  Okay, going off the record, end
18   of disk 7 at 2:06 p.m.
19       (Recess)
20       THE VIDEOGRAPHER:  We are back on the record, start
21   of disk 8 at 2:16 p.m.
22
23           EXAMINATION RESUMED
24   BY MS. PAULEY:
25   Q.  Okay.  So why don't we listen to the next

Page 263

1    recording.  This one's the next page in your transcript,
2    beginning on page 13.  It's entitled Eugene Bernardo,
3    JDN recording, Bernardo 1/31/13.  And I'll play it now.
4        (Recording played)
5    Q.  Okay.  So, again, same question, do you
6    recognize your voice in the recording you just listened
7    to?
8    A.  Yes.
9    Q.  And who is the other male voice on the phone?
10   A.  Eugene Bernardo.
11   Q.  And how do you know that?
12   A.  From the voice.
13   Q.  You recognize his voice?
14   A.  Yes.
15   Q.  Okay.  And, again, this recording was made in
16   the same way that the prior recording was made where you
17   pressed record on the device that was connected to your
18   phone?
19   A.  I would assume so.
20   Q.  Do you have any reason to believe it was made
21   any other way?
22   A.  No.
23   Q.  And this is the same device that the Albert
24   Claycomb recording that we just listened to was saved
25   to, correct?

Page 264

1    A.  Yes.
2    Q.  And, again, this is the device that somehow
3    ended up in your garage?
4    A.  Correct.
5    Q.  That you located in August of 2017?
6    A.  Correct.
7    Q.  Okay.  And, again, the title of this recording,
8    the Eugene Bernardo, JDN recording, Bernardo 1/31/13,
9    that's the title that you gave for this recording?
10   A.  When I had transferred it, yes.
11   Q.  And the 1/31/13 was the date that appeared in
12   connection with this recording on the device?
13   A.  Correct.
14   Q.  What -- do you recall what position or what
15   security you're referring to in this recording?
16   A.  I don't.
17   Q.  You don't recall?
18   A.  No.
19   Q.  Okay.  And why are you, you know, in -- I'm
20   sorry, why are you -- I'm just trying to remember
21   exactly where I'm looking at.
22       On line 18 you say, "But the reason why I, you
23   know, strongly urge to say let's not buy more yet," why
24   are you strongly urging him not to buy more yet?
25   A.  What page is this?

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

---

Page 265

1   Q. Page 13, line 18 and 19.
2   A. This might be the conversation about Sarepta.
3   Q. So you believe that this conversation is about
4 Serupta?
5   A. It might be.
6   Q. What makes you think that?
7   A. It could not be. I'm not really sure.
8   Q. Okay. So you don't know why you're saying --
9 why you're strongly urging him not to buy more yet?
10   A. I mean, you know, this is four years ago. I
11 don't know. Potentially it was the market, potentially
12 it was the stock, a bad day, I'm not really sure.
13   Q. Okay. Okay, let's listen to the next
14 recording. It begins on page 15.
15     (Recording played)
16   Q. And, again, do you recognize your voice in this
17 recording?
18   A. Yes.
19   Q. And who is the other voice on the call?
20   A. Eugene Bernardo.
21   Q. And, again, this recording was saved to the
22 same device as the prior two?
23   A. Yes.
24   Q. Okay. And it was, but the recording was made
25 in the same way that the prior two recordings were made?

---

Page 266

1   A. I believe so.
2   Q. Meaning that you pressed record on the device
3 connected to your phone when you initiated the call?
4   A. Yes.
5   Q. Okay. And this, again, this is the same device
6 that was located by you in August in your garage?
7   A. Correct.
8   Q. And the title of this recording, Eugene
9 Bernardo, JDN recording, Bernardo 1/31/13 follow-up,
10 that was the title that you gave to this recording when
11 you transferred it to the disk?
12   A. Yes.
13   Q. What was the purpose of this call?
14   A. That was a follow-up from the conversation
15 prior, which was the recording prior.
16   Q. And what was the purpose of following up?
17   A. Did it every single day.
18   Q. For what purpose?
19   A. I speak to, generally, most of my clients
20 multiple times per day, updates, where their accounts
21 are, a lot of times they call in. In his case, he
22 called in numerous times per day and I would call him
23 numerous times per day. It was just that relationship.
24   Q. Okay. Let's move on to the next one.
25 Beginning on page 18. And it's the recording titled

---

Page 267

1 Eugene Bernardo, JDN recording, Bernardo 2/6/13.
2     (Recording played)
3   Q. Okay. And, again, you recognize your voice in
4 that recording?
5   A. Yes.
6   Q. And who is the other male voice on the phone?
7   A. Eugene Bernardo.
8   Q. And this recording was made in the same way as
9 the prior three recordings, using the device that was
10 connected to your phone?
11   A. Yes.
12   Q. And you were the one who hit record on the
13 device?
14   A. Yes.
15   Q. And this was the same device that you located
16 in August of 2017 in your garage?
17   A. Yes.
18   Q. Okay. And what was the purpose of -- oh, let
19 me ask, of the title here, Eugene Bernardo, JDN
20 recording, Bernardo 2/6/13, that's the title that you
21 gave to this recording?
22   A. From the information on the screen, digital
23 screen.
24   Q. Okay. Of the recording device?
25   A. Yes.

---

Page 268

1   Q. Okay. So what was the purpose of the 2/6/13
2 call?
3   A. Good morning, touching base call, which we did
4 all the time, every day, virtually.
5   Q. And turning to page 19 of the transcript.
6   A. Okay.
7   Q. Do you see beginning on line 8 where you say,
8 "If we get a buck I'd be extremely happy. I mean, if we
9 could get a buck today, yeah. I would be more than
10 happy just to take it off. Will be at about 300 at that
11 point, and, you know, it'll be almost like nothing
12 really happened over the last couple," it's inaudible.
13     Do you know what you're referring to there?
14   A. I would assume the stock going a dollar higher.
15   Q. What stock was that?
16   A. Again, I would assume it's the SRPT.
17   Q. The Sarepta?
18   A. Correct.
19   Q. Okay. And why would you be extremely happy if
20 it went up a dollar?
21   A. Because when that fake tweet occurred, which I
22 guess it was roughly a week or so prior to this
23 conversation, the stock went down, I don't remember
24 exactly how much, but 20, 25, 30 percent. And it was
25 coming back slowly from that point.

---

Plaintiff Ex 17 - 15

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 269

1   Q.  If you would turn to page 20.  On lines 2 and 3
2   Mr. Bernardo says, "What if I told you to put a stop at
3   6000 profit, and to stop at 2009 minus?"
4        Do you see that?
5   A.  Yes.
6   Q.  What did you understand Mr. Bernardo's
7   suggestion to be?
8   A.  To put an order to sell at 6000 in green and a
9   stop loss at a $2000 loss.
10  Q.  And did you agree with that suggestion?
11  A.  I mean, according to the dialogue, I suggested
12  that that might not be necessarily a good idea with the
13  volatile stock.
14  Q.  Why not?
15  A.  Because we've done it before on his suggestion
16  and it got stopped out immediately and the stocks went
17  higher.
18  Q.  What do you mean it got stopped out
19  immediately?
20  A.  So we put a stock according to his terms and
21  when the market opened, the stock would go lower
22  temporarily, get stopped out and then trade up.
23  Q.  Turning to page 21.  On line, beginning on line
24  8, do you see where Mr. Bernardo says, "Okay.  I'm going
25  to listen to you, because if I did your kitchen, I'd

Page 270

1   expect you to trust me in putting it in."
2        Do you see that?
3   A.  Yes.
4   Q.  Did you understand that Mr. Bernardo trusted
5   you?
6   A.  Yes.
7   Q.  To have his best interest with respect to the
8   account in mind?
9   A.  Yes.
10  Q.  Why did you -- why did Mr. Bernardo trust you,
11  if you know?
12  A.  I couldn't tell you.
13  Q.  Going further on page, down page 21, beginning
14  at line 22, Mr. Bernardo says, "It has to be lined up
15  and everything.  So -- but what I wanted to tell you is
16  also is -- see, my mind just skipped, I've got too many
17  things on my mind right now with this Parkinson's."
18       Do you see that?
19  A.  Yes.
20  Q.  What did you know about Mr. Bernardo's
21  Parkinson's Disease in 2012-2013?
22  A.  Just what he told me.
23  Q.  And what was that?
24  A.  Stage 2, it wasn't advanced, he was still
25  running his business, it didn't affect his day to day.

Page 271

1   Q.  What questions did you ask Mr. Bernardo about
2   his disease?
3   A.  We talked about it every day.
4   Q.  What questions did you ask?
5   A.  I don't remember specifically.
6   Q.  Did you ask how long he had had Parkinson's
7   for?
8   A.  Potentially, I just don't remember.
9   Q.  Did you ask him what the symptoms of
10  Parkinson's were?
11  A.  I could have, I don't remember.
12  Q.  Did you ask what medications he took?
13  A.  I remember having a few conversations about
14  medication.  I think maybe this was one of them.  But I
15  don't remember exactly.
16  Q.  Did you have an understanding of what the side
17  effects of any medications Mr. Bernardo was taking were?
18  A.  He would talk about them.
19  Q.  So what was your understanding?
20  A.  Each one had a different side effect.
21  Q.  And what were they?
22  A.  I don't remember.  They were all different.
23  Q.  Would you agree that Mr. Bernardo's capacity to
24  understand any recommendations you would make with
25  respect to his account may have been affected by his

Page 272

1   illness and any side effects of the medications he was
2   taking?
3        MR. O'BRIEN: Objection.  Calls for speculation.
4   Objection to form, foundation.
5   A.  Could you repeat that?
6   Q.  Would you agree that Mr. Bernardo's capacity to
7   understand any recommendations that you made to him with
8   respect to his account may have been affected by his
9   illness and any side effects to the medications he was
10  taking?
11       MR. O'BRIEN: Same objections.
12  A.  I don't think so.
13  Q.  Why not?
14  A.  Because he ran a business, he had other
15  brokerage accounts at the same point in time.  He would
16  call constantly suggesting trades or a game plan,
17  theory.  He would look into stocks to buy and send me
18  information on them.  I think that he was well aware.
19  Q.  What about running a business made you think
20  that he had no impacts from having Parkinson's or any
21  medication?
22  A.  I guess that wouldn't just necessarily be a
23  determination factor, but I mean, he was driving at that
24  point in time, he was going on locations.  I can't
25  remember in detail.  It was a number of years ago.

Plaintiff Ex 17 - 16

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 273

1    Q.  What about his having other brokerage accounts
2  was relevant with respect to whether he had the ability
3  to understand your recommendations given his illness?
4    A.  I don't know if that would be relevant or not.
5  It's just, I remember he had multiple accounts that he
6  would speak about all the time.
7    Q.  Why did you say it was relevant a moment ago
8  when you answered my question?
9    A.  Did I say it was relevant?
10    Q.  When I asked you the question whether Mr.
11  Bernardo's capacity to understand your recommendations
12  was affected by his illness, you responded that he had
13  other brokerage accounts.
14    A.  Yes.
15    Q.  So what about him having other brokerage
16  accounts was relevant?
17    A.  I don't know if it was relevant or not.  I just
18  know --
19    Q.  Then why did you say it?
20    A.  Because he did have other brokerage accounts.
21    Q.  But you can't think of any reason why that's
22  relevant to whether he had the ability to understand
23  your recommendations?
24    A.  I mean, we would discuss the recommendations in
25  detail.  He would discuss positions in his other

Page 275

1  he was currently holding and he would ask me or
2  sometimes fax, fax information.  I mean, he was very
3  engaged.  He was, you know, very engaged.  He was in
4  control.
5    Q.  What was your understanding as to the expenses
6  associated with the medications Mr. Bernardo was taking
7  on account of his Parkinson's Disease?
8    A.  I'm not really sure.  I don't remember.
9    Q.  Did you have any understanding of how much he
10  had to pay on a monthly basis for medication?
11    A.  I don't remember.
12    Q.  Do you believe that it would be important for
13  you to have an understanding of what his expenses were
14  in connection with making recommendations to him for his
15  J.D. Nicholas account?
16      MR. O'BRIEN:  Objection.  Lacks foundation.
17    A.  I guess that would be.  I mean, he did say it
18  was experimental, so that would generally be free.
19    Q.  You believe his medications were free?
20    A.  If they were experimental.  He did say it in
21  this conversation here.
22    Q.  You believe he was saying in this conversation
23  that he was getting experimental free medication?
24    A.  I'm not saying that.  But, generally speaking,
25  if they're experimental treatments, they would be.

Page 274

1  brokerage accounts and what he didn't like, reasons why
2  he didn't like them.  If that's relevant, that's
3  relevant.
4    Q.  What about Mr. Bernardo's -- you mentioned that
5  he would call you with suggestions for the account.
6      What about -- what about that gave you the
7  impression that he had the ability to understand any
8  recommendations you made about his account?
9    A.  Could you repeat that?
10    Q.  You testified a moment ago that Mr. Bernardo
11  would call you with suggestions with respect to his J.D.
12  Nicholas account.
13      Do you remember that?
14    A.  Yes.
15    Q.  And that was in response to my question asking
16  you about whether Mr. Bernardo had the capacity to
17  understand any recommendations you made to him given his
18  illness.
19      Do you recall that?
20    A.  Yes.
21    Q.  My question is, is what about him making
22  suggestions to you gave you the understanding that he
23  had the ability to understand your recommendations?
24    A.  I mean, there would generally be stuff that he
25  looked at after the fact or ideas he had with positions

Page 276

1    Q.  What is that understanding based on?
2    A.  That's my understanding of it.
3    Q.  So you have, sitting here today, you have no
4  understanding of what amount of money, if any, Mr.
5  Bernardo was paying for medication with respect to
6  Parkinson's?
7    A.  I don't remember.  It was four and a half years
8  ago.
9    Q.  If we could turn to page 27.  And you'll see in
10  line 20 that Mr. Bernardo is referring to a brain
11  operation that he had.
12      Do you see that?
13    A.  Yes.
14    Q.  What did you know about any brain operations
15  that Mr. Bernardo had in or around 2012 or 2013?
16    A.  I don't recall.  I don't remember.
17    Q.  You don't remember anything about Mr. Bernardo
18  having a brain operation?
19    A.  I remember him telling me about it last month,
20  or earlier this month.
21    Q.  Did you ask any questions about the brain
22  operation that Mr. Bernardo had had at that time,
23  meaning in 2012-2013?
24    A.  I might have, I don't remember.
25    Q.  Do you know why he had to have a brain

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 277

1  operation?
2  A.  Not off the top of my head at this point.
3  Q.  Do you know what the outcome of the brain
4  operation was?
5  A.  I don't remember, no.
6  Q.  Do you know if he had to take any medications
7  in connection with an operation on his brain?
8  A.  I don't remember.
9  Q.  If we could turn to page 35.  And you'll see on
10 lines 15 and 16, Mr. Bernardo says, "Listen, I'm going
11 to recommend you to my son."
12       Do you see that?
13 A.  Yes.
14 Q.  Did Mr. Bernardo's son open an account with
15 you?
16 A.  Not that I remember.
17 Q.  Did you ever speak to his son?
18 A.  I might have.  I potentially might have.  I
19 don't remember.
20 Q.  Turning to -- Mr. Bernardo's son does not have
21 an account with you today, correct?
22 A.  No.
23 Q.  Turning to page 37.
24 A.  Okay.
25 Q.  Beginning at line 18.  Mr. Bernardo says,

Page 278

1  "Well, I'm listening to you.  I mean, you -- you told me
2  it won't be overnight, I'm listening to you.  And you
3  said you have to have a strong stomach, I have a strong
4  stomach for this -- I'm trying to have a strong stomach
5  for this.
6       "But what worries me is when you get too far
7  behind, having just a little handful.  It's like having
8  a -- a handful -- a quarter of a million, to me, is just
9  nothing compared to what I had, and I'm afraid now, what
10 if I lose that quarter of a million?  What if it goes
11 down another 125,000?  I'm basically down to nothing."
12       Do you see that?
13 A.  Yes.
14 Q.  So is Mr. Bernardo telling you that he's
15 essentially down to his last $125,000?
16 A.  No.
17 Q.  What do you interpret that statement to mean?
18 A.  That he doesn't want to lose a quarter million.
19 Q.  What is "I'm basically down to nothing" mean?
20 A.  I don't know what he means by that, but --
21 Q.  What does it mean to you?
22 A.  That means that if it goes down another
23 125,000, he's basically down to nothing.
24 Q.  And you knew at the time, and I believe Mr.
25 Bernardo said several times during this call, that he

Page 279

1  was in his late 60s, correct?
2  A.  Correct.
3  Q.  And he had told you that he had Parkinson's
4  Disease?
5  A.  Yes.
6  Q.  And that he'd had a brain operation?
7  A.  Yes.
8  Q.  Was your strategy suitable for somebody in
9  their late 60s who was sick and had all of their savings
10 invested with you?
11      MR. O'BRIEN: Objection.  Lacks foundation.  Form.
12 A.  I'd have a thorough suitability analysis with
13 every client, I explained costs, risks associated.  I
14 give them a good basis, foundation to invest to achieve
15 an objective.
16 Q.  So -- I'm sorry, say your answer again.
17      (Answer read)
18 Q.  So my question was, was the strategy that you
19 represented to Mr. Bernardo, was that strategy suitable
20 of somebody who was in his late 60s and who was sick and
21 as he is telling you in this call, had all of his
22 savings invested with you?
23      MR. O'BRIEN: Same objections.
24 A.  At that point in time after conducting a
25 suitability analysis, I mean, that's the game plan that

Page 280

1  we had laid a foundation on.  And he said it when we
2  were at his house prior to this month, that he was still
3  trading actively to myself at Aegis Capital.
4  Q.  So you believe your strategy at J.D. Nicholas
5  that you were recommending to Mr. Bernardo was suitable
6  to somebody in Mr. Bernardo's circumstances?
7  A.  Yes, after having conversations constantly and
8  reevaluating.
9  Q.  Now, this call we just listened to was quite a
10 lengthy call.  At no point during this call was there
11 any mention of any costs associated with any of the
12 trading that was discussed.
13      Why is that?
14      MR. O'BRIEN: Objection.  Mischaracterizes the
15 recording, and form.
16 Q.  Can you identify, take as much time as you
17 need, can you identify in the transcript of the
18 recording we just listened to beginning on page 18 where
19 you're discussing the costs associated with any of the
20 trading?
21      MR. O'BRIEN: Again, same objections.
22 A.  I mean, we, from what I understood from the
23 recording, we didn't engage in a transaction in the
24 conversation.
25 Q.  Can you identify anywhere within the transcript

Plaintiff Ex 17 - 18

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 281

1  of this recording where costs are discussed?
2  MR. O'BRIEN: Same objection.
3  A. It could have been a prior transaction, I mean,
4  a prior conversation.
5  Q. Well, that's not my question.
6  Can you identify anywhere in the transcript of
7  this recorded call where costs are discussed?
8  A. No, I don't know why that would be discussed
9  necessarily on that conversation.
10  Q. So let's move on to the next recording. This
11  one begins on page 46 of the transcript.
12  MR. O'BRIEN: I'm going to need a break. Can we
13  just have a quick break?
14  MS. PAULEY: Sure. That's fine.
15  THE VIDEOGRAPHER: Going off the record at 3:04 p.m.
16  (Recess)
17  THE VIDEOGRAPHER: Back on the record at 3:11 p.m.
18
19  EXAMINATION RESUMED
20  BY MS. PAULEY:
21  Q. Right before we took the break, Mr. Dean, you
22  had mentioned that you did a suitability analysis for
23  Mr. Bernardo.
24  Do you remember that?
25  A. Yes.

Page 282

1  Q. Okay. What documentation can you identify for
2  us that would reflect the suitability analysis that you
3  conducted?
4  A. It would be in my drawer or J.D. Nicholas would
5  have it, I would assume.
6  Q. In what drawer?
7  A. Well, my old drawer at J.D. Nicholas. It would
8  be in that paperwork.
9  Q. What paperwork are you referring to?
10  A. Note pages from the account, beginning
11  conversations, prior to opening the account and after
12  opening the account. I don't know if they had supplied
13  that stuff to you guys.
14  Q. What note pages?
15  A. Client note pages.
16  Q. What does that mean?
17  A. Notes that I take on clients.
18  Q. Handwritten notes?
19  A. Yes.
20  Q. You take handwritten notes with respect to your
21  clients?
22  A. Every single one of them.
23  Q. And where were those notes maintained?
24  A. At J.D. Nicholas.
25  Q. Where at J.D. Nicholas?

Page 283

1  A. I don't know where, or what they did with them
2  afterwards, but they were in my drawer, my client book.
3  Q. And was it one notebook or what --
4  A. No, probably five.
5  Q. Around five notebooks?
6  A. Something along those lines.
7  Q. And there are handwritten notes contained
8  within those notebooks?
9  A. Every broker has those for their clients.
10  Q. And did you have a separate notebook for
11  different clients or how was the notebook organized?
12  A. Alphabetically.
13  Q. By client?
14  A. It's a binder, yes. It was by client. Well,
15  alphabetically, yes, by client's last name.
16  Q. So you're saying it was five binders?
17  A. Um-hmm, correct. They are small. They are
18  small, I don't know how to describe them, but small
19  binders. Not your large, three and a half inch.
20  Q. And the binders contained handwritten notes?
21  A. Client pages with their information and then
22  handwritten notes, contemporaneous notes.
23  Q. What's a client page?
24  A. I don't know how to describe it. Their name,
25  address, phone number, different phone numbers, it has

Page 284

1  all the trades that they have done, that's really up to
2  the broker to keep that up to date. I can't recall what
3  else. Email address, all pertinent information.
4  Q. What effort have you made to obtain those
5  binders or notebooks in connection with this litigation?
6  A. We've called and tried several dozen times.
7  Q. Who have you called?
8  A. The owners, the compliance, all the old
9  compliance, and we just constantly get the runaround.
10  Q. So the owners meaning Nick Tsiketas, James
11  Dolan and Dan Dvorznak?
12  A. Yes.
13  Q. You personally have spoken with each of them?
14  A. And Don.
15  Q. And Don who?
16  A. And Don Fowler.
17  Q. And Don Fowler --
18  A. He has spoken to them as well.
19  Q. And you're saying Don Fowler has also spoken to
20  each of the three owners?
21  A. Yes.
22  Q. And what did the owners tell you when you spoke
23  with them?
24  A. They have to look, or we think we supplied it
25  all, or you have to ask Scalise because he's the one

Plaintiff Ex 17 - 19

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 285

1  that maintains it which makes no sense because he has no
2  relationship with them anymore. It's all on a computer,
3  we just have to find the computer. It's just a bunch of
4  BS.
5     Q. And what have -- you said you also spoke to
6  some of the former compliance personnel at J.D.
7  Nicholas?
8     A. Rick Scalise and also Anthony Minerva.
9     Q. And what did Mr. Scalise tell you?
10    A. I actually had not spoken to him, sorry.
11 Minerva I had spoken to, but they were both former
12 compliance.
13    Q. So you have not spoken to Mr. Scalise?
14    A. No. Jim Dolan spoke to him and relayed what he
15 said to Don Fowler, supposedly.
16    Q. And what was that?
17    A. Was that Scalise would have to, I guess, look
18 further or some dismissive comment.
19    Q. And you said you did speak to Mr. Minerva,
20 though?
21    A. At one time, yes.
22    Q. And what did he say?
23    A. He pretty much hung up on me.
24    Q. Okay. And during a call you had, I believe you
25 said with one of the owners, you said, did one of them

Page 286

1  say to you that they had supplied it all?
2     A. That's, yeah, what they had said to us pretty
3  much, that they supplied everything, I guess to maybe
4  Ian, originally, and that he supplied everything.
5     Q. And who, which owner specifically said that to
6  you?
7     A. I don't remember if it was to me or Don, but it
8  was Jim Dolan.
9     Q. And by Ian, you are referring to Ian Frimet?
10    A. That's correct.
11    Q. Okay. Who represented J.D. Nicholas in
12 connection with the SEC's investigation?
13    A. Yes.
14    Q. Okay. And am I correct in that what Mr. Dolan
15 was saying was that they had supplied everything to Mr.
16 Frimet who had in turn supplied everything to us, is
17 that correct?
18    A. That's correct.
19    Q. Okay. So let's go to the next call in the
20 transcript which is Exhibit 254. It's entitled Eugene
21 Bernardo, JDN recording, Bernardo SRPT tweet 1/31/13 and
22 I'll play it first.
23       (Recording played)
24    Q. And, again, that was your voice on the
25 recording?

Page 287

1     A. Yes.
2     Q. And was the other voice Eugene Bernardo?
3     A. Yes.
4     Q. And this recording was made in the same way as
5  the prior recordings we have listened to today?
6     A. I believe so.
7     Q. And it was also on the device you located in
8  your garage?
9     A. Yes.
10    Q. What was the purpose of this call?
11    A. Typical call that we would have in the morning,
12 kind of update call, update phone call.
13    Q. Are you recommending that more SRPT stock be
14 purchased in Mr. Bernardo's account?
15    A. We were discussing it, I don't think anything
16 was purchased on that conversation.
17    Q. And line 10 on page 46, what IPO are you
18 referring to?
19    A. I don't know. I don't remember.
20    Q. And you don't believe that any more SRPT or
21 Sarepta was purchased in response to the call?
22    A. I don't know.
23    Q. Okay. Let's listen to the next one. Page 49
24 of Exhibit 254. It's called Pilkington Sync Trade.
25       (Recording played)

Page 288

1     Q. Do you recognize your voice on that call?
2     A. No.
3     Q. That's not your voice?
4     A. No.
5     Q. Do you know who it is?
6     A. Potentially Don. It's not me.
7     Q. Okay. So you don't recall this call with --
8  and Pilkington, is that Bobby Pilkington?
9     A. I would assume so.
10    Q. Why would -- oh, you know what, it's still
11 going.
12       (Recording played)
13    MR. O'BRIEN: Okay, so the court reporter missed it.
14 So let's go back to the beginning. I started by saying
15 I think the dead air continues for some time, if I
16 recall this recording correctly. This was not a
17 recording that was produced as part of the recordings
18 that Greg found on that device in August.
19       This was another recording that was produced in
20 discovery at a separate time and so it -- and so I don't
21 know why you're asking him about this.
22    MS. PAULEY: Where was this recording obtained from?
23    MR. O'BRIEN: Sitting here, I don't know. I'd have
24 to go back and figure it out. But it was produced,
25 obviously you have it so you know it was produced.

Plaintiff Ex 17 - 20

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean – Vol. 2
October 27, 2017

Page 289

1     MS. PAULEY: Right. Where else did you obtain
2  recordings? We produced recordings to you that we had
3  originally obtained from J.D. Nicholas and then you
4  produced to us recordings that Mr. Dean had located.
5     What other sources of recordings were there?
6     MR. O'BRIEN: I don't know because I didn't -- I
7  haven't sort of researched the provenance of this
8  particular recording.
9     I do know that there were recordings in
10  discovery. I know the SEC produced recordings. It's my
11  understanding that Ian Frimet also produced recordings
12  to the SEC.
13     So my assumption is it's from one of those
14  recordings that was produced and was somehow provided to
15  the SEC. I couldn't tell you anything more.
16     MS. PAULEY: Okay. Well, we'll follow up, we'll
17  follow up and just make sure we understand what the
18  source of that recording is.
19     MR. O'BRIEN: And we may not know. As you know, we
20  weren't involved in the initial investigation of this
21  case. That was when Ian Frimet represented J.D.
22  Nicholas, so the answer very well may be that we don't
23  know where this recording came from, but it's in,
24  obviously, in discovery.
25     MS. PAULEY: Okay. Well, yeah, I believe we

Page 290

1  received this from you around either the day, the same
2  day or the day after we received the other recordings
3  that had originally been provided by Mr. Dean. So we
4  can follow up afterwards.
5     But what you're representing here today is that
6  the voices on this recording, you're saying Mr. Dean's
7  voice is not on this recording?
8     MR. O'BRIEN: Well, I'm not testifying, but Mr. Dean
9  has said that it's not his voice, it doesn't sound like
10  his voice to me either.
11     MS. PAULEY: Why don't we listen to the rest of it
12  just to confirm that your voice is at no point in this
13  recording.
14     THE WITNESS: I've never heard this before.
15     MS. PAULEY: Okay. Well, I'm going to play the rest
16  of it.
17     (Recording played)
18  Q.  So at no point during that recording did you
19  hear your voice?
20  A.  No.
21  Q.  Okay. So, then, let's go to the recording
22  that's transcribed on page 52 of Exhibit 254 titled
23  Steve Hellwig, JDN recording, Hellwig GRPN MOS.
24     (Recording played)
25  Q.  Did you recognize your voice on that call?

Page 291

1  A.  Yes.
2  Q.  And who is the other voice?
3  A.  Steve Hellwig.
4  Q.  Was Hellwig a client of yours?
5  A.  Yes.
6  Q.  And, again, this recording was made in the same
7  way as all the others, using the recording device that
8  was connected to your phone?
9  A.  Yeah, other than the one you played before
10  this.
11  Q.  Right. Okay.
12     And this is the same recording device that you
13  located in your garage?
14  A.  Yes.
15  Q.  So what was the purpose -- and, again, the
16  title of this call, Steve Hellwig, JDN recording,
17  Hellwig GRPN MOS, that's the title that you gave for
18  this recording?
19  A.  Um-hmm.
20  Q.  How come you didn't put a date on this one?
21  A.  Potentially it didn't have a date on it.
22  Q.  Okay. So you don't -- you think that the
23  reason why there was no date associated with it on the
24  device itself?
25  A.  Yeah, I was going off the information on the

Page 292

1  device.
2  Q.  Okay. Do you have any idea when this recording
3  was made?
4  A.  I don't. I don't.
5  Q.  And what was the purpose of this call?
6  A.  Just a standard touching base call that I do
7  with most all my clients.
8  Q.  And going to page 53, line 10 and 11 you say,
9  "A little over two grand we made between the stock that
10  we had sold."
11     Do you see that?
12  A.  Yes.
13  Q.  What are you referring to there?
14  A.  That he made two grand from the stock he had
15  sold.
16  Q.  Do you know what stock that was?
17  A.  I don't.
18  Q.  Do you know if the two grand was before or
19  after costs?
20  A.  I don't recall.
21  Q.  Would you agree it would be important for Mr.
22  Hellwig to understand what he had made after costs
23  versus before costs?
24  A.  Of course, yeah. I mean, we discussed cost and
25  risk all the time.

Plaintiff Ex 17 - 21

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 293

1    Q.  But not in this call, correct?
2    A.  There was no transaction on the call.
3    Q.  Correct.  So there's no discussion of costs in
4    this recording, is that correct?
5    A.  Correct.
6    Q.  Okay.  Why don't we take a break.  We're almost
7    finished.  Why don't we take a break for just a few
8    minutes and then we can wrap up.
9        THE VIDEOGRAPHER:  Going off the record at 3:32 p.m.
10       (Recess)
11       THE VIDEOGRAPHER:  Back on the record at 3:41 p.m.
12
13           EXAMINATION RESUMED
14   BY MS. PAULEY:
15   Q.  Okay, just a few more questions.
16       For the device that you located in your garage
17   on which these recordings that we listened to today were
18   saved, where is that device now?
19   A.  I threw it away.
20   Q.  You threw it in the trash?
21   A.  Correct.
22   Q.  Why?
23   A.  Because I transferred the information and sent
24   it to Liam.
25   Q.  You transferred everything that was on the

Page 294

1    device to Liam, onto something that went to Liam?
2    A.  Onto a disk.
3    Q.  Everything that was on the device?
4    A.  Everything that was relevant to J.D. Nicholas.
5    Q.  Who made the determination of what was relevant
6    and what was not?
7    A.  Myself.
8    Q.  And the device is in the trash?
9    A.  Correct.
10   Q.  Where did you -- is it a trash at your home?
11   A.  It was at my home, yeah, but I don't know where
12   it is now.
13   Q.  Did you -- did Liam listen -- or did anyone
14   else other than you listen to the recordings from the
15   device before you threw it in the trash?
16   A.  I'm not sure.
17   Q.  How do you not know?
18   A.  Potentially in 2013-'14, I don't know about --
19   Q.  After you located the device in 2017, did you
20   -- did anyone other than you ever have custody of the
21   device?
22   A.  I mean, custody, no, I guess not.
23   Q.  So you never gave the device itself to Liam?
24   A.  No.
25   Q.  Why did you transfer certain information from

Page 295

1    the device onto a disk rather than just provide the
2    device itself to your counsel?
3    A.  The -- well, the device was semidamaged in the
4    first place.  It was sitting, I guess, in a puddle of
5    dried up, I don't know what it was, it was dark liquid
6    that was dried.  So I just, I thought it was a better
7    idea to put the information on a disk.
8    Q.  In what way was it damaged?
9    A.  The battery area was exposed and it had a dried
10   battery acid, I guess is what it was.
11   Q.  But you were able to retrieve recordings from
12   the device?
13   A.  Yeah, the recordings that were audible.
14   Q.  Did you transfer onto any type of disk or any
15   other media any of the other recordings that were not
16   produced in connection with this litigation?
17   A.  No, I don't think so.
18   Q.  So the only recordings that were transferred
19   were the ones we have listened here to today?
20   A.  Yes.  Yeah, there were only a handful of
21   recordings on there.  There was my wife, GMAC or GMC,
22   some white noise and a handful of recordings that I
23   produced with the exception of that Pilkington which
24   didn't come from me.
25   Q.  So have all recordings with customers from J.D.

Page 296

1    Nicholas that are in your possession, custody or control
2    been provided to your counsel?
3    A.  Yeah, from what I know, unless I find something
4    else, which I would provide.
5    Q.  Do you expect to find something else?
6    A.  I would not expect to, but if I do, I would
7    provide it.
8    Q.  How is it -- can you explain why this
9    particular recording device was brought to your home but
10   no other ones were?
11   A.  I bring random stuff home on accident all the
12   time.  I brought home Don's cell phone once on accident.
13   It was in my pocket.  I can't explain it, no.
14   Q.  Can you explain how the recording device could
15   be sitting in your bin in your garage for a period of
16   time without you discovering it?
17   A.  It could be many different reasons.  My wife
18   has a knack of cleaning out my drawers and everything
19   else and thinking she's doing me a favor, I guess, but
20   typically rearranging things to the point where she
21   could find things and I can't.
22       After Sandy, originally, it took us about two
23   years to redo our basement, which we had a bunch of
24   stuff in bins in the garage and the attic, it could have
25   potentially somehow gotten there.  Maybe when she got a

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Gregory T. Dean, et al.

Gregory T. Dean - Vol. 2
October 27, 2017

Page 297

1   new car or myself got a new car, took all the stuff that
2   was in the trunk, put it in a bin, put it in the garage.
3   Q.  Hurricane Sandy was in October of 2012, right?
4   A.  Correct.
5   Q.  Okay.  And these recordings were all from 2013
6   and 2014?
7   A.  Correct.
8   Q.  Okay.  So these recordings were all made after
9   Hurricane Sandy, right?
10  A.  Yes.
11  Q.  Okay.  And did you -- you mentioned before in
12  connection with Pilkington Sync Trade recording that you
13  thought one of the voices might be Don Fowler, was that
14  right?
15  A.  I believe so, yes.
16  Q.  Do you know why Don Fowler would have had
17  recorded calls on a device that was hooked up to the
18  phone on your desk?
19    MR. O'BRIEN: I will object.  Misstates the
20  evidence.  Lacks foundation.
21  A.  I don't think that that was the case.
22  Q.  The recording -- or the -- okay.  We can strike
23  that.
24      Did Don Fowler record calls?
25  A.  I don't know.

Page 298

1   Q.  You have no idea if he used a recording device
2   at any point in time?
3   A.  I didn't sit next to him, and I don't know.
4   Q.  You never had any conversations with him about
5   recording calls with customers?
6   A.  Not that I remember.
7   Q.  Okay.  So sitting here today, you have no
8   understanding as to whether Don Fowler recorded calls
9   with customers at any point in time at J.D. Nicholas?
10  A.  Not that I recall or remember, no.
11    MS. PAULEY: Okay.  I don't think we have any
12  further questions so we can close the record.
13    MR. O'BRIEN: I just --
14    MS. PAULEY: Oh, sure.
15    MR. O'BRIEN: Just to clarify based on your last
16  question.
17
18      EXAMINATION
19  BY MR. O'BRIEN:
20  Q.  The Pilkington recording which starts on page
21  49 of SEC 254, was that recording on the device you
22  found in your garage?
23  A.  I don't know.  I don't think so, but I'm not
24  really sure.
25  Q.  Did you put any of the, other than the GMAC and

Page 299

1   your wife's recording that was on the device, did you
2   move all of the other recordings onto a disk that you
3   sent to your counsel?
4   A.  The recordings that were, yeah, relevant, the
5   J.D. Nicholas customer client recordings, every one,
6   yeah, every one of them.
7    MR. O'BRIEN: That's all I have.  Thanks.
8    MS. PAULEY: We're finished.
9    THE VIDEOGRAPHER: This concludes the video
10  deposition of Gregory Dean.  The time is 3:48 p.m.,
11  going off the record.
12      (At 3:48 p.m., the deposition proceedings
13      concluded.)
14
15
16      ---------------------------
17      GREGORY T. DEAN
18
19
20
21
22
23
24
25

Page 300

1   STATE OF NEW YORK     )
2                         ) ss
3   COUNTY OF NEW YORK    )
4       I hereby certify that the witness in the
5   foregoing deposition, GREGORY T. DEAN, was by me duly
6   sworn to testify to the truth, the whole truth, and
7   nothing but the truth, in the within-entitled cause;
8   that said deposition was taken at the time and place
9   herein named; that the deposition is a true record of
10  the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested person,
12  and was thereafter transcribed into typewriting by
13  computer.
14      I further certify that I am not interested in
15  the outcome of the said action, nor connected with, nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  this 8th day of November, 2017.
20  Reading and Signing was: Not requested
21
22
23
24  JOSEPH B. PIROZZI, RPR
25  STATE OF NEW YORK

Plaintiff Ex 17 - 23