HBEMSECC                                                              1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION,
4
                  Plaintiff,
5
              v.                              17 Civ. 139 (GHW)
6
    GREGORY T. DEAN AND DONALD J.
7   FOWLER,

8                 Defendants.

9   ------------------------------x
                                      New York, N.Y.
10                                    November 14, 2017
                                      9:30 a.m.
11
    Before:
12
                      HON. GREGORY H. WOODS,
13
                                      District Judge
14
                          APPEARANCES
15
    DAVID STOELTING
16  KRISTIN M. PAULEY
    THOMAS P. SMITH
17       Attorneys for Plaintiff

18  McCORMICK & O'BRIEN L.L.P.
         Attorneys for Defendants
19  BY:  LIAM O'BRIEN

20

21

22

23

24

25

**Plaintiff Ex 58 - 1**

HBEMSECC                                                                    2

1           (Case called)

2           THE COURT:  This is Judge Woods.  Do I have counsel

3   for plaintiff on the line?

4           MR. STOELTING:  Yes, your Honor.  Good morning.  It's

5   David Stoelting, Kristin Pauley and Tom Smith for plaintiff.

6           THE COURT:  Do I have counsel for defendants on the

7   line?

8           MR. O'BRIEN:  Good morning, your Honor.  Liam O'Brien

9   for defendants.

10          THE COURT:  Thank you.  I scheduled this conference to

11  discuss the November 7 letter submitted by the parties.  I

12  scheduled a prior conference.  I understand that one of the

13  parties was not available to proceed at that time, so I

14  rescheduled today's conference.

15          Since the submission of the joint letter on the 7th

16  there has been some exchange of correspondence regarding

17  potential sanctions related issues.  I'll hear from each of you

18  with respect to those issues as well if you are prepared to

19  begin to discuss them.  I can tell you that I do not expect to

20  rule on any motion for sanctions during this conference.  Any

21  information that you give me with respect to the sanctions

22  issues will really just be for context to begin the examination

23  of those issues.

24          The issue that was raised in the initial letter is the

25  request by the SEC for leave to quash the 17 nonparty subpoenas

**Plaintiff Ex 58 - 2**

1            That addresses the subpoenas.

2            Let's talk about the sanctions issues that have been

3    raised by counsel for plaintiff.  There are two sets of issues.

4    As I said, I don't expect to rule on these motions now.  They

5    raise significant questions and I expect to invite full

6    briefing on them.  But in order to decide on the appropriate

7    course of action I'd like to hear from each of you now since we

8    are all on the line.

9            Let me begin with counsel for the SEC.  Counsel.

10           MR. STOELTING:  Thank you, your Honor.  There are two

11   aspects of the defendant's conduct here that are the basis for

12   this request.  The first is spoliation of evidence.  And Rule

13   37(e) says quite clearly that electronically stored information

14   needs to be preserved.  The plaintiff issued the document

15   request to defendants in April 2017 calling for all documents

16   concerning the customers, all documents concerning

17   communications with the customers.  Documents -- I don't think

18   there is any dispute, encompasses audio recordings.

19           Mr. Dean was then deposed in July 2017.  He did not

20   mention anything about recordings during his investigative

21   testimony in 2014, at a time when he was still working at JD

22   Nicholas.  He did say that he occasionally recorded

23   conversations but that he had not done so in three years and

24   that he has thrown out all of the recordings that he did have.

25           After Dean's deposition was completed in July 2017, he

HBEMSECC                                                                16

1   did not mention anything about recordings.  There was no

2   recordings produced to us.

3           THE COURT:  I'm sorry, counsel.  Can I pause you for a

4   moment.  The 2014 statement was made under oath, is that

5   correct?

6           MR. STOELTING:  Yes, it was under oath.  Mr. Dean had

7   counsel with him at that testimony session.

8           THE COURT:  Thank you.  Proceed.  This is.

9           MR. STOELTING:  The SEC had no knowledge that any

10  recordings had been located or discovered by Mr. Dean or

11  Mr. O'Brien was aware of any recordings until the Eugene

12  Bernardo deposition in Chicago on October 3 when at the very

13  end of that deposition Mr. O'Brien pulled out his laptop and

14  began playing a recording of the conversation between

15  Mr. Bernardo and Mr. Dean.  Over our strenuous objections

16  Mr. O'Brien continued with the recording and the objections

17  were because we had never been provided with these recordings,

18  did not even know they existed.

19           It turns out several days before Mr. O'Brien had

20  e-mailed to us or tried to e-mail to us several audio

21  recordings which were very large files that did not get through

22  our system, as is very common.  Our e-mail system blocked

23  e-mails with large files.  In any event, there had been no

24  other disclosure to us about the recordings from the time they

25  were discovered by Mr. Dean in early August until, at the

**Plaintiff Ex 58 - 4**

HBEMSECC                                                                17

1   earliest, late September.  So that's a period of about eight

2   weeks.  I'll just emphasize that the SEC's document request

3   from April 2017 says the request is ongoing in nature,

4   responsive documents should be produced as they are found.

5   What should have happened is, we should have been alerted

6   immediately to the discovery of the recordings in early August,

7   but that did not happen.

8           Once we finally got Mr. O'Brien to tell us that the

9   recordings had been discovered by Mr. Dean, we then said we

10  want Mr. Dean to come in and tell us about the discovery of the

11  recordings.  Your Honor will remember that this came up in the

12  October 16 court conference where at the very end of that

13  conference I told the Court about this issue and that Mr. Dean

14  had agreed to come in for another deposition that took place

15  after the close of the deposition cutoff on October 27.

16          When Mr. Dean appeared in our offices on October 27

17  for that deposition, we learned for the very first time what

18  had actually happened.  And he testified that he had found the

19  recordings in a box in his garage and he has no understanding

20  of how that recording device got in his garage.  But he came

21  across it in early August.  And then he said he listened to it

22  and made a judgment himself about which recordings were

23  relevant and which were not.  He transferred them to some other

24  medium, either a disk or a flash drive, and then gave that disk

25  or flash drive to Mr. O'Brien and then at that point threw the

HBEMSECC                                                                    18

1    original recording device into the trash.

2             We argue that there is certainly a failure to preserve

3    the electronic restored information on the device.  There was a

4    failure to disclose to the SEC promptly the discovery of the

5    recordings.  There was a failure to disclose to the SEC the

6    destruction of the original device.  We have asked Mr. O'Brien

7    to provide to us the format in which he received those

8    recordings from Mr. Dean, but we have not received a response

9    to that request.

10            And it seems like one of the many problems that arise

11   from this is that Mr. Dean, the defendant, is the one who made

12   the judgment about what recordings were relevant and what were

13   not before transferring them to something else and then giving

14   them to his lawyer.  In my mind, there is still a little

15   fuzziness about when Mr. O'Brien learned of the original

16   device, whether he was aware of its destruction at the time or

17   not, or whether anyone other than Mr. Dean listened to the

18   original recording before it was destroyed.

19            In addition to just not being able to listen to those

20   original recordings and to assess the metadata, there would

21   have been information on that metadata that we would have liked

22   to have known, such as the caller name, the numbers that were

23   involved, and other information that would appear in metadata

24   on audio recordings.  We are basically left to trusting

25   Mr. Dean's version of events that he put all relevant

Plaintiff Ex 58 - 6

HBEMSECC                                                                19

1  recordings onto the second device and that that was transmitted

2  to Mr. O'Brien.  Obviously, Mr. Dean is someone who has an

3  interest in the outcome of the litigation.  So we are not

4  comfortable relying on his representation that all recordings

5  were preserved and, in fact, we will never know that.

6          Certainly the fact of the destruction had to have been

7  known to Mr. O'Brien in early August.  We have asked him

8  repeatedly why were we not immediately told about the

9  recordings when they were discovered.  And we have just never

10 gotten an answer from him about why he waited eight weeks to

11 disclose to us the existence of these recordings.

12         The second issue actually --

13         THE COURT:  Let me pause you on this.  Mr. O'Brien, do

14 you care to comment on this issue?  At the outset can I hear

15 when you first learn of the existence of these recordings.

16         MR. O'BRIEN:  Your Honor, I don't think the

17 characterization that we have been asked repeatedly is true.

18 As best as I know, we have only been asked once.  We can't lock

19 in a definite date.  My client advises me that he discovered

20 the recordings in early August and at some point brought those

21 to my attention.  I told him to send those to me.  We don't

22 definitively know when we received them.  I know I was away for

23 part of the time.  I know my client was away for part of the

24 time.

25         We certainly received the recordings sometime in, I

**Plaintiff Ex 58 - 7**

1    would say, early September, but, again, that is a best guess.

2    We transmitted when we were preparing for the Bernardo

3    depositions.  We e-mailed those recordings to the SEC.  We did

4    not get any bounce-back notice from the SEC.  And we assumed

5    that they then had the recordings in advance of the deposition.

6          THE COURT:  Do you have the medium that your client

7    used to transmit the recordings to you, the physical medium?

8          MR. O'BRIEN:  We believe it was a disk.  We are trying

9    to locate that disk, but we have not located it yet.  And with

10   respect to the destruction of the recording device or the

11   storage device, we did not know that our client had destroyed

12   that piece of equipment until right before the deposition.

13         THE COURT:  Anything else on this point at this time,

14   Mr. O'Brien?

15         MR. O'BRIEN:  No, your Honor.

16         THE COURT:  Counsel for plaintiff, would you mind

17   proceeding to the second issue.

18         MR. STOELTING:  Yes, your Honor.  As your Honor will

19   recall, at the October 16 hearing, which was in response to

20   Mr. O'Brien's motion to quash the SEC's deposition subpoena

21   served on Dr. McCoy, and Mr. O'Brien's argument at that time

22   both in the joint letter and before the Court was that he could

23   not -- he thought it was unfair for us to proceed with the

24   McCoy deposition when he did not have McCoy's tax returns and

25   documents concerning other arbitrations that McCoy may have

Plaintiff Ex 58 - 8

1    to Dr. McCoy that I did not -- I did not believe that to be the

2    case, but I did not want to affirmatively state that that was

3    not the case.

4            In fact, we took over the representation of our

5    clients, Gregory Dean and Don Fowler, from Ian Frimet, the same

6    attorney who represented Dr. McCoy in his arbitration against

7    Craig Scott Capital.  So I wanted an opportunity to confirm

8    that in fact those records had never been turned over to us by

9    Dr. McCoy's prior counsel and by Mr. Dean and Mr. Fowler's

10   prior counsel, Ian Frimet.

11           Subsequent to the depositions, when we got back to New

12   York, we conducted a search and we were able to confirm that

13   Ian Frimet had not in fact turned over the McCoy arbitration

14   records to us at any point, and we were able then to also pull

15   the entire file from the McCoy/Craig Scott Capital file from

16   the archives and produce that to the SEC.

17           THE COURT:  Thank you.

18           Let me ask the parties about how we should proceed

19   going forward.  The first issue with respect to the alleged

20   spoliation of evidence is one that we will need to address and

21   I'll need to decide before trial.

22           Counsel for the SEC, what is your view regarding the

23   appropriate timing for a motion with respect to that issue?

24           MR. STOELTING:  Well, we can be prepared to submit a

25   full motion in the next couple of weeks, fleshing out the full

1   record on the spoliation issue.  I was a little concerned to

2   hear, you know, some pretty vague answers from Mr. O'Brien

3   about when he learned of the destruction, when he received the

4   recordings, and what form he received them.  As I mentioned, we

5   had asked Mr. O'Brien for the recordings in the format that he

6   received them from Mr. Dean.  If that item has now gone

7   missing, which it appears to have, it appears to have gone

8   missing as well, I think that's an additional concern and

9   additional failure to preserve electronically stored

10  information.

11          THE COURT:  Thank you.  Let me just address that

12  briefly.  I intended to do it later in the conference, but this

13  may be an opportune time.

14          Mr. O Brian, you were under an obligation to maintain

15  that record.  I'm ordering you not to destroy, dispose of the

16  medium that your client used to transmit this evidence to you.

17  I was somewhat concerned by the fact that it has gone missing.

18          I don't know the size of your office or the

19  circumstances in which that took place.  But in addition to

20  your ethical obligations, because of the importance of this

21  material for discovery in this case, I'm ordering you not to

22  destroy or delete the medium that was used to transmit the

23  information to you.

24          MR. O'BRIEN:  We understand that, your Honor.  Often

25  when disks come into our office, our admin, particularly if

HBEMSECC                                                                29

1    it's electronic, loads the records onto the system, and so we

2    don't necessarily keep all the disks we receive because it's

3    often discovery, etc. that we receive from other parties.  But

4    we are trying to locate the disk.

5         THE COURT:  Thank you.  You clearly have the sense of

6    the significance of this question and at least the appearance

7    of perhaps improper handling of the materials in the event that

8    that disk also goes missing.  I hope that you will conduct a

9    diligent search for it.  How large is your office, Mr. O'Brien?

10        MR. O'BRIEN:  We are 12 attorneys and one admin and

11   one paralegal.

12        THE COURT:  Thank you.  I hope with an office of that

13   size that you will be able to solve this mystery in a short

14   period of time.

15        Counsel for plaintiff, let me turn back to you.  I

16   appreciate that this is an issue that I am going to need to

17   decide before trial.  Is there any benefit to front-loading

18   this motion?  In other words, is this an issue that the Court

19   will be considering in the event that there is a summary

20   judgment motion?  I don't know if there is a summary judgment

21   motion here.

22        The ultimate question is, is this a motion that should

23   be briefed now or should it be briefed simultaneously with or

24   following a summary judgment motion, if there is one?  If there

25   is no summary judgment motion anticipated, then I would expect

**Plaintiff Ex 58 - 11**

HBEMSECC                                                            30

1    that we would set a briefing schedule for this so I can resolve

2    this promptly in anticipation of our trial.

3              What is your view, counsel for plaintiff?

4              MR. STOELTING:  Well, your Honor, after just

5    reflecting for a moment, I think that it probably does not to

6    be front-loaded and that we could -- the summary judgment

7    deadline is January 10.  We are still assessing the evidence.

8    And in the event we do make a summary judgment motion, we could

9    fold the sanctions issues up with summary judgment.  And if we

10   don't make a summary judgment motion, we can still file the

11   sanctions motion on January 10.  I think if there is a summary

12   judgment motion, the Court may benefit from kind of a broader

13   view of the allegations and the evidence within the context of

14   the sanctions issue.  My suggestion would be to give us until

15   January 10, the summary judgment deadline, and then we can make

16   a summary judgment motion and sanctions or sanctions only at

17   that time.

18             THE COURT:  Thank you.  I will certainly want to

19   discuss with plaintiffs if they expect to bring an affirmative

20   motion for summary judgment motion in the case.

21             What I'll do at this point is simply not set a

22   briefing schedule for the sanctions motion.  If it is something

23   that you wish to present to the Court, I just ask that you

24   write me a subsequent premotion conference letter, perhaps

25   together with any motion in connection with any letter sent to

**Plaintiff Ex 58 - 12**

HBEMSECC                                                                 31

1   me in connection with a motion for summary judgment.  At that

2   point I'll set a briefing schedule for the motion with respect

3   to the alleged spoliation.

4            MR. STOELTING:  Your Honor, if I can get a

5   clarification.  The current scheduling order has a January 10

6   deadline for filing summary judgment motions.  Are you asking

7   for another premotion letter if we anticipate summary judgment

8   before January 10?

9            THE COURT:  Give me one second.

10           In the original case management and scheduling order,

11  which has been modified in part over the course of time, but

12  only in pertinent part, in paragraph 9 of the order you'll see

13  that I require that a premotion conference request letter be

14  sent to me no later than one week following the close of

15  discovery.  If a party wishes to bring a summary judgment

16  motion, the language of the paragraph reads as follows, in

17  part:  "Any motion for summary judgment will be deemed untimely

18  unless a request for a premotion conference related thereto is

19  made in writing within one week after the close of discovery."

20           So the reference that I made to a premotion letter

21  with respect to any motion for summary judgment is not a new

22  request, but it's the one that's been enshrined in the Rule 16

23  order which, as you learned from earlier in this conference, I

24  enforce.

25           MR. O'BRIEN:  Absolutely, your Honor.  We are

**Plaintiff Ex 58 - 13**