UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SECURITIES AND EXCHANGE                 :
COMMISSION,                                          :
                            Plaintiff,     :
            -against-                      :
                                       :
DONALD J. FOWLER,                             :
                          Defendant.  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/25/2020

1:17-cv-139-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

     Defendant Donald J. Fowler misused his position as a broker to recommend a series of

investments that were unsuitable to any investor.  He implemented trades in his customers' accounts

without their consent.  His customers lost thousands, while Mr. Fowler profited from the substantial

commissions that his trades generated.  A jury unanimously found Mr. Fowler liable with respect to

the charges mounted against him by the Securities and Exchange Commission in this case.  Because

the Court finds that there is a substantial likelihood that Mr. Fowler will again violate the securities

laws, the Court will enter a permanent injunction to protect the public from future violations by Mr.

Fowler.  The Court also orders Mr. Fowler to disgorge his ill-gotten gains, and to pay Tier III

penalties for each of his violations.

   **I.**    **BACKGROUND**

      **A.**  **The Investigation and Resulting Complaint Against Fowler and Dean**

     This case developed out of an investigation of J.D. Nicolas, Inc. ("J.D. Nicolas") by the

Securities and Exchange Commission (the "SEC").  The investigation began in 2014.  Plaintiff's 56.1

Statement, Dkt. No. 70 ("P's 56.1 Statement"), ¶ 137.  At the time of the investigation, Defendants

Donald Fowler and Gregory Dean were brokers at the firm.  *Id.*  The SEC focused its investigation

on Mr. Fowler and Mr. Dean, among others.  *Id.* ¶¶ 136, 138.  In April 2014, the SEC asked J.D.

Nicolas to retain documents "created, modified, or accessed" by Messrs. Dean and Fowler.  *Id.*

¶ 138.  And in November of the same year, Mr. Fowler and Mr. Dean both provided investigative testimony to the SEC.  *Id.* ¶ 138.

In March 2016—approximately a year and a half after his investigative testimony—Mr. Fowler entered into his first tolling agreement with the SEC.  Declaration of Jorge G. Tenreiro, Dkt. No. 190 ("Tenreiro Decl."), Ex. X.  The SEC and Mr. Fowler entered into another tolling agreement in August 2016.  *Id.* Ex. Y.  The Court is unaware of what transpired between the 2014 investigation and the 2016 tolling agreements.  For purposes of this motion, what is significant is that, notwithstanding any conclusions reached as a result of the investigation, the SEC did not seek to enjoin Mr. Fowler from further conduct that would violate the securities laws, potentially harming his current and prospective customers.  No request for injunctive relief was made by the SEC until after the close of trial in this matter.

But the SEC's investigation had unearthed something of great concern—the unsuitable investment strategies implemented by Messrs. Dean and Fowler in their customers' accounts.  In January 2017, the SEC commenced this action against Mr. Fowler and Mr. Dean.  Dkt. No. 1.  The SEC alleged that Mr. Fowler and Mr. Dean "recommended to customers a high-cost trading strategy consisting of the excessive buying and selling of stocks."  *Id.* at 1.  The allegations targeted a series of trades allegedly implemented by Mr. Fowler and Mr. Dean in 27 customer accounts at J.D. Nicolas.  *Id.* at 2.  By the time that the complaint was filed, J.D. Nicolas had gone out of business.  *Id.* at 4.

The complaint alleged that Mr. Fowler and Mr. Dean engaged in excessive trading in their customers' accounts, driving up transaction fees and costs on their customers' accounts to unconscionable levels.  "Many of the accounts had cost-to-equity ratios in excess of 100%, with a couple over 200%, and one at 463.65%.  The average annualized cost-to-equity ratio for these accounts was 110.90%, meaning that the customers, on average, had to realize 110.90% in profits just to break even."  *Id.* at 8.

The complaint also contained allegations that Mr. Fowler and Mr. Dean churned several of their customers' accounts. *Id.* at 9. For example, the complaint focused on the trading in the account of one of Mr. Fowler's customers—Customer 24. "The average equity in Customer 24's account was only $54,739, but Fowler made a total of $1,709,242 in purchases, and each investment was held for an average of 10.9 days." *Id.* at 10.

On the basis of these allegations, the SEC claimed that Mr. Fowler and Mr. Dean violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 17 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

### B. The Litigation Through Mr. Dean's Settlement on the Eve of Trial

After the complaint was filed, this case proceeded in the ordinary manner. The parties engaged in an extended period of discovery. Following the completion of discovery, the SEC and the defendants filed cross-motions for summary judgment. *See* Dkt. Nos. 52, 68. The Court denied both motions, Dkt. No. 91, and later scheduled trial to begin on June 10, 2019. Throughout the litigation, Mr. Dean and Mr. Fowler were represented by the same counsel—Liam O'Brien.

On the morning of June 10, 2019, while awaiting the arrival of the venire, the Court was informed that the SEC and Mr. Dean had agreed to resolve the SEC's claims against him. The Court entered a final judgment as to Mr. Dean later that day, implementing the resolution that had been agreed upon by the SEC and Mr. Dean. Dkt. No. 168.

That final judgment included, among other things, a permanent injunction, prohibiting Mr. Dean from violating the Securities Act or the Exchange Act. *Id.* at 1. The judgment also ordered that Mr. Dean pay disgorgement of "$253,881.98, representing profits gained as a result of the conduct alleged in the Complaint . . . and a civil penalty in the amount of $253,881.98." *Id.* at 3. Mr. Dean expressly consented to the relief entered by the Court. Dkt No. 159-1, at 1. In addition, Mr.

Dean admitted certain of the facts that led to his conclusion that he had violated the securities laws, namely that he "from 2011 through 2014:  (a) knowingly or recklessly made trade recommendations to customers with no reasonable basis; (b) made material misrepresentations and omissions to customers; and (c) engaged in unauthorized trading in customer accounts."  *Id.* at 7.

### C.   The Trial

#### 1.   The Verdict

In the wake of Mr. Dean's settlement, trial proceeded against Mr. Fowler alone.  The evidence presented by the SEC against Mr. Fowler over the course of the following days was powerful, and ultimately persuasive.  The SEC's case focused on the accounts of 13 of Mr. Fowler's clients.  The jury unanimously found Mr. Fowler liable with respect to all of the SEC's six causes of action.  The jury found that Mr. Fowler *with scienter* did "employ any device, scheme or artifice to defraud, or engage in any act . . . which would operate as a fraud or deceit on any person" in violation of identified sections of the Exchange Act.  Verdict Sheet, Dkt. No. 169 (emphasis added).  The jury also concluded that Mr. Fowler did "*with scienter* make any untrue statement or a material fact, or any omission of a material fact, in violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b))."  *Id.* (emphasis added).  He also "negligently obtain[ed] money or property by means of an[] untrue statement of a material fact, or by an[] omission of a material fact" in violation of Section 17(a)(2) of the Securities Act, *id.*, and negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit on the purchaser of a security, in violation of Section 17(a)(3) of the Securities Act.  *Id.*

The jury specifically found that Mr. Fowler "with scienter recommend[ed] an investment strategy with no reasonable basis to believe the strategy was suitable for any customer, in violation of Section 10(b) of the Exchange Act."  *Id.*  And, moreover, the jury found that Mr. Fowler, again, acting with scienter, made unauthorized trades in the accounts of 12 of the 13 customer accounts

that were the focus of the litigation.[1]  *Id.*

These ultimate conclusions are dry, but damning.  The Court will not recount the emotional testimony of several of Mr. Fowler's victims recounting their losses, and how they were injured as a result of Mr. Fowler's breach of their trust.  The jury's conclusion says it all.

Not all of Mr. Fowlers' 13 customers at issue in the trial testified, either live or by deposition designation, but the testimony presented a consistent picture of Mr. Fowler's management of their accounts—describing substantial trading volume beyond their expectations, resulting in excessive costs.  *See, e.g.* Trial Transcript ("Tr.") 173:14-16 ("Q:  Was that in-and-out rapid trading activity, was that something that you were asking for?  A:  No, but I, I apparently let it happen.").  There was also substantial evidence that Mr. Fowler disregarded the wishes of his customers, driving them to the strategies that the jury found to have been unsuitable.  For example, after one of his customers wrote that his investment goal was "current income," through conversation, Mr. Fowler got the customer to "what he truly wanted."  *Id.* 687:25-688:3; *see also id.* 688:8-14 ("He did want to have some level of income at one point or another, I'm not denying that, we had that conversation but for what he was doing in that . . . account . . . , he wanted speculation and I know that he wrote current income, but the conversation that him and I had were not accurate to just write in current income and that's it."); *id.* 690:6-10 ("Q:  So, Mr. Weather said I don't use margin, right?  A:  He said that, yeah.  Q:  But he did use margin in your account.  You had him sign a margin agreement, correct?  A:  He also used margin accounts, yes.").

Ultimately, the jury found that Mr. Fowler engaged in unsuitable trading in all of the customer accounts that were examined and engaged in unauthorized trading in 12 of 13 of his customers' accounts.  The consequences of this conduct was significant, resulting in substantial losses for Mr. Fowler's clients, many of whom were not wealthy, and were ill-suited to suffer the

---

[1] The jury did not find that Mr. Fowler engaged in unauthorized trading in the account of Clay B. Miller.

consequences of Mr. Fowler's misconduct.  In all instances in which the jury was asked the question,

Mr. Fowler was found to have engaged in his misconduct with scienter.

### 2.  Fowler's Background and Investment Strategy

Mr. Fowler testified at length.  He explained that he had worked substantially his entire

career in stock brokerage firms, starting with the predecessor firm for J.D. Nicolas in 2007.  *Id.*

624:9-10.  Mr. Fowler never graduated from college; he left SUNY Farmingdale after an illness,

deciding to focus on building his "book of business."  *Id.* 808:1-8.  Mr. Fowler had limited

instruction in finance and investment outside of his on-the-job training.

Early in his career, Mr. Fowler made cold-calls to find customers for the brokerage, but by

2011 he had graduated to pursuing leads generated by his junior, cold-calling colleagues.  *Id.* 643:1-

645:25.  Hundreds of cold-calls were made from his office each day, working to identify prospects.

*Id.* 645:11-21.  Once a prospect was identified, he or she was handed over to a broker, such as Mr.

Fowler, who then worked to persuade them to invest through his firm.  After 2011, he did very little

cold calling.  *Id.*. 810:11-12.  By then, his role had evolved, such that junior brokers would do the

cold-calling and pass on leads to him.  Mr. Fowler followed up on those leads to try to develop the

leads into customers.  *Id.* 810:23-811:10.  By the time that he was managing the 13 accounts that

were the focus of the trial, Mr. Fowler had developed his book of business to include nearly 100

individual customers at a time; and approximately 400 over the course of the years at issue.  *Id.*

811:15-24.

Over the course of his years in the industry, Mr. Fowler obtained a number of licenses,

including Series 7, Series 63, and Series 24.  *Id.* 648:17-650:1.  In order to obtain those licenses, Mr.

Fowler had to pass a number of exams and was required to take continuing education classes

regarding the responsibilities of brokers to their clients.  *Id.*  Mr. Fowler was aware of the rules and

obligations imposed on him by FINRA, and, in particular the concepts of reasonable basis

suitability—broadly, the requirement that a broker have a reasonable basis to believe that an investment is suitable for his customer, *id.* 650:7-651:22—and the concept of customer-specific suitability, which, broadly, requires that a trading strategy recommended for a customer must be suitable for a given customer, *id.* 652:10-21.  He was also aware that he was prohibited from placing his own interests ahead of those of his clients.  *Id.* 652:1-6.

It was in his role as a broker that Mr. Fowler invested assets in his customers' accounts— implementing trading ideas that he developed.  He had limited formal education in business or investment.  He took business classes at college before dropping out.  *Id.* 808:2-4.  Apart from that, he learned to invest on the job, through on the job training and his own reading.  He has "read lots and lots of books throughout the years, a lot of webinars, stuff like that."  *Id.* 808:13-15.  He testified that he was particularly influenced by four books, "Investing in Stocks," "Event Trading," "One Good Trade," and "Trading Catalysts" "which was a very good book in regard to how an event-trading strategy works.  I read that a few times."  *Id.* 809:8-14.  He also read a number of periodicals in the financial industry.

During his testimony, Mr. Fowler described the methodology that he used to develop ideas for the "event driven strategy" that he implemented for many of the customers who were the subject of this case.  Mr. Fowler testified that he found his ideas in public documents.  *Id.* 847:13-23 ("Q:  With respect to your stock-specific recommendations, how did you come up with those recommendations?  A:  So, I'm constantly reading all the time.  In regards to financial news, I would read different financial websites, research reports, different publications, 10-Q filings, anything I could get my hands on stock specific.  I would read that.  Q:  What publications during that time period did you read regularly?  A:  Wall Street Journal I read regularly.  Investor[']s Business Daily, those are probably the most.")  Once he had an idea, Mr. Fowler did additional research.  *Id.* 848:10-21 ("I would then typically look at the financials on a company.  How big the company was, their

float, that's the amount of shares that are actually out on the market trading.  I'd look at insiders' buys and sales to see sentiment from an insider's standpoint.  I would look at recent news, I would look at recent upgrades and downgrades by other research analysts that had coverage on the company.  I would then essentially look at the chart and the history of the chart.  I'd get an idea of the direction on where I thought the stock was going to trade.  And then at that point in time, if it passed—if it passed through everything and got to the bottom, then I would make a recommendation.").  Mr. Fowler did not describe any financial analysis associated with his proposed trades.  Indeed, Mr. Fowler testified that he did not know the performance associated with his recommended strategies.  *Id.* 696:24-697:10 ("Q:  You are talking about hundreds of accounts; what was your performance?  A:  Again, I can point out plenty of accounts that have made plenty of money throughout the years.  With that said, I have never done an analysis where I have taken all of my customer accounts and put it into a spreadsheet.").

From the Court's perspective, Mr. Fowler's testimony showed him to be alternatively dismissive, or fundamentally ignorant of, the problematic nature of the trading strategy that he implemented.  Again, this is ultimately captured by the jury's verdict, but some excerpts from Mr. Fowler's testimony are illustrative.  Mr. Fowler explained his view of the turnover ratio in his clients' accounts.  He testified that "I don't view—and I testified to this earlier—turnover as the sole indicator of risk.  You can look at turnover, and it can be indicative of higher risk due to the commissions that are tied to turnover.  But turnover, in and of itself, you know, I don't view as indicative of anything really."  *Id.* 670:15-20.  Similarly, Mr. Fowler discredited the value of measuring the commission-to-equity ratio—a ratio that is broadly used in the industry and one that his own firm's supervisory manual recommended.  *See id.* 751:15-752:15 (A:  "[The cost-equity-ratio] is a totally distorted number and that's all I have to say about that.  It is a distorted number that you cannot just look at commission equity and then figure out how much money this account needs in

order to break even.").

Mr. Fowler may have felt obliged to express such disdain for those commonly used financial metrics because those of his customers dramatically exceeded the benchmarks established by his own firm for even its most risk-seeking customers. A high cost-equity ratio was considered to be 10%; but for the 13 customers of Mr. Fowler examined at trial, it was 142%. *Id.* 755:2-3, 25-756:3. And a turnover ratio of 4 was considered by Mr. Fowler's firm to be high; the turnover ratio for the 13 customers examined at trial was 116. *Id.* 756: 9-14.

Mr. Fowler was subject to "special supervision" while at J.D. Nicolas. *Id.* 319:15-320:9. While he was on special supervision, a supervisor would call three to five of his customers a month to 394:14-21. Mr. Fowler also received a substantial number of complaints regarding unsuitable recommendations and unauthorized trades while at J.D. Nicolas. *See, e.g.*, *id.* 703-4-709:10. He was aware that a number of his clients were unhappy with what he was doing with their money. *Id.* 698:15-20. He testified that he did nothing to change his strategy as a result of the complaints or the fact that he had been placed under special supervision as a result. *Id.*; *see also id.* 699:2-12 (Q: You acknowledged, in August of 2012, that you were placed under special supervision at J.D. Nicolas; right? A: Yes. Q: But nothing changed about how you were trading in your clients['] accounts after this, did it Mr. Fowler? A: The trading strategies essentially remained the same. . . . The strategy in and of itself did not change. Q: And the costs and the level of costs that you were implementing did not change, right? A: Correct.").

Rather than using the complaints to influence his manner of handling his customers' accounts, Mr. Fowler described the complaints about his strategy and the associated losses in a self-focused way—articulating his apparent view that such complaints are principally designed to support asset recovery efforts against him. In the Court's view, Mr. Fowler expressed a profound a lack of empathy regarding the impact of the strategies that he recommended to his customers, coupled with

an inability or unwillingness to learn from his past mistakes.  *See, e.g. id.* 703:21-704-6 ("When people

lose money in the stock market, it is a business decision to file a complaint for them and ultimately

there are kitchen sink claims that are often the same exact thing where they'll allege an unsuitable or

an unauthorized transaction and, frankly, it puts the burden on me to prove that that was not the

case in some sort of an arbitration proceeding.  So, this, as far as customer filing complaints when

there is an actual business around asset recovery for stock market losses, usually it's 80 percent of

these complaints are from the same asset recovery firm, it is the same exact thing every time."); *see*

*also id.* 706:9-16 ("Q:  Why didn't you, to protect yourself from this business of filing complaints

against brokers, do something?  A:  Well, I tried.  Like I said, I tried.  It didn't work.  And, frankly, it

wouldn't have changed anything.  They would still say they were unauthorized.  Even if you could

prove that they were unauthorized they would still say unsuitable.  It would still be the same kitchen

sink claims.")  Rather than considering that the complaints may have been the same every time

because his conduct was inappropriate in the same way, Mr. Fowler discredited the complaints as

routine and "kitchen sink."  And he did nothing to change his own investment strategy in spite of

the expressed concerns of certain of his customers, even after he was placed on special supervision.

In reaching its verdict, the jury must have concluded that Mr. Fowler's testimony was not

credible.  The Court did not find him to be credible either.  For example, the jury found that Mr.

Fowler executed unauthorized trades in 12 of his customers' accounts.  However, Mr. Fowler

testified that he spoke with his customers about each of his trades in advance.  *See, e.g. id.* 764:19-21

(Q:  And if there is [sic] 1,200 trades[,] your testimony is there is [sic] 1,200 phone calls?  A:  That's

correct.").  Similarly, Mr. Fowler testified that he spoke about his commissions with each of his

clients on a "recommendation-by-recommendation" basis.  *Id.* 817:3-20.  But the phone records

introduced by the SEC did not show evidence of phone calls regarding Mr. Fowler's customers'

trades—and the jury reasonably concluded that Mr. Fowler's sworn version of events at trial was

false.  Similarly, in finding that Mr. Fowler acted with scienter, the jury concluded that Mr. Fowler's

testimony regarding his asserted beliefs with respect to the reasonableness of his strategy was not

credible.

### 3.   The Impact of Fowler's Misconduct

In the aggregate, the 13 customers at issue in the trial suffered total losses of $467,627

during the period in which Mr. Fowler was servicing their accounts.  Tenreiro Decl. Ex. C (PX-1A).

All of those customers lost money.  *Id.*  The substantial losses of Mr. Fowler's customers came

during a period in which the S&P 500 Index maintained substantial growth.

Much of the customers' losses was the result of the very high amount of commissions that

Fowler charged his clients.  Mr. Fowler's sole source of income from J.D. Nicolas was the receipt of

commissions generated by his customers' trades.  Tr. 614:14-16.  As a result, Mr. Fowler had

substantial personal motivation to engage in the misconduct found by the jury.  From the

commissions paid, twenty percent went to J.D. Nicolas, Mr. Fowler's firm.  The remainder of the

commissions for each of the 13 of Mr. Fowler's customers at issue in trial were shared 50/50 by Mr.

Fowler, and his partner, Mr. Dean.  *Id.* 614:22-24.

For the 13 customers at issue in the trial, the aggregate commissions charged by J.D. Nicolas

between 2011 and 2014 were as shown in the following table.  Tenreiro Decl. Ex. D (PX-1G).  Of

these sums, Mr. Fowler personally received 40% of the commissions generated.  The SEC seeks

disgorgement of those amounts.

| Account Name | Aggregate Commissions | Fowler's Take |
|---|---|---|
| Kenneth J. Bayer | $13,537 | $5,414.80 |
| Lane Clizbe | $9,445 | $3,778.00 |
| Louis A. Dellorfano | $23,292 | $9,316.80 |
| G. Allen Deuschle | $20,993 | $8,397.20 |

| | | |
|---|---|---|
| Steve B. DiMercurio | $24,912 | $9,964.80 |
| Jeffrey Funk | $16,097 | $6,438.80 |
| Bob Krueger | $8,493 | $8,4930 |
| Clay B. Miller | $20,437 | $8,174.80 |
| Al Riedstra | $13,870 | $5,548.00 |
| Peter Skrna | $13,097 | $5,238.80 |
| Robert & Glenna Weathers | $33,805 | $13,522.00 |
| Gary J. Wendorff | $27,755 | $11,102.00 |
| Donald Womeldorph Jr. | $35,735 | $14,294.00 |
| Total | $261,466 | $104,568.40 |

In addition, Mr. Fowler received half of the "postage fees" charged to his customers; the other half was paid to his partner, Mr. Dean.  Tenreiro Decl. Ex. I (PX-234), at 9.  In the aggregate, the 13 customers at issue during the trial paid $54,996 in postage fees, of which Mr. Fowler received $27,498.  PX-1G.

The SEC also presented evidence regarding the commissions paid by a number of Mr. Dean's customers during the same period.  Those commissions summed up to $508,672 across the period.  *Id.*  The evidence presented at trial supports the conclusion that 40% of Mr. Dean's customer's commissions (totaling approximately $203,469) were shared with Mr. Fowler.  Mr. Dean's customers also paid a substantial amount of "postage fees" that were split with Mr. Fowler.  The SEC requests that the Court order disgorgement of those amounts by Mr. Fowler as well.

## II.    ANALYSIS

### A. Disgorgement

### 1.   Legal Standard[2]

"Once the district court has found federal securities law violations, it has broad equitable

power to fashion appropriate remedies, including ordering that culpable defendants disgorge their

profits." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quotation omitted). Disgorgement

"consists of factfinding by a district court to determine the amount of money acquired through

wrongdoing . . . and an order compelling the wrongdoer to pay that amount plus interest to the

court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). Unlike other remedies, disgorgement is

not designed to compensate victims or to punish wrongdoers, *id.* at 116 n. 25, 117, but is instead

meant to deter wrongdoing by "forcing a defendant to give up the amount he was unjustly

enriched," *id.* at 117 (quotation omitted).

To determine the amount of money acquired through wrongdoing, courts apply a two-part

burden shifting framework. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011); *see

also SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). First, the agency seeking disgorgement must

"show that its calculations reasonably approximate[] the amount of the defendants' unjust gains."

*Bronson Partners*, 654 F.3d at 368 (brackets and quotation omitted). Once the agency has met that

burden, "defendants [can attempt] to show that [the agency's] figures [are] inaccurate," *id.* (quotation

omitted), or that some of the gains were not the result of wrongdoing, *Razmilovic*, 738 F.3d at 31. A

defendant's burden is high, however. If the agency has made a reasonable approximation, "the risk

of uncertainty falls on the wrongdoer whose illegal conduct created the uncertainty." *Bronson

Partners*, 654 F.3d at 368 (quotation omitted); *see also Razmilovic*, 738 F.3d at 31 (holding that the risk

---

[2] The legal analysis in this and subsequent sections of this opinion is drawn with appreciation from the accurate description of the applicable legal principles in *S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05 CIV. 5231 RJS, 2014 WL 2112032 (S.D.N.Y. May 6, 2014) (Sullivan, J.), *aff'd sub nom. S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016).

of uncertainty falls on the wrongdoer as long as the agency's "measure of disgorgement is reasonable").

In making the disgorgement calculation, the proper focus is revenues, not profits. *See Bronson Partners*, 654 F.3d at 375 ("[W]here the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the larger sum."). Defendants "are not entitled to deduct costs associated with committing their illegal acts." *Id.* (quotation omitted). Nevertheless, courts should deduct any money that a defendant returns or has returned to her or his victims. *See id.* at 369; *cf. SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (approving a district court's decision to credit defendants for money they had already paid to victims as part of a private settlement). Defendants are "only required to give back the proceeds of [their] securities fraud once." *SEC v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998) (quotation omitted).

As part of the disgorgement judgment, a court may order a defendant to pay prejudgment interest to "prevent[ the] defendant from obtaining the benefit of what amounts to an interest free loan." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see also SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (noting that prejudgment interest is designed to take account of "inflation and the power of money to earn an economic return"). A district court has discretion both in deciding whether to require prejudgment interest and in setting the appropriate interest rate. *See First Jersey Secs.*, 101 F.3d at 1476. "The personal wrongdoing of a defendant should be considered in determining that an award of interest is in accord with doctrines of fundamental fairness. In the context of Section 10(b) and Rule 10b–5 actions, proof of scienter is sufficient to justify an award of prejudgment interest." *S.E.C. v. Musella*, 748 F. Supp. 1028, 1042–43 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990) (citations omitted).

## 2.    Application

The SEC argues that Mr. Fowler should disgorge the full amount of the commissions and

"postage fees" that he received from the 13 clients who were the subject of the trial. The SEC also asks that the Court order disgorgement of his portions of commissions on Mr. Dean's accounts. The Court takes up the question of whether the SEC has satisfied its burden to show the amount of Mr. Fowler's gains with respect to each of these two categories in turn.

The SEC has clearly met its burden to prove the amount of the commissions and "postage fees" extracted by Mr. Fowler from his 13 customers. The SEC presented evidence at trial regarding each of the 13 accounts, including the trading history in each of the accounts and the commissions and "postage fees" paid. The jury found that Mr. Fowler's strategy with respect to each of the accounts was unsuitable. Of those commission amounts, however, Mr. Fowler personally received only 40% of the total because a 20% fee was first paid to J.D. Nicolas, and he shared the remaining 80% with his partner, Mr. Dean. Therefore, the Court concludes that Mr. Fowler was unjustly enriched by $104,568.40 in commissions as a result of his fraud on his 13 customers. He also received $27,498 in "postage fees" from those clients. Mr. Fowler has presented no argument to rebut the SEC's proof with respect to these amounts. Consequently, the Court will order disgorgement in the amount of $132,076.40. Because Mr. Fowler acted with scienter, an award of prejudgment interest is warranted. The Court will apply prejudgment interest at the underpayment rate established for the Internal Revenue Service pursuant to 26 U.S.C. § 6621.

The Court concludes that the SEC has not met its burden with respect to Mr. Dean's customers who were not the subject of the trial. It is worthwhile to flash back to the procedural history of the case. On the morning of the trial, the SEC was planning to present a case against both Mr. Fowler and Mr. Dean. When Mr. Dean settled with the SEC, the SEC culled its case and limited the direct evidence of fraud to the 13 customers who were principally serviced by Mr. Fowler. As a result, there was relatively little evidence presented regarding the management of Mr. Dean's accounts. The trial included evidence of the aggregate losses in Mr. Dean's accounts, and the

costs associated with them.  But the SEC, understandably, did not focus its proof at trial on the management of those accounts.

Instead, as evidence of fraudulent conduct with respect to those accounts, the SEC asks the Court to rely on the admission provided by Mr. Dean in connection with the consent order of judgment entered against him.  In it, as noted above, Mr. Dean admitted that he "from 2011 through 2014:  (a) knowingly or recklessly made trade recommendations to customers with no reasonable basis; (b) made material misrepresentations and omissions to customers; and (c) engaged in unauthorized trading in customer accounts."  Dkt No. 159-1, at 7.  And he agreed, as part of the judgment to pay "$253,881.98, representing profits gained as a result of the conduct alleged in the Complaint . . . ." *Id.* at 3.

On this record, the Court declines to infer that the commissions on Mr. Dean's accounts were necessarily the product of fraud.  The language of Mr. Dean's admission does not tie to the specific accounts to which the SEC now points.  Without more detail to link each account to Mr. Dean's admitted misconduct, the Court is left to take an inferential leap to conclude that the accounts identified by the SEC were the affected ones.[3]

The Court is also conscientious of the fact that the information that links Mr. Dean's accounts to fraudulent conduct was not presented at trial, and that Mr. Fowler did not have the opportunity to challenge it as evidence of an obligation on his part to pay any amount as disgorgement.  While both Mr. Dean and Mr. Fowler were represented by the same lawyer, the Court is mindful that, ultimately, these were admissions of Mr. Dean only.  Therefore, the Court will not order that Mr. Fowler disgorge the amount of commissions that he received from Mr. Dean's customers' accounts.

---

[3] This is a gap that the SEC might readily have filled with a more detailed set of admissions from Mr. Dean.

### B. Civil Penalties

#### 1.    Legal Standard

In addition to disgorgement, federal statutes authorize three increasing tiers of civil fines for violations of the securities laws.  *See* 15 U.S.C. §§ 77t(d)(2) (Securities Act), 78u(d)(3)(B) (Exchange Act), 80b9(e)(2)(IAA).  For any violation, a court may impose Tier I penalties-fines of up to the higher of (1) $5,000 for each violation by a natural person or $50,000 for each violation by "any other person," such as a corporation; or (2) the defendant's "gross amount of pecuniary gain."  *See* 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), 80b9(e)(2)(A).  If a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," a court may instead impose Tier II penalties—fines of up to the higher of (1) $50,000 for each violation by a natural person or $250,000 for each violation by "any other person"; or (2) the defendant's "gross amount of pecuniary gain."  15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3) (B)(ii), 80b–9(e)(2)(B).  If a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may instead impose Tier III penalties—fines of up to the higher of (1) $100,000 for each violation by a natural person or $500,000 for each violation by "any other person"; or (2) the defendant's "gross amount of pecuniary gain."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B) (iii), 80b–9(e)(2)(C).[4]

A defendant's gross amount of pecuniary gain is similar to that defendant's disgorgement amount, but with three differences.  First, gross pecuniary gain, unlike disgorgement, may consider gains only from frauds occurring within the five-year statute of limitations for civil penalties.  *See Gabelli v. SEC*, 568 U.S. 442, 447-448 (2013) (interpreting 28 U.S.C. § 2462).  Second, because the

---

[4] The amount of these statutory penalties are adjusted by the SEC by regulation.  *See* 17 C.F.R. § 201.1001.  For the period from March 4, 2009 to March 5, 2013, which embraces most of the period at issue here, the maximum Tier III penalty was $150,000 for each violation by a natural person.  *Id.*  The maximum penalty was $160,000 thereafter.  *Id.*

civil penalties statutes focus on the gross amount of pecuniary gain—as opposed to disgorgement, which is focused on simple gains—defendants are not entitled to deduct money returned to victims. Otherwise, a defendant who paid back all gains before judgment could practically nullify the statutory penalty. Third, disgorgement can be awarded jointly and severally, but civil penalties cannot. *See S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287-88 (2d Cir. 2013). Nevertheless, where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations. *See SEC v. Great Am. Techs., Inc.*, No. 07 Civ. 10694 (DC), 2010 WL 1416121, at *2 (S.D.N.Y. Apr. 8, 2010) (in a case where a corporate defendant gained $2.3 million and an individual defendant personally diverted $1 million of that sum, fining the individual defendant based on the full $2.3 million gain), *aff'd sub nom. SEC v. Setteducat*e, 419 F. App'x 23 (2d Cir. 2011). Hence, there may be some overlap among defendants' gains, and the gains attributed to each defendant may add up to over one hundred percent of total gains.

"Beyond setting maximum penalties, the statutes leave the actual amount of the penalty . . . up to the discretion of the district court." *Razmilovic*, 738 F.3d at 38 (quotation omitted); *see also* 15 U.S.C. §§ 77t(d)(2)(A) ("The amount of the penalty shall be determined by the court in light of the facts and circumstances."), 78u(d)(3)(B)(i) (same), 80b–9(e)(2)(A) (same). "In exercising this discretion, courts weigh (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014) (quotation omitted).

The penalty provisions of the relevant securities laws do not define "violation," 15 U.S.C. §§

77t(d), 78u(d)(3), 80b–9(e).  As a result, courts have determined the number of violations using a variety of methods.  *See In re Reserve Fund Secs. and Derivative Litig.*, Nos. 09 MD 2011, 09 Civ. 4346 (PGG), 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013).  For example, a court can look to the number of investors defrauded or the number of fraudulent transactions to determine the number of violations.  *Id.* (*citing Pentagon Capital Mgmt. PLC*, 725 F.3d at 288 n.7) (approving district court's methodology of counting each trade as a separate violation); *SEC v. Elliot*, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at * 11 (S.D.N.Y. June 12, 2012) (counting each transaction as a separate violation); *SEC v. Glantz*, No. 94 Civ. 5737(LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (assessing one violation for each victim); *SEC v. Milan Capital Grp., Inc.*, No. 00 Civ. 108 (DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (same); *SEC v. Kenton Capital Ltd.*, 69 F.Supp.2d 1, 17 n.15 (D.D.C. 1998) (same)).  In the alternative, a court may consider the number of statutes that each defendant violated, or whether the violations were all part of a single scheme.  *Id.* (*citing SEC v. Shehyn*, No. 04 Civ. 2003 (LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (assessing penalty for each statute violated); *SEC v. Johnson*, No. 03 Civ. 177(JFK), 2006 WL 2053379, at *10 (S.D.N.Y. July 24, 2006) (assessing penalty for each statutory violation found by jury); *SEC v. Rabinovich & Assocs., LP*, No. 07 Civ. 10547(GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (finding one violation where defendant's conduct was part of "single scheme or plan")).

### 2.    Application

Tier III penalties are clearly appropriate for Mr. Fowler.  The jury found him liable of several counts of securities fraud.  As a result, there is no doubt that his conduct "involved fraud."  His conduct was egregious.  Many of Mr. Fowler's clients were relatively unsophisticated.  And the Court believes that the evidence at trial established that Mr. Fowler took advantage of the relative lack of sophistication of some of his clients to bilk them.  As described above, and as found by the jury, the strategy employed by Mr. Fowler was unsuitable for anyone.  Mr. Fowler disregarded the

outrageously high cost-to-equity and turnover ratios of his customers' accounts, which exceeded his firm's guidance for risk-seeking customers by many multiples. And he traded in 12 of their accounts without authorization.

Mr. Fowler was found by the jury to have acted with scienter. And as described above, he was aware that customers had complained about his investment strategy. In response to those known complaints, Mr. Fowler chose to do nothing to change his strategy. Mr. Fowler's conduct resulted in substantial losses in his customers' accounts—thousands of dollars that some could ill afford to lose. And his conduct was recurrent—he applied the strategy again and again to the 13 customers at issue in the trial. The Court acknowledges that the 13 customers at issue were a fraction of his 400 accounts over the relevant period. But the number of affected customers was substantial, and the evidence revealed a repeated pattern of misconduct by Mr. Fowler. Mr. Fowler has presented no evidence or argument regarding his inability to pay a penalty assessed by the Court.

The Court will impose a third-tier penalty on Mr. Fowler of $150,000 with respect to each of the 13 customers whose accounts were the focus of the trial. While Mr. Fowler implemented the same unsuitable strategy for each of the 13 accounts, the Court does not believe that penalties should be assessed as if this was a single scheme. It was not, for example, a scheme derived from a single offering. *See e.g., SEC v. Riel*, 282 F. Supp. 3d 499, 529 (N.D.N.Y. 2017); *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 370-71 (D.R.I. 2011). Instead, as Mr. Fowler argued throughout the trial, he approached each of his customers individually. The 13 customers at issue in his trial were only a subset of his entire customer base. Mr. Fowler selected his victims for this conduct individually; therefore, treating his treatment of each of his defrauded customers as a separate violation best effectuates the purposes of the statute. While the Court has the authority to impose penalties for each of the trades in those customers' accounts, the Court declines to do so for two reasons: first, because each set of trades within a given defrauded customer's account could be

considered to be part of a single scheme to defraud that individual; and, second simply because the resulting award would be so substantial that the Court does not believe that Mr. Fowler would reasonably be capable of satisfying the award.  Therefore, the Court will impose a third-tier penalty of $150,000 for each of Mr. Fowler's 13 victims—for a total of $1,950,000.

### C.  Permanent Injunction

#### 1.    Legal Standard

The SEC may seek permanent injunctive relief for violations of the Securities Act, and the Exchange Act.  *See* 15 U.S.C. §§ 77t(b) (Securities Act); 78u(d)(l) (Exchange Act).  To obtain such relief, "[t]he SEC must demonstrate that there is a substantial likelihood of future violations of illegal securities conduct."  *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *see also SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)), *rev'd on other grounds sub nom. Gabelli v. SEC*, 582 U.S. 442 (2013) (requiring a showing of a "reasonable likelihood that the wrong will be repeated."); *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019) ("Unless the agency shows a real threat of future harm, 'there is in fact no lawful purpose to be served' by a preventive injunction." (quoting *SEC v. Torr*, 87 F.2d 446, 450 (2d Cir. 1937)).

To evaluate whether there is a substantial likelihood of future violations of the securities laws, courts look to the following factors:  (1) the fact that a defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether the defendant might be in a position where future violations could be anticipated.  *Cavanagh*, 155 F.3d at 135 (citation omitted).  Ultimately, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts.  Accordingly, the adverse effect of an injunction upon

defendants is a factor to be considered by the district court in exercising its discretion." *Manor Nursing Centers, Inc.*, 458 F.2d at 1102.

2. **Application**

The entry of a permanent injunction against Mr. Fowler is warranted here.  As described above, Mr. Fowler was found liable for securities fraud with respect to 13 of his customers' accounts.  He made unauthorized trades in 12 of those customers' accounts.  Mr. Fowler acted with a high degree of scienter.  The jury found that he engaged in that misconduct with scienter.  Mr. Fowler testified that he was aware of the FINRA's suitability rules, but he implemented a trading strategy that flagrantly violated them.  He did so despite the fact that he had received complaints from other customers regarding the suitability of his strategies, and was placed on special supervision as a result.  Those complaints put Mr. Fowler on notice regarding the potential impropriety of his conduct, yet he engaged in the conduct charged in this case.

Mr. Fowler's offenses here were not isolated.  He was proven to have engaged in this course of misconduct with 13 clients over the course of three years.  And, as just noted, the evidence of prior complaints involving Mr. Fowler suggests that he may have engaged in similar practices with other customers not examined during the course of this trial.

Mr. Fowler continues to assert that his conduct was blameless.  Mr. Fowler had every right to defend himself vigorously in this case and the Court does not hold the fact that he did so against him in any way.  However, Mr. Fowler's testimony regarding his views on investments generally, and the propriety of his conduct show him to present a substantial risk of future injury to his customers.  As described above, Mr. Fowler discredited standard industry metrics designed to measure the risk of his strategies.  Mr. Fowler did not analyze the performance of his recommended strategies, or even, according to his testimony, conduct financial analysis of his recommended trades.  Mr. Fowler's professed disdain of commonplace financial metrics suggests that he presents a continuing

risk to customers.

So too does Mr. Fowler's apparent lack of interest in learning from past mistakes. Confronted with customer complaints regarding the unsuitability of his trading strategy, Mr. Fowler did nothing to reconsider his strategy. Instead, he belittled the complaints as "kitchen sink" and blustered forward with his approach, disregarding client feedback, and, in the case of these 13 customers, the clear data showing that his strategies were unsuitable to any investor. No one excerpt from the trial testimony can capture what the Court observed over the course of Mr. Fowler's days of testimony: he presented himself disdainful of his customers' concerns, and unjustifiably satisfied with his performance in the face of concrete evidence of his malfeasance and data showing the terrible investment returns for all the 13 clients examined at trial. Mr. Fowler's overconfidence may make him a good salesman, but it also makes him a danger to future customers.

Mr. Fowler continues to work in the securities industry. He has worked in the industry since he left college, so the likelihood that he will be in a position to commit further violations is very high.

All of the factors laid out in *Cavanagh* weigh heavily in favor of the entry of a permanent injunction against Mr. Fowler. Mr. Fowler argues that an injunction is not warranted because of the long delay between the commission of his misconduct and the trial. He argues that the SEC's failure to pursue an injunction earlier supports the conclusion that no injunction is necessary. He also points to the absence of evidence of similar misconduct by Mr. Fowler in the period after 2014. The Court appreciates the argument that the SEC might have taken more prompt action to protect Mr. Fowler's customers from similar misconduct. But ultimately, it is the Court, not the SEC, that must determine whether the entry of an injunction is warranted. The SEC's delay in seeking an injunction does not bear significant weight in the Court's analysis given the substantial evidence supporting the need for entry of injunctive relief against Mr. Fowler.

The Court has considered Mr. Fowler's argument that the events at issue in the trial are now dated. However, the evidence of the events proven at trial amply support the Court's conclusion that an injunction is warranted. The Court has little assurance that Mr. Fowler's conduct has changed in the intervening years: to the Court's knowledge, the SEC did not examine those years. The Court is hesitant to rely on the word of Mr. Fowler, given the jury's conclusion that, contrary to his sworn testimony, he engaged in unauthorized trades. Moreover, Mr. Fowler's testimony at trial in 2019 reflected his continued belief in the propriety of his abusive investment strategies and his disregard for financial metrics commonly used to measure the risk of investment strategies. Mr. Fowler's testimony dates from 2019, not 2014, and supports the Court's conclusion that injunctive relief remains necessary here.

The Court is very mindful of the potential impact of this type of injunctive relief on Mr. Fowler and the stigma that it places on him in the industry. The Court has weighed that harm. But ultimately, "the public interest, when in conflict with private interest, is paramount." *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959). The Court finds that Mr. Fowler presents a continuing substantial risk of future securities violations, and will enter an injunction requiring him to fully comply with those laws in the future.

## III.  conclusion

For the reasons stated above, the SEC's motion is GRANTED. Mr. Fowler is ordered to disgorge $132,076.40, plus prejudgment interest at the underpayment rate established for the Internal Revenue Service pursuant to 26 U.S.C. § 6621. Mr. Fowler is further ordered to pay civil penalties in the amount of $1,950,000. The Court will also permanently enjoin Mr. Fowler from further violations of the securities laws.

The SEC is directed to submit an appropriate proposed permanent injunction and form of judgment within 14 days of the entry of this Memorandum Opinion and Order. The SEC is also

directed to submit to the Court a letter by the same date, setting forth its calculation of prejudgment interest, attaching an Excel spreadsheet to show its calculations.  The spreadsheet should also be submitted in native format to the Court's chambers email account, copying counsel for the defendant.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 189.

SO ORDERED.

Dated:  February 25, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge